1               UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
2                 NASHVILLE DIVISION

3   UNITED STATES OF AMERICA     )
                        )
4   VS                    )   No. 3:20-mj-2336
                        )
5   CALEB JORDAN          )
   _____
6

7       BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

8               MAGISTRATE JUDGE

9       **TRANSCRIPT OF ELECTRONIC RECORDING**

10           (via video conference)

11         April 23, 2020 – **(REDACTED)**

12   _____

13   <u>APPEARANCES:</u>

14   For the Government:    CARRIE DAUGHTREY
                      U.S. Attorney's Office
15                     110 Ninth Ave S., Suite A961
                     Nashville, TN 37203
16

17   For the Defendant:     ANDREW BRANDON
                      Federal Public Defender's
18                      Office
                     810 Broadway, Suite 200
19                     Nashville, TN 37203

20

   _____
21   PREPARED FROM **ELECTRONIC RECORDING** BY:

22   **Roxann Harkins, RPR, CRR**
   Official Court Reporter
23   801 Broadway, Suite A837
   Nashville, TN 37203
24   615.403.8314.
   roxann_harkins@tnmd.uscourts.gov
25

# I N D E X

Government witness

**JONATHAN HENDRIX**

Direct Examination By Ms. Daughtrey .................9
Cross-Examination By Mr. Brandon ...................24
Redirect Examination By Ms. Daughtrey .............42

# E X H I B I T S

Government No. 1....Instagram Chat excerpt ........14
Government No. 2....Website excerpt ...............21

1

2          The above-styled cause came to be heard

3    on April 23, 2020, before the Hon. Jeffery S.

4    Frensley, Magistrate Judge, when the following

5    proceedings were had to-wit:

6              **TRANSCRIPT OF ELECTRONIC RECORDING**

7                          **\*\*\***

8

9          THE COURT:  Good afternoon.  Welcome,

10   everyone.  We're here this afternoon in the matter of

11   the *United States of America versus Caleb D. Jordan*.

12   It's Case No. 20-mj-2336.  And we are here today by

13   video conference.

14         Mr. Jordan is present on the video

15   conference, along with Mr. Brandon.  And I see

16   Mr. Hendrix.  We also have Ms. Santos from the

17   pretrial services office.  I do not see Ms. Daughtrey.

18   Is she on?

19         MR. BRANDON:  Your Honor, she was here

20   earlier and I think must have dropped off

21   accidentally.  I would also note that it appears we've

22   got -- some echo is coming from the marshals that we

23   may be able to ask them to do something about.

24         THE COURT:  Yeah.

25         MS. DAUGHTREY:  I am on.  Can you hear

1  me?

2           THE COURT:  Yes, I can hear you.

3           MS. DAUGHTREY:  I am on here.  I don't

4  know why my video's not working.

5           THE COURT:  All right.  Well, okay,

6  that's fine.  I guess one option you can do is you can

7  refresh, if you want to, Ms. Daughtrey.  That might

8  address the issue.  We'll go ahead.

9           So, Mr. Brandon, we had set this matter

10 today for a preliminary hearing and detention hearing.

11 Have you had an opportunity to speak with Mr. Jordan

12 in advance of this hearing?

13          MR. BRANDON:  Yes, sir, I have.

14          THE COURT:  Okay.  And did you talk with

15 him about proceeding by video conference today?

16          MR. BRANDON:  Yes, Your Honor.

17          THE COURT:  All right.  Very good.  And

18 do you have any objection to proceeding by video

19 conference, Mr. Brandon?

20          MR. BRANDON:  I don't, Your Honor.

21          THE COURT:  All right.  Mr. Jordan, for

22 purposes of the record, you've heard Mr. Brandon

23 indicate that he's talked with you about proceeding by

24 video conference today.  I just want to confirm that

25 you consent to proceeding by video conference today.

1     Is that correct, sir?

2                    THE DEFENDANT:  Yes, Your Honor.

3                    THE COURT:  All right, thank you, sir.

4                    So the Court's in receipt of the Pretrial

5     Services Report, which I've reviewed.  I assume that

6     you each have a copy of it and you can keep your copy

7     of the report at the completion of this proceeding.

8                    Mr. Brandon, how are we going to proceed

9     today?

10                   MR. BRANDON:  I'm sorry, was that a

11    question directed at me?

12                   THE COURT:  Yes.

13                   MR. BRANDON:  Yes, Your Honor.  Today we

14    intend to waive and reserve our right to a detention

15    hearing, but proceed with the preliminary hearing.

16                   THE COURT:  Okay, very good.  Thank you.

17                   I'm wondering, is there anybody in the

18    marshals lockup with you, Mr. Jordan?  Mr. Jordan, can

19    you hear me?

20                   THE DEFENDANT:  Yes.  Yes, Your Honor.

21                   THE COURT:  I'm wondering if somebody in

22    the lockup could just mute your microphone so we won't

23    get this feedback.  And if at some point in time you

24    need to say something, just, you know, wave to us or

25    something and we'll be looking out for that, but we're

```
 1    getting a lot of feedback and it appears to be coming
 2    from the marshals area.  Is there some way maybe you
 3    can ask them if they could mute the microphone on
 4    your -- on your computer?
 5              MR. HENDRIX:  Your Honor, if you want me
 6    to, I can try to call -- I can try to call control on
 7    my cell phone and have somebody go in there.
 8              THE COURT:  Okay.
 9              MR. HENDRIX:  Give me just one second.
10    Let me see if I can get them because I don't think
11    they're in processing where he's at and can hear you.
12              THE COURT:  Okay.
13              MR. HENDRIX:  Give me one second.
14              THE COURT:  Thank you.  It will make it a
15    little bit better for everybody to be able to hear
16    what's going on.  Mr. Jordan, you'll still be able to
17    hear everything.  We just won't get the feedback
18    that's coming out of the cell area there.
19              Okay.  My courtroom deputy just indicated
20    she's called already and they're going to go in and
21    take care of it.  Thank you, Mr. Hendrix.
22              MS. DAUGHTREY:  Can you-all see me at
23    this point?
24              THE COURT:  Yes.
25              MS. DAUGHTREY:  Okay.
```

1                    (Pause in proceedings.)

2                    MR. BRANDON:  Your Honor, I just wanted

3     to notify the Court that I had my investigator,

4     Richard Moore, in the office here with me as well.  If

5     he pops up on the screen (indiscernible).

6                    THE COURT:  Okay, that's very good.

7     Thank you, Mr. Brandon.  That's fine.

8                    MS. DAUGHTREY:  Judge, I was just playing

9     around in here, and I was able to actually mute the

10    defendant.  So apparently that's an option that any of

11    us can do.

12                   THE COURT:  I want to make sure.

13    Sometimes that causes difficulty with him hearing.

14    Mr. Jordan, can you hear still us?  Can you hear us,

15    Mr. Jordan?  Give us a thumbs up if you can.  Okay.

16    It looks like we're good now.  I'm not hearing any

17    feedback.  Is anybody else having an issue?  Okay.

18                   MS. DAUGHTREY:  No.

19                   THE COURT:  Thank you to the marshals for

20    assisting us with that.  And Mr. Jordan, you can still

21    hear everything; correct?  If you'd give me a thumbs

22    up, if you can.  All right, very good.

23                   All right.  Then, Ms. Daughtrey, you

24    heard Mr. Brandon indicate that he's going to waive

25    and reserve on detention and go forward with the

```
1   preliminary hearing.  So are you prepared to go
2   forward at this time?
3               MS. DAUGHTREY:  Yes, I am, Your Honor.
4               THE COURT:  Just --
5               MS. DAUGHTREY:  And I would like to
6   call --
7               THE COURT:  I'm sorry, I just wanted
8   to --
9               MS. DAUGHTREY:  Go ahead.
10              THE COURT:  We did receive a couple of
11  exhibits.  I wanted to make sure Mr. Brandon's
12  received those as well.
13              MR. BRANDON:  Your Honor, I received two
14  exhibits, what I understand to be two exhibits.
15              THE COURT:  Okay, very good.  Okay, then
16  you can go ahead.
17              MS. DAUGHTREY:  Okay.  I'd like to call
18  HSI Special Agent Jonathan Hendrix.
19              THE COURT:  All right.  Agent Hendrix,
20  you're on the video conference already.  We need to
21  swear you.
22                      JONATHAN HENDRIX
23  called as a witness, after having been first duly
24  sworn, testified as follows.
25              THE COURT:  Very good.
```

1                    **DIRECT EXAMINATION**

2     BY MS. DAUGHTREY:

3          Q.    All right.  Could you state your name for

4     the record and spell your last name?

5          A.    Yes, ma'am.  My full name is Jonathan

6     Andrew Hendrix, H-e-n-d-r-i-x.  I am employed as a

7     special agent with the United States Department of

8     Homeland Security in Nashville, Tennessee, and have

9     been so for about 18 years.

10         Q.    Thank you.  And you are the lead agent

11    locally; is that correct?

12         A.    Yes, ma'am, that's correct.

13         Q.    Okay.  Have you read the affidavit in

14    support of the arrest warrant?

15         A.    Yes, ma'am, that's correct.

16         Q.    Is everything in that affidavit true and

17    correct to the best of your knowledge?

18         A.    To my knowledge, yes, ma'am.

19         Q.    Okay.  And you've been involved in this

20    investigation from the beginning when it -- when it

21    hit Nashville, at least?

22         A.    That's correct, once -- once our office

23    received it, that's correct.

24         Q.    Okay.  All right.  So I wanted to, in

25    addition to the affidavit, to ask if you-all have been

1    able to further the investigation since the arrest?

2         A.    We have -- we have somewhat.  During a

3    search warrant that was executed, we seized numerous

4    items of -- numerous electronic items, and that's

5    going to take some time to -- to examine.

6         Q.    Okay.  And what makes you say that?  Have

7    you begun the (indiscernible)?

8         A.    We have.  We've begun the examination

9    process.  There were several items, I think somewhere

10   around 20 items that were taken, electronic devices or

11   items.  The ones that we have been able to, to date,

12   to be able to go through are thumb drives that were

13   taken from the residence of the defendant, as well as

14   the defendant's cell phone.  He was arrested in

15   possession of a -- I think it was an iPhone XR.

16              And originally it was -- it was not -- it

17   was locked, but (indiscernible) software has now been

18   able to get into the device.  So we were able to parse

19   that out.  But that one device had 88,000 files on it,

20   so it will take several days to -- to figure out what

21   was even on that one device.  The thumb drives

22   themselves had around 20,000 files on them.  And other

23   items we haven't been able to --

24        Q.    Okay.  So over a hundred thousand files

25   on these thumb drives and phone?

1          A.     Yes, ma'am, that's correct.

2          Q.     Okay.  And these items that you're

3    talking about, where in the home were they seized

4    from?

5          A.     His bedroom.  The only room that we

6    searched in the house, to my knowledge, was his

7    bedroom.  I was not present for the search.

8          Q.     Okay.  And has anybody looked -- begun to

9    look at the files that you've retrieved so far from

10   the thumb drives and the phone?

11         A.     Yes, ma'am.

12         Q.     Okay.  And what -- what is the nature of

13   the files -- of those files?

14         A.     The thumb drives that were discovered in

15   the -- in the defendant's bedroom contained large

16   amounts of child exploitation material, child

17   pornography.  I think total to date, not all of it has

18   been -- it will take us a while to actually examine

19   all of them, but we have a program called Griffi

20   (phonetic) that we use that looks for images and

21   videos.  And of those images and videos off of these

22   devices, as of right now, as we stand, there were 4300

23   images and videos of child pornography identified on

24   those drives and the cell phone combined, but we're

25   only about 25 percent through those items.

1          So I don't know -- I can only tell you

2    that's what I have now.  I can't -- I can't guess to

3    what we will have.  I don't know.

4          Q.    Okay.  And in the affidavit for the

5    arrest warrant, there was some chats that were

6    between -- between -- I'm trying to -- sorry.  Between

7    who you believed to be the defendant and -- and the

8    (indiscernible); is that correct?

9          A.    Victims' Instagram chats, yes, ma'am,

10   that's correct.

11         Q.    Instagram chats, I'm sorry, yes.  Do you

12   know which particular chat that I'm referring to from

13   the -- from the affidavit?

14         A.    Yes, ma'am.

15         Q.    Okay.  And I would like for you to look

16   at Exhibit 1.  I think you may already have seen it.

17   But if you could turn to that exhibit.

18         A.    I do.  I have it.

19         Q.    Okay.  And what -- what exactly is that

20   exhibit?  What does it represent?

21         A.    I have six pages that is from an

22   Instagram Records Return after the Tennessee Bureau of

23   Investigation executed a search warrant on the

24   Instagram account.  And these are six pages that is

25   from a 68,000-page document returned by Instagram.

1      Q.    And that (indiscernible) is mentioned in

2  the affidavit; correct?

3      A.    Yes, ma'am.

4      Q.    Okay.  And the -- the chats, who are they

5  between?  The significant chats in those pages, who

6  are they between?

7           MR. BRANDON:  Your Honor, I'd just like

8  to lodge a standing objection to hearsay.  I'm pretty

9  sure I know where that objection is going, but just

10  for the record want to lodge that.

11           THE COURT:  All right.  It will be noted.

12  Overruled.  You can continue.

13  BY MS. DAUGHTREY:

14      Q.    Could you tell us the usernames?

15           THE WITNESS:  I didn't hear the Judge.

16           MR. BRANDON:  Yeah, I couldn't hear the

17  Judge either.

18           THE COURT:  Sorry about that.  The

19  objection is noted and overruled.  You can continue.

20  BY MS. DAUGHTREY:

21      Q.    Can you tell us what the usernames were

22  on there?

23      A.    Yes, ma'am.  The usernames on the

24  Instagram chats are fun kid ten underscore YO; YO

25  underscore boi, b-o-i, underscore manny, m-a-n-n-y,

1  underscore.  And then Rick underscore it looks like 0
2  and then O.
3       Q.   Okay.  And those are the individuals that
4  are engaged in the chat; is that correct?
5       A.   This particular chat, yes, ma'am.
6       Q.   Okay.  And what is the nature of -- or I
7  guess first I'd like to ask that that exhibit be
8  entered into evidence as Exhibit 1.
9            THE COURT:  It will be admitted.
10           (Government Exhibit No. 1 was admitted.)
11  BY MS. DAUGHTREY:
12       Q.   So, Agent Hendrix, what is it those pages
13  from the Instagram return represent?
14       A.   They -- they represent a chat between
15  Instagram users that appears to be sexual in nature or
16  attempting to get someone to do something or create
17  something sexual in nature.
18       Q.   And the portions of that particular chat
19  were included in that statement; is that correct?
20       A.   Portions of them, yes, ma'am.
21       Q.   Yeah.  So were you all able to determine
22  who these individuals were that were in the -- in the
23  chat, starting with funkid10_YO?
24       A.   Yes, ma'am.  The three individuals in the
25  chat, funkid10_YO, we believe, is the defendant,

1   Mr. Jordan.  And the other two that I mentioned are
2   victims that we identified in Virginia, the state of
3   Virginia.
4           Q.    Okay.  And are those two brothers, from
5   your understanding?
6           A.    That's correct.  One is 11 and one is 13.
7           Q.    Has anybody spoken with those victims?
8           A.    Yes, ma'am.
9           Q.    Okay.  And were they able to identify an
10  additional victim from the interviews of these two and
11  their families?
12          A.    They were able to identify a neighboring
13  12-year-old boy.
14          Q.    Okay.  And did the -- did the two boys in
15  Virginia that are brothers that are in this discussion
16  here, did they confirm their Instagram names?
17          A.    Yes, ma'am, they did.
18          Q.    Okay.  And did they know who funkid10_YO
19  was?
20          A.    The agents that were able to locate them
21  and interview them stated that funkid10_YO was Caleb
22  Jordan.  Caleb Jordan lived in Tennessee, and that he
23  was adopted.
24          Q.    Okay.  I'm sorry.  Did you say that he
25  lived in Mt. Juliet?

1        A.    Mt. Juliet, Tennessee.  I just said

2    Tennessee, but they did -- they did say Mt. Juliet,

3    Tennessee (indiscernible).

4        Q.    Somehow my sound is off.

5             THE COURT:  Can you hear now?

6    BY MS. DAUGHTREY:

7        Q.    Did they know this individual as Caleb

8    Jordan?

9        A.    Yes, ma'am, they identified a photograph

10   of him and stated that he lives in Tennessee.  I

11   believe they did say Mt. Juliet, Tennessee, and that

12   he was -- he was also adopted.

13             MS. DAUGHTREY:  If I could have just a

14   moment.  I'm having difficulty hearing everybody.

15             THE COURT:  Yeah, that's fine.

16             Mr. Jordan, you're able to hear

17   everything okay, aren't you?  If you are, give me a

18   thumbs up.  All right, thank you, sir.

19             Any luck, Ms. Daughtrey?

20             MS. DAUGHTREY:  I'm getting something on

21   here that said Windows (indiscernible) is not

22   responding.  I'm sorry for the delay.

23             THE COURT:  No, that's okay.

24             Any luck, you hearing anything that I'm

25   saying?

1          MS. DAUGHTREY:  Are you guys able to hear

2     me?

3          THE COURT:  Yeah, we've got you.

4          MS. DAUGHTREY:  I'm going to try to come

5     up on my -- on my home computer, I'm sorry.

6          THE COURT:  Okay.  If you want to -- you

7     could try to refresh.  Are you there?

8          MS. DAUGHTREY:  Yeah, I can hear you.

9          THE COURT:  Oh, great.

10         MS. DAUGHTREY:  Sorry.  I am so sorry

11    about that.

12         THE COURT:  That's fine.

13         MR. BRANDON:  Your Honor, could I just

14    object, I guess, to the form of the question.  I

15    believe it was originally directed about the victim's

16    knowledge, and then I think the answer was about the

17    agent's knowledge.  And I'm just -- I'm not sure who

18    we're talking about at this point.

19         THE COURT:  All right.  The objection's

20    noted.  You want to clarify a little bit,

21    Ms. Daughtrey?

22         MS. DAUGHTREY:  Yeah.  I didn't hear what

23    the response was.

24    BY MS. DAUGHTREY:

25         Q.   Did they inform the agents that they knew

```
 1   that this person that went by funkid10_YO was a person

 2   by the name of Caleb Jordan?

 3              THE COURT:  We're not getting you there,

 4   Mr. Hendrix.

 5              THE WITNESS:  How about now?

 6              THE COURT:  Yes.

 7              THE WITNESS:  Excellent.

 8              Yes, that's correct.  They identified him

 9   through a photograph and also knew him from his

10   Instagram username.  And stated that he lived in

11   Tennessee, I believe they stated Mt. Juliet,

12   Tennessee, and that he had been adopted.  I don't see

13   Ms. Daughtrey, just so you know.

14              MS. DAUGHTREY:  Okay.  I do -- I am here.

15   I'm going to work on getting this set up on my Mac

16   computer.

17              THE COURT:  That's fine.  We can still

18   hear you.  So you can keep going.

19              MS. DAUGHTREY:  Okay.  I will do that.

20   BY MS. DAUGHTREY:

21        Q.    And so I'd like to turn to the second

22   exhibit, Exhibit No. 2.

23        A.    Yes, ma'am.

24        Q.    Can you tell us what -- do you recognize

25   this?
```

1        A.      Yes, ma'am, I do.

2        Q.      And can you tell us what -- what it is?

3        A.      This is a screen capture from the video

4   that was found on the third victim in Virginia's

5   cellular device.

6        Q.      Okay.  And -- go ahead.

7        A.      And it's a -- it came from a video that

8   was recorded and sent to the third victim.  It depicts

9   the two original victims that they found, the two

10  brothers, the two brothers' father has a construction

11  business in that area, and this is the web page for

12  his construction business.  And the person that

13  created this captured his web page and reworded the

14  text on the web page, only the text.  Everything else

15  on his web page looked the same.  And it's -- it's a

16  threat toward the two original victims given to the

17  neighboring -- the neighboring victim.

18       Q.      And what was the reaction of the

19  (indiscernible)?

20       A.      I'm sorry?

21              THE COURT:  I think the question --

22              MS. DAUGHTREY:  Give me just a moment.

23  I'm getting feedback on two different computers.

24  That's better.

25

1    BY MS. DAUGHTREY:

2        Q.    All right.  Let's try this.

3        A.    There you go.

4        Q.    Could you tell us what the response of

5    the boy was that received this?

6        A.    The response of the boy told us that he

7    received this from Caleb and that the three -- the

8    three victims were -- were scared of Caleb.

9        Q.    Okay.  Was this the kind of threat that

10   the boys were receiving from him in order to -- that

11   was the reason why they were continuing to film these

12   videos?

13       A.    Some of that, that's correct.  Would you

14   see that in some of the chats.  We didn't understand

15   what that was.  Some of that we probably still don't

16   understand.  But there were numerous chats where the

17   boys would talk about, don't kill me or don't do

18   something to me.  And (indiscernible) --

19       Q.    Okay.

20       A.    -- images.

21            MS. DAUGHTREY:  Your Honor, at this time

22   I would ask that Exhibit 2 be entered into evidence.

23            THE COURT:  All right.  It will be

24   admitted.

25

1          (Government Exhibit No. 2 was admitted.)

2          MR. BRANDON:  Your Honor, could I just

3  object generally to the foundation of that evidence.

4  All I have is a photograph of what looks like a

5  screenshot and testimony that it was an edited copy of

6  somebody's website but don't have any information

7  backing that up.

8          THE COURT:  Okay.

9          MS. DAUGHTREY:  I can ask a few more

10 questions.

11          THE COURT:  Okay.

12 BY MS. DAUGHTREY:

13     Q.    Where exactly did this screenshot come

14 from?

15     A.    The screenshot came from a video that was

16 captured on victim 3's cell phone.  The video is -- I

17 don't know the length of the video, but it's a -- it's

18 a short video, three or four seconds.  It's as -- it's

19 someone that's holding a cell phone looking at the

20 computer screen, scrolling down the screen.  It makes

21 it look like it's a dark net site.  It says at the top

22 of the screen .tor, referencing the end router or TOR,

23 dark net.

24          And it's changed the text contest --

25 content, I'm sorry, from what the construction company

stated to -- it talks about the first sentence is the
same, founded in 2009, Duran Contracting is a home
company.  We value your needs and wants and are happy
to provide you with children.  My first son ███ and
next, ███, are unique children.  The doctors said to
us they have special organs that we will sell for
2,000 to $5,000.  We charge more if you want to kill
my children.  This is a private site and we ask you to
keep it secret.

It scrolls down through there.  So I
wasn't able to provide you the -- the copy of the
video for this.  I just gave you a copy of the
screenshot of the first portion so you'd know what it
was.

Q.   Okay.  And you indicated that this video
was on the third Virginia victim's computer; is that
correct?

A.   I believe it was his cell phone.

Q.   His cell phone, I'm sorry.  And did he
indicate where he got this information or where he --

A.   He indicated that it came from Caleb
Jordan.

Q.   Okay.  All right.  One of the... One of
the chats in Exhibit 1 that I'm not sure is reflected
in the -- in the statement -- or the affidavit of

1    complaint, refers to -- or is a conversation between

2    fun kid -- funkid10_YO and Rick_0O.  At some point is

3    there mention of any problems that the boys were

4    having with the -- with the video?

5         A.    So what we believe the context is saying

6    is that they weren't creating the videos in the manner

7    that -- that he wanted them to create the videos.  So

8    if they would not create the videos correctly, then he

9    would make them redo the videos in a different --

10   different way or a different position.

11              As the chats run through, you can see

12   that he's talking about if -- if you can't do on it a

13   bed, do it on a chair, hold his head a certain way.

14   Make sure you hear him gag, put it all the way in.

15   You hear these terms being used.  And the boys -- the

16   victims responding to the affirmative.

17        Q.    Okay.  And at some point someone talks

18   about crying; is that correct?

19        A.    That's correct.  The chat talks about

20   what we believe is the youngest victim crying during

21   being sexually assaulted by the older victim.  We

22   found other videos on the thumb drives and other

23   things where there's several -- several victims that

24   appears to be crying (indiscernible).

25              MS. DAUGHTREY:  I believe that's all the

1    questions I have at this time.

2                    THE COURT:  All right.  Mr. Brandon.

3                    MR. BRANDON:  Thank you, Your Honor.

4                    **CROSS-EXAMINATION**

5    BY MR. BRANDON:

6         Q.    I just heard the words several victims

7    crying.  I'm wondering who's -- who -- which victims

8    you're referring to in that instance.

9         A.    The other ones we don't know who they

10   are.

11        Q.    So you're saying there are additional

12   people depicted in the videos between these same

13   names; is that right?

14        A.    No, sir.

15        Q.    Okay.

16        A.    These are other videos that we discovered

17   on electronic devices at his residence.

18        Q.    All right.  Well, let's talk about that.

19   I think you said that there's a cell phone, an iPhone,

20   and then a thumb drive; is that right?

21        A.    There's several thumb drives.

22        Q.    Okay.  This cell phone had some --

23   something like 88,000 files on it?

24        A.    Somewhere in that neighborhood, but I

25   don't know how many of those are images or videos or

1   text documents or -- it's just a lot of files.

2        Q.   Right.  An iPhone -- any iPhone would

3   likely have a lot of files on it; right?

4        A.   As long as it's not brand-new, it should,

5   yeah.

6        Q.   Right, right.  So you don't know how many

7   of those might be pornographic?

8        A.   Not today, no, sir.

9        Q.   And then the thumb drives have some

10  20,000 files that you're aware of?

11        A.   Well, that's for images and videos.  It

12  may have other files that I'm not certain of, but,

13  yeah, around 20,000 total-ish, somewhere in there.

14        Q.   And you said that some of them are child

15  porn -- what you believe to be child pornography;

16  right?

17        A.   That's correct.  So the ones that would

18  fit the definition that I see would be as of right

19  now, a little over 4300 would fit the federal

20  definition for child pornography.  But that's between

21  the thumb drives and the cell phone.  I don't believe

22  the laptops and I know the other gaming devices and

23  other things have not been -- been examined yet to

24  date.

25        So I can't tell you what was on the phone

1    as opposed -- right now today what was on the phone as
2    opposed to what was on the thumb drives.  It
3    doesn't -- as we build stuff into it, it carries all
4    into one case number.  Does that kind of make sense?
5         Q.    Yes, I understand.  And the -- your
6    evaluation that they would meet the federal definition
7    is based on a forensic examination by a computer
8    program; is that right?
9         A.    No, it's based on me visually looking at
10   them.
11        Q.    And, again, I think you had said that
12   there were -- that there were multiple victims in
13   videos you'd seen that were not the two names that
14   we've been discussing; is that right?  ██████████?
15        A.    There are multiple children, which we
16   assume are going to be victims.  We haven't identified
17   them.  And haven't, to date, figured out where that
18   evidence derived from.  We just know it's on the
19   device.
20        Q.    Okay.  And I'm just trying to figure out
21   how -- how you -- am I correct in thinking that you've
22   concluded that those were not just images that were
23   floating out on the -- on the Internet.  They were not
24   premade but, rather, they were made by or for
25   Mr. Jordan?

1    A.    That's correct, that's what we believe.

2    Q.    And --

3    A.    They fit --

4    Q.    Sorry.

5    A.    They fit and they are the same mold and

6    the same characterizations as the other videos that he

7    was doing previous to his 18th birthday and then now.

8    You'll see videos where there's several -- it's

9    predominantly males, young males.  The child

10   pornography runs the gamut from abuse of infant and

11   toddler all the way to adolescent, 12, 13ish years

12   old.

13         But the -- some of the images we see are,

14   like, boys sitting on each other's faces.  Some of

15   them are wearing clothes and then some of them are

16   not.  And then you'll see them progress into then

17   having sexual acts with the -- with each other.

18   Q.    And the boys sitting on each other's

19   faces, that was a -- sort of a theme from the previous

20   prosecution of Mr. Jordan as a juvenile; right?

21   A.    That's what I was -- that's what I was

22   informed of, that's correct.

23   Q.    Okay.  And that was a prosecution or

24   investigation led by the TBI; right?

25   A.    Well, there was -- there were two.

1   Wilson County had one on him at one point and then TBI

2   had an investigation on him at one point.  Both were

3   when he was a juvenile.  And I would be guessing to

4   tell you which -- which one.  I think you're correct

5   at TBI.  I just -- off the top of my head, I just

6   don't remember.

7           Q.    Right.  And the TBI was involved in

8   this -- this arrest and investigation as well; right?

9           A.    His current charges?

10          Q.    Yeah.

11          A.    Yes, sir.  Wilson County, TBI, FBI and

12  HSI.

13          Q.    Okay.  I want to talk a little bit about

14  the additional allegations in -- in your affidavit.

15  And I am correct in thinking that this is your

16  affidavit; is that right?

17          A.    That's correct.

18          Q.    And did you -- did you write it as well

19  as approve of it, sign it?

20          A.    Correct.

21          Q.    Okay.  There are a number of victims

22  referenced -- and I'm just going to go by the name --

23  the labels that you've given them, which were minor

24  victims 1 through -- I forget the last one, but is

25  that all right?

1      A.     That's fine.

2      Q.     Okay.  So there's -- the first one is

3  Minor Victim 1 who is said to be 14 years old; is that

4  right?

5      A.     There's several.  Let me make sure I'm

6  where you're at here.

7      Q.     And I think it's on page --

8      A.     Yeah, that is -- yeah, that was about

9  a -- that was TBI's victim.

10     Q.     Okay.  And when you say TBI's victim,

11 what does -- what does that mean?

12     A.     A victim that TBI had identified.  We

13 have not as HSI.

14     Q.     I see.  But you have included them in the

15 affidavit?

16     A.     Correct, that was information I received

17 from TBI.

18     Q.     Okay.  And TBI informed you that they

19 received an investigative referral from a community

20 member stating Caleb Jordan solicited sex from

21 Minor Victim 1; right?

22     A.     That's correct.

23     Q.     And then on page 4 it sort of follows up

24 on that and said Jordan also requested a blow job from

25 Minor Victim 1 for $800 in return.  You see that?

1    A.    Yes, sir, paragraph 8.

2    Q.    Is that the -- do you assume that that is

3    the incident referred to on page 2 regarding

4    soliciting sex?

5    A.    I think that's correct.  I don't remember

6    the person that TBI told me that -- how they got the

7    lead or the referral.  I just know that it was a

8    person in the community, and I think it was a group of

9    victims, not just -- you know, eight victims that

10    didn't know each other.  From what I remember from

11    FBI, it was a group of victims that all knew each

12    other.

13    Q.    And is it fair to say they were all on

14    the same group chat?

15    A.    I don't know.  I'd have to ask TBI.

16    Q.    Okay, okay.  So your knowledge is

17    somewhat limited about -- about these -- what I call

18    the enumerated victims --

19    A.    Yeah, the ones that -- that's correct.

20    The ones that TBI gave us and talked to us about, we

21    don't have their information or the victims'

22    information.  I don't even have a case file on these

23    people yet.  The ones that I would know the most about

24    would be the ones that are in Virginia.

25    Q.    Okay.  On page 4, this is just about

1   Minor Victim 1, again it says Jordan knew

2   Minor Victim 1 was 14 years old since they have known

3   each other for a long time.  Do you know anything

4   about what that means?

5        A.   No, sir.  From what I -- from what I

6   recall, the TBI told me that they went to school

7   together.  And that -- I can't remember if he told me

8   because they were in the same grade he knew the age at

9   that time or if they were in the same school, he knew

10  the age of the defendant at that time.  I don't

11  recall.

12       Q.   And just to be real clear about this,

13  Mr. Jordan, you understand him to be 19 years old;

14  right?

15       A.   19 and some months as of today.

16       Q.   Right.  And so as of the TBI -- the

17  original earlier TBI investigation, the prosecution

18  would have been when he was maybe, what, 17?

19       A.   It was a juvenile.  Yes, sir, he was a

20  juvenile.

21       Q.   Okay.  And so when -- when these people

22  who are currently 14, they might have known him when

23  he was younger; right?

24       A.   That's correct.  Hang on.  My lights

25  turned off on me because I've been still, so.

1          That's the way I understand it.  I don't

2     know -- you would have to talk to TBI about --

3     specifically about these.  I don't recall that all of

4     the victims were around the same age or if they ran

5     different age -- if there was a gap in their ages.

6     That I just don't know.

7          Q.    Right.  And there are references -- and

8     I'm just going to jump around since obviously your

9     knowledge is a little bit limited here, but there's

10    references, for instance, to Minor Victim 3 having

11    sent a screenshot to Minor Victim 2 of some -- what's

12    alleged to be child pornography.  Did you see that?

13         A.    Is that No. 16?

14         Q.    Let's see.  Yeah, in paragraph 16, for

15    instance.

16         A.    Yes, I see it.

17         Q.    Do you know if there's any investigation

18    into Minor Victim 3, for instance, for transmitting

19    child pornography to Minor Victim 2?

20         A.    Not that I know of at all.

21         Q.    Is it -- do you know -- let me see how to

22    ask this.  Are the screenshots of the kinds of videos

23    that you referred to earlier, like with the people in

24    Virginia?  Do you know what kind of screenshots are

25    being sent?

1    A.    I don't understand your question, I'm
2  sorry.
3    Q.    It says that -- that Minor Victim 3 sent
4  a screenshot to Minor Victim 2 of some pornographic
5  material.
6    A.    Okay.
7    Q.    Do you know what the content of those
8  screenshots were?
9    A.    With the TBI, I do not.
10    Q.    Okay.  And on page 5, for instance, I
11  think it's paragraph 16 again, it says Minor Victim 3
12  stated that he'd known Jordan since the sixth grade.
13  Do you see that?
14    A.    Yes, sir, I do.
15    Q.    Okay.  And so -- so, again, presumably
16  they knew each other when they were both minors;
17  right?
18    A.    That's -- that's my understanding,
19  correct.
20    Q.    And now Mr. Jordan has sort of aged out
21  of being a minor; right?
22    A.    Yes, sir.  He's 19 and four months or
23  something.
24    Q.    Right.  There's -- on page 3, it's
25  referring to Minor Victim 4, and it says

1    Minor Victim 4 received screenshots of a conversation

2    between Jordan and an individual using the name Robert

3    Prowl.  Do you know who Robert Prowl is?

4          A.    We believe Robert Prowl is Mr. Caleb

5    Jordan.

6          Q.    I see.  So you -- you think that that's

7    sort of a fake account or something?

8          A.    I don't necessarily know that it's fake,

9    but I think the name is probably fake.  It comes back

10    to his Vol State college email address.

11          Q.    And then -- and then on page 3 it

12    describes Minor Victim 5 and Minor Victim 6 who appear

13    to be siblings in Pennsylvania?

14          A.    Yes, sir.

15          Q.    And it says that they were -- that they

16    were victims in the previous 2018 investigation

17    involving Jordan when he was a juvenile; is that

18    right?

19          A.    Yes, sir.  Yes, sir.

20          Q.    And it alleges that Mr. Jordan was trying

21    to reach out to minor victim on Facebook and Instagram

22    again; is that right?

23          A.    Yes, sir.

24          Q.    Do you have any understanding that it got

25    farther than that?

1   A.   I don't believe it did.  The TBI agent

2   that handled his juvenile case is still in contact

3   with the mother of these victims.  I do know that.

4   And I believe she was the one that stated that that

5   had occurred.  And she caught that and basically

6   stopped it.

7   Q.   And I guess what I'm asking is to the

8   extent that they are -- that they are alleged to be

9   victims, they were alleged to be victims of the -- of

10  the past juvenile investigation, but that they have --

11  there's no allegation that they have been specifically

12  solicited to send child pornographic material while

13  Mr. Jordan was an adult; is that right?

14  A.   That's correct.  To my knowledge I don't

15  know that any of the TBI victims in the affidavit

16  or -- or the Wilson -- or if Wilson County had any

17  victims that I'm not aware of either.  I don't know

18  that any of those that I can think of right now have

19  had conversations -- not to my knowledge, while he was

20  an adult.  I think my intent on showing this to the

21  Court was to just show his previous -- previous

22  history of -- of the defendant.

23  Q.   I understand.  On page 6 it discusses Kid

24  Crazy and Application A?

25  A.   Yes, sir.

1       Q.      Can you explain what Application A is?

2       A.      Application A is a foreign-based chat

3   service.

4       Q.      And your assumption is -- the assumption

5   here is that Mr. Jordan is Kid Crazy?

6       A.      Yes, sir.

7       Q.      Okay.  And so the allegation is that --

8   is that Mr. Jordan is using this foreign-based chat

9   service to solicit things?

10      A.      To sell child pornography.

11      Q.      Okay.  So on page 6 it states that Kid

12  Crazy was claiming to be producing videos of himself

13  sexually assaulting who he claimed was his younger

14  brother.  Do you see that?

15      A.      That's correct.  Yes, sir.

16      Q.      Do you have any evidence, for instance,

17  that Mr. Jordan has a younger brother?

18      A.      No, sir.

19      Q.      Okay.  Do you have -- is there any

20  evidence of him being involved in any videos?

21      A.      Being involved -- not to date, not that

22  I'm aware of.

23      Q.      And your -- your initial question is a

24  good one.  I mean to say, himself personally appearing

25  in any videos?

1          A.     Not that I'm -- not that I have seen, but

2    I -- you know, not saying it's never happened.  I'm

3    just saying I don't have that to date, basically.

4          Q.     And he claimed to be able to provide

5    custom videos here; right?

6          A.     That's correct.

7          Q.     And those -- those, again -- that might

8    be a reference to videos of other people, but you

9    don't have any -- any evidence that he's making custom

10   videos of himself?

11         A.     Of him -- of himself, not that I'm aware

12   of.

13         Q.     Right.  Two words that were not used

14   in -- in the affidavit or previously in your testimony

15   here are autism and Asperger's.  And do you

16   understand -- do you have any knowledge about

17   Mr. Jordan's diagnosis with -- on the autism spectrum?

18         A.     No, sir, I do not.

19         Q.     Have you had any discussions with TBI

20   about that?

21         A.     Not autism.  There was a statement that

22   TBI told us that he may possibly have some type of

23   Asperger's syndrome or symptoms, but they didn't know

24   anything other than that he had stated that.  But the

25   day that I -- I believe the day that we did the search

1  warrant, I showed up about the time -- because, you
2  know, even on the front end of this, we're still
3  having to do -- you know, I came to see the Judge,
4  right.  So I was the last one to get to the house by
5  the time I got the documents from the court and were
6  able to go out there and give the warrant.
7          When I -- when we were leaving, they
8  asked him if he had any medication, and one of the
9  medications he stated was -- he stated was for
10 Asperger's.
11      Q.   Okay.  And I'm going to ask you just a
12 little bit about the warrants that you've referenced.
13 And I'm not going to try to get into probable cause or
14 anything, but I just want to make sure that we're all
15 talking about the same stuff here so I understand.
16          On page 3 of the -- of the complaint --
17 or the affidavit, it says in November 2019 TBI
18 submitted subpoenas to Instagram.  Those subpoenas, do
19 you know what they were seeking?
20      A.   No, sir, I have not seen them.
21      Q.   Okay.  And it says that what they
22 received from it was subscriber information, email
23 addresses of accounts and IP addresses.  Is that your
24 understanding?
25      A.   Yes, sir, that's correct.

1  Q.  Do you know whether they received any --
2  any messages, direct messages or other content from
3  within the accounts, as it were, from those subpoenas?
4  A.  From Instagram they -- they did a search
5  warrant after the subpoenas.
6  Q.  Right.  And then on page 4 on
7  paragraph 13 it says that they -- TBI executed a
8  search warrant; is that right?
9  A.  Yeah, I'm assuming it's page 4, but
10  that's correct, they did.
11  Q.  I see.  And so it was only from the
12  search warrant that they received content --
13  A.  (indiscernible).
14  Q.  -- from within the account?
15  A.  Correct.  It takes a search warrant to
16  get actual content, videos, text messaging.  The
17  subpoenas would have given them account information,
18  IPs, stuff that's not content in itself.
19  Q.  And then you -- you earlier referred to
20  another warrant, and that was the search warrant of
21  the house; right?
22  A.  That was my warrant.
23  Q.  Right.  And that was to -- I'm just
24  trying to get -- make sure I understand what all
25  warrants were involved, to your knowledge.  That was

1    the search warrant to go search his house?

2         A.    That's correct.  I requested and applied

3    for and received a federal search warrant for his

4    residence located at ███████████.  That was last

5    Saturday.  I also received an arrest warrant from the

6    Court at the same time for Mr. Jordan.  Previous to

7    that I had been given the return from TBI's warrant

8    that they did on Mr. Jordan's Instagram account, which

9    is what we used -- that was the 68,000-page document

10   that I was talking about, Instagram.

11             Now, they may have other peripheral

12   documents that I don't have to date, maybe the returns

13   for all those things.  I don't particularly possess

14   them.  We can -- we can get those, but I have not seen

15   everything they have, only the return that we started

16   to go through with TBI in the Instagram account.

17        Q.    And just since you talked about the thumb

18   drive and the cell phone, were those -- the search

19   warrant that you had for the house, that allowed you

20   to search the cell phone and the thumb drive?

21        A.    That's correct.

22        Q.    And were -- was there any sort of

23   encryption or did you have to break into those in any

24   way?

25        A.    I don't believe the thumb drives were

encrypted. The phone is encrypted and I know the
laptop has some type of encryption on it. We found
some documents in his bedroom where he talks about
trying to learn about encryption. He talks about
trying to learn about stealing someone's IP. I mean,
there's several things that you would -- for the --
for the lack of a better term, the general term
hackers would see that. That stuff was in there, but
the phone was not -- it was not -- he didn't have it
in a vault or encrypted by some secondary or third
party. It was encrypted by Apple just by, you know,
what is your passcode.

     Q.    Right.

     A.    And he didn't want to give us his
passcode, which is fine.

     Q.    (indiscernible)?

     A.    I'm sorry?

     Q.    How did you get into it?

     A.    We have programs called GrayKey that gets
into the actual phone. So it circumvents the passcode
on the phone and then we're able to digest the actual
phone. So the laptop, I know, had some encryption
things on it, but the boot hard drive for the laptop
was not encrypted, so we should be able to get into
that laptop as well.

1              MR. BRANDON:  Your Honor, could I have

2    just one second?

3              THE COURT:  Yes, you may.

4              MR. BRANDON:  Those are all my questions,

5    Your Honor.

6              THE COURT:  Thank you, Mr. Brandon.

7              Ms. Daughtrey, any redirect?

8              MS. DAUGHTREY:  Yeah, I would like to

9    just clarify a few things if that would be okay.

10             THE COURT:  You may.

11             MS. DAUGHTREY:  It will be quick.

12                    **REDIRECT EXAMINATION**

13   BY MS. DAUGHTREY:

14        Q.    So, Agent Hendrix, you talked about

15   the -- the review of some of the seized devices so

16   far.  And you indicated there were almost $4,300 --

17   4300 images and videos.

18             What percentage of those items have you

19   searched?  Is it 100 percent or?

20        A.    You mean of the items we took?

21        Q.    Yeah, of the items that you've begun

22   looking at.

23        A.    Oh, the percentage that we've looked at,

24   all those items?  Probably a quarter.  Probably a

25   quarter.

1    Q.    Okay.

2          THE COURT:  I'm sorry to interrupt.  Is

3    that a quarter of all of the items or a quarter of the

4    items you've started to look at?

5          THE WITNESS:  I'm sorry, Your Honor.  A

6    quarter of the items that we've begun to look at,

7    we're about 25 percent through actually looking at

8    those devices.

9          THE COURT:  Okay.

10   BY MS. DAUGHTREY:

11   Q.    And have you run some of those images and

12   videos against the National Center for Missing and

13   Exploited Children (inaudible) database?

14   A.    We ran it through Project VIC database,

15   Project VIC database showed 4,000 plus or something, I

16   can't remember the exact number, but it was several.

17   Q.    Okay.  And that was known victims or

18   previously viewed child pornography; is that correct?

19   A.    Previously viewed.  We would have to

20   submit it direct to NCMEC, which they are closed right

21   now because of the COVID-19.  To verify that, we would

22   have to submit it directly to NCMEC and get it back.

23   Q.    Okay.

24   A.    We won't do that until we're done with --

25   Q.    Right.

1          A.      -- the entire thing.

2          Q.      Right.  But according to your database,

3   quite a few of those images and videos were -- have

4   never been seen before.  They're unknown?

5          A.      That's us looking at it ourselves.

6          Q.      Yeah.

7          A.      No.

8          Q.      When you wrote this affidavit for the

9   arrest warrant, was a TBI agent with you?

10         A.      Yes, ma'am, and an FBI agent.

11         Q.      And an FBI, okay.  So you were getting

12  the information for the affidavit directly from a TBI

13  agent; is that correct?

14         A.      Yes, ma'am, that's correct.

15         Q.      Okay.  And the victims that are mentioned

16  in here, like victims 1 through 7, those are -- those

17  are victims that had been interacting with Mr. Jordan

18  since October of this year; is that correct?

19         A.      That's the way I understand it, but

20  that's from -- that's from TBI.

21         Q.      TBI, right.

22         A.      (indiscernible).

23         Q.      You haven't independently verified that?

24         A.      No, ma'am.

25         Q.      But your understanding is that Mr. --

1  Mr. Jordan has been reaching out to these victims,
2  some of whom are repeats, since he's been an adult?
3      A.   That's correct, but that's just what I
4  was told.
5      Q.   Okay.  And I think Mr. Brandon asked you
6  about whether or not he was soliciting minors on
7  Application A or -- yeah, Application A.  Can you tell
8  us where you-all found that he was actually soliciting
9  the minors to produce the child pornography?
10     A.    I -- I think his question, unless I
11  misunderstood it was it wasn't soliciting minors, but
12  he was chatting on Application A website for some type
13  of child pornography.  What he was doing on
14  Application A was the attempt to sell child
15  pornography that he would state he could produce or
16  would produce and could make custom child pornography
17  at the request of an individual.
18          The applications that he was using to
19  solicit or communicate with individuals was Instagram,
20  Snapchat, I want to -- I want to say email, and then
21  straight from the phone texting.  There may have been
22  others.  I just know those off the top of my head.
23     Q.   All right.  So he wasn't using
24  Application A to communicate with the boys?
25     A.   Not -- not with minors that I recall, but

1    I -- I've only -- we have that, I just -- I really

2    haven't had time to look at it.  So I -- it's -- I

3    don't know how to answer your question yet.

4         Q.    Okay.  So basically you're telling us

5    that you're just in the very beginning of these

6    investigations?

7         A.    The infancy of that.  I know I can say he

8    did these other things, but as far as other victims,

9    I -- as of today, I don't know.

10        Q.    Okay.  And then just going back to the

11   affidavit --

12        A.    There we go, sorry.

13        Q.    That's okay.  When you wrote that

14   affidavit with the TBI agent and an FBI agent, you

15   submitted it for my review; is that correct?

16        A.    Yes, ma'am.

17        Q.    And I made some edits to it; correct?

18        A.    Yes, ma'am.

19        Q.    And then you reviewed it in its entirety

20   to verify any edits that I made were accurate; is that

21   correct?

22        A.    That's correct.  I think we went back,

23   like, three times.

24        Q.    Okay.

25             MS. DAUGHTREY:  I believe that's all the

1    questions I have at this point.

2              THE COURT:  All right.  Very good.

3    Ms. Daughtrey, do you have any other proof you want to

4    put on at this time on probable cause?

5              MS. DAUGHTREY:  You're on mute,

6    Your Honor.

7              THE COURT:  Thank you.

8              MS. DAUGHTREY:  Sorry, Your Honor.

9              THE COURT:  That's all right.  I'm sorry,

10   thank you.  Do you have any other proof that you want

11   to put on at this time, Ms. Daughtrey, on probable

12   cause?

13             MS. DAUGHTREY:  No, I do not.

14             THE COURT:  All right.  Very good.

15             Mr. Brandon, anything you want to put on?

16             MR. BRANDON:  I have no additional proof,

17   Your Honor.

18             THE COURT:  All right.  Do y'all want to

19   be heard?  Ms. Daughtrey?

20             MS. DAUGHTREY:  No, Your Honor.

21             THE COURT:  All right.  Mr. Brandon?

22             MR. BRANDON:  No -- no extensive

23   argument, just that I would note that, again, I think

24   the -- I think the proof is a little -- a little

25   skimpy on the victims 1 through 8 or whatever the

1  numbers were and that the affidavit of complaint

2  doesn't firmly establish the -- I think the victimhood

3  of the -- of the people who we only learned are from

4  Virginia in the testimony.

5          And so I'm a little concerned about that

6  it's only the agent's testimony today that really

7  establishes the victim's age and their association

8  here and that a lot of that is not really in the

9  affidavit of complaint.  And that would be my only

10  argument, Your Honor.

11          THE COURT:  All right.  Thank you,

12  Mr. Brandon.

13          Ms. Daughtrey, anything in response?

14          MS. DAUGHTREY:  Yes, Your Honor.  I

15  believe that there are several of those victims that

16  are listed that the TBI has been working with, not

17  Agent Hendrix, but the TBI that clearly indicate that

18  there are minor victims whom he's soliciting and

19  trying to coerce into providing recorded child

20  pornography to him or sex directly.

21          And, of course, that latter was not -- is

22  not charged, but I do believe that there is sufficient

23  proof to establish probable cause that there is

24  attempted production of child pornography, as well as

25  transportation of child pornography.

1          It's clear that he transported the child

2    pornography to the HSI undercover agent and that was

3    confirmed in there, so that transportation is, I

4    think, clearly established.  And with regard to the

5    solicitation, I think some of the boys have talked to

6    TBI agents in recent months about being solicited for

7    production of child pornography.  But also the

8    Virginia children who were in the video that the HSI

9    agent purchased, the conversations between the two of

10   those victims and Mr. Jordan clearly indicate that he

11   was soliciting child pornography from them, he was

12   instructing them.  And it matched the child

13   pornography that the HSI agent purchased from

14   Mr. Jordan.  So I think -- I think there is more than

15   sufficient probable cause to establish the two

16   charges.

17          THE COURT:  All right.  Very good.

18          The Court's heard the proof on this

19   matter.  And as the parties are well aware, the burden

20   on the government at this stage of the proceedings is

21   very low.  The Court's satisfied, based upon the

22   testimony of the agent in this matter, that the

23   government has sufficiently established probable cause

24   as to both of the counts, production and

25   transportation of child pornography based on the proof

1   and the evidence I've heard in this matter.

2          Ms. Daughtrey, is there anything further

3   from the government's standpoint we need to do today

4   in this case?  You're on mute.  Ms. Daughtrey, I think

5   you might be muted.  We couldn't hear you.

6          MS. DAUGHTREY:  My apologies for the --

7   for the direct examination.  I was very flustered and

8   not used to this online stuff.

9          THE COURT:  That's okay.

10         MS. DAUGHTREY:  Yeah, so.

11         THE COURT:  Nothing further?

12         MS. DAUGHTREY:  Thank you.

13         THE COURT:  That's it?

14         MS. DAUGHTREY:  No, that's it.

15         THE COURT:  Mr. Brandon, anything else

16   for Mr. Jordan today?

17         MR. BRANDON:  Nothing further at this

18   time, Your Honor.

19         THE COURT:  All right, very good.  Thank

20   you very much.  Thank you to everyone for your

21   participation and your patience in this process.

22         Mr. Jordan, Mr. Brandon will be available

23   to talk to you later to discuss your case further and

24   will continue to communicate with you during this

25   time.  And with that -- oh, I wanted to ask one

1    question, Ms. Daughtrey, with regard to the exhibits.

2    Those are to be under seal; is that correct?

3              MS. DAUGHTREY:  Yes, Your Honor.  I would

4    ask that they be placed under seal.  They have

5    identifying information potentially of the victims,

6    so.

7              THE COURT:  All right.  Those -- those

8    will be under seal.  And, again, if I didn't say it

9    earlier, you can each keep a copy of the Pretrial

10   Services Report in this matter.

11             And the Court will enter the order to the

12   effect of Mr. Jordan waiving and reserving on the

13   detention issue in this case.  Thank you all again

14   very much and we'll be in recess.

15             MR. BRANDON:  Thank you, Your Honor.

16             MS. DAUGHTREY:  Thank you.

17             **\*\*\*END OF ELECTRONIC RECORDING\*\*\***

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3          I, Roxann Harkins, Official Court Reporter

4     for the United States District Court for the Middle

5     District of Tennessee, in Nashville, do hereby

6     certify:

7               That I transcribed from **electronic**

8     **recording** the proceedings held via video conference on

9     April 23, 2020, in the matter of UNITED STATES OF

10    AMERICA v. CALEB JORDAN, Case No. 3:20-mj-2336;

11         that said proceedings in connection with the

12    hearing were reduced to typewritten form by me; and

13    that the foregoing transcript is a true and accurate

14    transcript of said proceedings.

15

16              This is the 14th day of October, 2020.

17

18                   s/ Roxann Harkins____
                     ROXANN HARKINS, RPR, CRR
19                   Official Court Reporter

20

21

22

23

24

25