1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4                   Plaintiff,         )
                                       )
5         vs.                          )  No. 20 CR 637
                                       )
6   JEREMIAH HARRIS,                   )  Chicago, Illinois
                                       )  July 6, 2022
7                   Defendant.         )  10:10 o'clock a.m.

8
                 TRANSCRIPT OF PROCEEDINGS -
9                       Sentencing
          BEFORE THE HONORABLE MANISH S. SHAH
10

11  APPEARANCES:

12  For the Government:       HON. JOHN R. LAUSCH, JR.
                              United States Attorney
13                            219 South Dearborn Street, Suite 500
                              Chicago, Illinois  60604
14                            (312) 353-1598
                              BY:  MS. KELLY L. GUZMAN
15
    For the Defendant:        BREEN & PUGH
16                            BY:  MR. TODD S. PUGH
                                   MS. CHELSY L. VAN OVERMEIREN
17                            53 West Jackson Boulevard, Suite 1215
                              Chicago, Illinois  60604
18                            (312) 360-1001

19                            LAW OFFICE OF JOSHUA G. HERMAN
                              BY:  MR. JOSHUA G. HERMAN
20                            53 West Jackson Boulevard, Suite 404
                              Chicago, Illinois  60604
21                            (312) 909-0434

22                            WEINBERG LAW
                              BY:  MS. ALEXANDRIA M. MICELI
23                            53 West Jackson Boulevard, Suite 1215
                              Chicago, Illinois  60604
24                            (312) 322-0097

25

2

1    APPEARANCES (Continued):

2

3    U.S. Probation Office:    MR. MICHAEL I. ALPER

4

5    Also Present:            MS. CYNTHIA L. SHORT, defense
                              mitigation specialist
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                    COLLEEN M. CONWAY, CSR, RMR, CRR
23                       Official Court Reporter
               219 South Dearborn Street, Room 1918
24                     Chicago, Illinois  60604
                          (312) 435-5594
25                 colleen_conway@ilnd.uscourts.gov

3

1      (Defendant present.  Proceedings heard in open court:)

2              THE CLERK:  20 CR 637, United States versus Harris.

3              MS. GUZMAN:  Good morning, Your Honor.  Kelly Guzman

4      on behalf of the United States.

5              MR. PUGH:  Good morning, Your Honor.  Todd Pugh, Josh

6      Herman, Alexandria Miceli, and Chelsy Van Overmeiren on behalf

7      of Jerry Harris.

8              MR. ALPER:  Good morning --

9              THE COURT:  Mr. Harris is present.  I see Mr. Harris.

10             MR. PUGH:  He is, Your Honor.

11             MR. ALPER:  Good morning, Your Honor.  Michael Alper,

12     U.S. Probation.

13             THE COURT:  Good morning, everyone.

14             We're here today for sentencing.  Is the government

15     ready to proceed?

16             MS. GUZMAN:  Yes, Your Honor.

17             THE COURT:  Mr. Pugh, is the defense ready to

18     proceed?

19             MR. PUGH:  We are, Your Honor.

20             THE COURT:  Mr. Harris, let me just talk to you a

21     little bit about how this process is going to work this

22     morning.

23             First, I am going to just make sure that I have

24     everything that I am supposed to have.  We'll then talk about

25     the Presentence Investigation Report.  I will calculate the

1   sentencing guidelines that apply to your case.  Then we are
2   going to review the proposed conditions of supervised release.

3          After that, there are a number of issues that, in
4   some ways, are preliminary to what, I imagine, is the most
5   important issue, but we'll address those preliminary issues
6   first.  That includes restitution, forfeiture, special
7   assessments, a fine.

8          And after we resolve those issues, I'll hear, then,
9   the presentations from the parties.  I'll have the defense go
10  first, and I'll hear from people who the defense would like me
11  to hear from.  I will then hear from any victims who would like
12  to be heard.  And then the government's lawyer will make her
13  presentation.  Then, Mr. Harris, I'll give you an opportunity
14  to speak to me and address me.

15         And after all of that, that may be a good time to
16  take a break, and we might take a break, or we'll continue.
17  And then I will explain how I take into account everything that
18  I need to take into account and then I'll announce the
19  sentence.

20         So all of that's going to take a little time this
21  morning.  If at any point you'd like to speak privately with
22  your lawyers, just let me know, and I'll stop what we're doing
23  and I'll give you the opportunity to speak privately with them.

24         We are going to place you, Mr. Harris, under oath
25  because I want to ask you a few questions, primarily just to

1    make sure that you are ready to proceed.

2          But you should keep in mind that you will be under

3    oath.  Anything you say can be used against you.  Any false

4    statement you make can be used against you in a new prosecution

5    for perjury or making false statements.

6          If you don't want to answer a question that I may

7    ask, you don't have to answer it, and I won't hold it against

8    you if you choose not to answer it.

9          Do you understand everything I have said so far?

10       (Defendant nods.)

11          THE COURT:  If you could speak into a microphone.

12          THE DEFENDANT:  Yes, sir, I do.

13          THE COURT:  Please swear in Mr. Harris.

14          THE CLERK:  Raise your right hand.

15       (Defendant stands and is duly sworn.)

16          THE COURT:  Thank you, Mr. Harris.  You can take a

17   seat.

18       (Defendant sits.)

19          THE COURT:  Mr. Harris, have you received the

20   Presentence Investigation Report?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Did you read it?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Did you discuss it with your lawyers?

25          THE DEFENDANT:  Yes.

6

1    THE COURT:  Did they answer any questions you had

2    about the Presentence Investigation Report?

3    THE DEFENDANT:  Yes.

4    THE COURT:  Thank you, Mr. Harris.

5    I have the Presentence Investigation Report with its

6    exhibits, which includes the government's version of the

7    offense with reports of interviews attached and the victim

8    impact statement from Minor 1's parent.

9    I have the defense version of the offense with its

10   exhibits, which were submitted also as a supplement to the PSR,

11   and on a flash drive.  And that includes several hours of video

12   statements from friends and supporters, letters from

13   supporters, a video called a Bodymap video that Mr. Harris

14   narrates, along with a written report from Dr. Urbanik.  I have

15   Dr. Hutchinson's report, Dr. McGarrahan's report, the Social

16   Security records, the medical records, the school records, the

17   certificates and awards, the genogram, and various timelines of

18   neuropsychological, psychological, and medical testing, and

19   what the lawyers have called a life chronology timeline.

20   I have the Probation Office's recommendation, the

21   defense sentencing memorandum with its exhibits, the

22   government's sentencing memorandum, and the defense objections

23   to the recommended supervised release conditions.

24   I think that's everything that's part of the record

25   for sentencing, but let me confirm that with the lawyers.

7

1        Ms. Guzman, is there anything I have omitted or

2    forgotten to mention?

3        MS. GUZMAN:  Not to my knowledge, Your Honor.

4        THE COURT:  Mr. Pugh?

5        MR. PUGH:  Your Honor, I did yesterday send over four

6    curriculum vitaes that we would ask be made part of the record

7    in this case as well.

8        THE COURT:  I did receive those as well, and I have

9    them.

10        Are there any government corrections to the PSR?

11        MS. GUZMAN:  No.

12        THE COURT:  And I understood from the defense memo

13    that there were no corrections to the PSR.  Is that right?

14        MR. PUGH:  That is correct, Your Honor.

15        THE COURT:  Then I will adopt the Presentence

16    Investigation Report.

17        And, Mr. Alper, my thanks to the Probation Office --

18        MR. ALPER:  Thank you, Your Honor.

19        THE COURT:  -- for the report.

20        Let's talk about the sentencing guidelines and the

21    formal calculation of the guidelines.

22        The Probation Office's calculation was slightly

23    different than the parties' preliminary calculation in the plea

24    agreement, but I understand that there is no dispute now about

25    how the Probation Office has calculated the guidelines.

1          Is that right, Ms. Guzman?

2          MS. GUZMAN:  That is correct, Your Honor.

3          THE COURT:  Mr. Pugh, is that right?

4          MR. PUGH:  That is correct, Your Honor.

5          THE COURT:  Does the government make the motion for

6     the third point for acceptance of responsibility?

7          MS. GUZMAN:  Yeah, at this time, Your Honor, but we'd

8     ask to reserve until we hear the defense presentation.

9          THE COURT:  That's fine.  We'll reserve on that

10    motion.  But it ultimately, likely, will not affect the

11    guidelines calculation.

12          With the understanding that an expectation that an

13    adjustment for acceptance of responsibility will be applied,

14    the adjusted offense level will be a level 43, the criminal

15    history category is I, so the guidelines, the sentencing

16    guidelines, would recommend life in prison, but because the

17    offenses of conviction have a maximum total sentence of 50

18    years in prison, the guidelines recommendation, then, is 50

19    years in prison, or 600 months.

20          The recommended fine range is $50,000 to $500,000.

21    And I'll just note that, as I look at the fine table, the fine

22    table max is $500,000.  I think the PSR mentioned 250,000, or

23    at least the recommendation said 250, but, as I read the fine

24    table, the maximum fine is $500,000.

25          And the guidelines recommend a term of supervised

1  release of five years to life.

2      Does that comport with the parties' understanding of

3  the guidelines calculation?  Ms. Guzman?

4      MS. GUZMAN:  Yes, Your Honor.

5      THE COURT:  Mr. Pugh?

6      MR. PUGH:  It does, Your Honor.

7      THE COURT:  And, Mr. Alper, does that track with the

8  Probation Office's understanding?

9      MR. ALPER:  Yes, Your Honor.

10      THE COURT:  Let's next talk about the conditions of

11  supervised release.

12      Mr. Pugh, have you reviewed the language of the

13  proposed conditions of supervised release with Mr. Harris?

14      MR. PUGH:  We have, Your Honor.

15      THE COURT:  Do you agree, on his behalf, that when I

16  am referring to and imposing conditions of supervised release,

17  I can refer to them by reference to what's in the PSR without

18  reading them out loud, verbatim to Mr. Harris?

19      MR. PUGH:  We do agree with that procedure, Your

20  Honor.

21      THE COURT:  And do you also -- with exception to your

22  objections, which we'll address in a moment, do you waive an

23  explanation of the reasons for imposing the conditions of

24  supervised release?

25      MR. PUGH:  We do waive, Your Honor.

1    THE COURT:  Mr. Harris, let me talk to you about that

2  for a moment.

3    In your Presentence Investigation Report, there are

4  some conditions of supervised release that have been

5  recommended in your case.

6    Conditions of supervised release are part of the

7  sentence.  And during the time of supervised release, you'd be

8  required to comply with those conditions.  And the failure to

9  comply with conditions of supervised release could result in

10  further imprisonment.

11    Mr. Pugh is telling me that other than some

12  objections that have been raised that we'll talk about in a

13  moment, you don't need me to read out loud to you the

14  conditions of supervised release if I am imposing the ones that

15  have been recommended in your case, and you don't need me to

16  explain to you why I am imposing those conditions.

17    Is all of that correct?

18    THE DEFENDANT:  Yes, it is.

19    THE COURT:  Okay.  Thank you, Mr. Harris.

20    Other than the written objections, Mr. Pugh, are

21  there any other objections to the conditions of supervised

22  release?

23    MR. PUGH:  No, Your Honor.

24    THE COURT:  Then I will resolve those, the objections

25  you have raised, now.

1      MR. PUGH:  And, Your Honor, may I ask that Ms. Miceli
2  address the Court on these objections?

3      THE COURT:  Sure, that's fine.

4      As to the mandatory condition No. 6 for substance
5  abuse use and testing, I agree with the defense that there is a
6  low risk of future substance abuse, so I will ameliorate
7  mandatory condition No. 6 and delete the substance abuse
8  testing part of that condition.  But I do intend to impose the
9  part of the mandatory condition that prohibits the unlawful use
10  of a controlled substance.

11      My view is making sure that Mr. Harris is clearheaded
12  is important, as is making sure he's not breaking any laws.
13  And to the extent federal law on the use of controlled
14  substances is different than state law, this will make sure
15  that Mr. Harris understands he needs to comply with federal
16  law.

17      Does the government have any issue with that
18  modification that I intend to impose?

19      MS. GUZMAN:  No, Your Honor.

20      THE COURT:  Mr. Alper, does Probation have any issue
21  with that?

22      MR. ALPER:  No, Your Honor.

23      If I am to understand correctly, then, for the
24  condition 6, it'll end after "use of a controlled substance,"
25  period?  Everything after the word "and" will be stricken?

**12**

1     THE COURT:  Correct.

2     Next, there is an objection to discretionary

3 condition No. 7.

4     And I agree with the defense that a prohibition on

5 any use of alcohol is unnecessary.  There is no indication that

6 alcohol and controlled substances were contributors to the

7 offense conduct, but, as I said, I do think keeping Mr. Harris

8 generally clearheaded is a good idea, so I will modify that

9 condition to prohibit the excessive use of alcohol defined as

10 having a blood-alcohol concentration of 0.08% and any use of a

11 narcotic drug or controlled substance, as defined by federal

12 law, without a prescription.

13     Does the government have any issues with that?

14     MS. GUZMAN:  No, Your Honor.

15     THE COURT:  Mr. Alper, does Probation have any issue

16 with that?

17     MR. ALPER:  No, Your Honor.

18     THE COURT:  Next, there is an objection to

19 discretionary condition 23.

20     The defense objection to condition 23 is overruled.

21 It is limited by the possessive "your person, property, et

22 cetera."  I don't agree that adding the words "in which you

23 have an ownership or possessory interest" clarifies anything.

24 And I worry, actually, that that modifier would make this

25 condition underinclusive.

1        If Mr. Harris is staying in a place where he doesn't

2   have an ownership or possessory interest, that still could be a

3   location where it's reasonable to search for evidence of a

4   violation.  And "your person, property, et cetera" is not vague

5   in my view.

6        The reason to warn other occupants is to avoid a

7   situation where a probation officer is conducting a search and

8   encounters someone who is surprised and possibly hostile.  That

9   condition protects the probation officer and is appropriate.

10  So that objection is overruled.

11       As to special condition No. 9, I am bound by *Rhodes*,

12  R-h-o-d-e-s, and I also agree with it.  These kinds of

13  contingent conditions that depend on facts and circumstances

14  that are unknown today are best addressed when closer in time

15  to implementation.

16       The objection is noted now and can be raised if and

17  when a specific form of testing is sought by Probation.

18       The objection to the recommended -- to the

19  prohibition on possession or use of a device with internet

20  access or online computer service without prior approval of the

21  probation officer is overruled.

22       I have no reason to think that the Probation Office

23  would withhold approval for any device or access that is

24  appropriate and necessary for modern life.  And if there's an

25  issue with implementation, Mr. Harris can bring it to my

1    attention during the time of supervised release.

2           And the same is my view for the prohibition on a

3    "device that could be used for covert photography."  I don't

4    agree that "covert" is vague, and there is no reason to think

5    prior approval for any kind of device would be withheld if it's

6    determined that that kind of device would be appropriate for

7    Mr. Harris to have.

8           On the issue of unsupervised private contact with

9    persons under 18 without approval of a probation officer and

10   treatment provider, I agree with the defense that the word

11   "and treatment provider" is unnecessary and unclear, and I will

12   strike that.  The Probation Office can be the source of

13   approval with respect to those contacts.

14           I don't agree that "engage in activities" is vague.

15   It is modified by the restrictive clause "that will put you in

16   unsupervised private contact with any person under the age of

17   18."

18           I am inclined to delete the prohibition on "not

19   knowingly visit locations where persons under age 18 regularly

20   congregate."  Even though, as phrased, this restriction is not

21   applicable to unintentional incidental contact in the normal

22   commercial business, as phrased, this condition doesn't have

23   the benefit of prior approval, so my view is that there are

24   other laws in place and other conditions in place that will

25   adequately monitor Mr. Harris, and that should be sufficient,

1     as we sit here today, for conditions.

2              And, again, if there is some issue with where Mr.

3     Harris wants to go, that can be raised with me during

4     supervised release.

5              Ms. Guzman, does the government have any issue with

6     that ruling by me?

7              MS. GUZMAN:  No, Your Honor.

8              THE COURT:  Mr. Alper, any issues with that from

9     Probation?

10             MR. ALPER:  No, Your Honor.

11             THE COURT:  I think that addresses all of the raised

12    objections, but, counsel, you can tell me if I've missed

13    something.

14             MS. MICELI:  Judge, we would just ask for

15    clarification on what is involved in supervision for the

16    private contacts.  So it says "unsupervised private contact."

17    Does that mean a legal guardian or is it something more?  Any

18    adult?

19             THE COURT:  I am satisfied that the Probation Office

20    can implement what "supervision" means, and that common,

21    everyday language about what "supervision" entails is adequate

22    notice to Mr. Harris.

23         (Defense counsel nods.)

24             THE COURT:  Anything else on supervised release for

25    the defense?

1      MS. MICELI:  I do not believe so, Your Honor.

2      THE COURT:  So the defense objections to the proposed

3  conditions of supervised release are overruled in part and

4  sustained in part.

5      I do intend to impose an eight-year term of

6  supervised release.  I think that is sufficient but not greater

7  than necessary based on what I know and what I expect of Mr.

8  Harris today.

9      That term could be extended if there is a problem.

10 But eight years will be a long time of supervision and will

11 give us enough information to know whether Mr. Harris can be a

12 law-abiding person who is not a danger to others.  And all of

13 the recommended conditions are appropriate to make sure that

14 Mr. Harris is engaged in lawful behavior, thinking clearly,

15 getting any needed treatment and help, and that the Probation

16 Office has the tools necessary to keep an eye on him and

17 monitor his compliance with any obligations, including any

18 financial obligations that may still be in place during

19 supervision.  And all of that is designed to keep the public

20 safe from future criminal conduct.  So I do intend to impose

21 that term of supervised release.

22     Next, let's talk about restitution.

23     The government's motion to defer a final restitution

24 finding is granted.

25     I understand there is no objection to that from the

1  defense?

2  MR. PUGH:  There is not.  And we'll work that out, I

3  think, with the government in the ensuing weeks.

4  THE COURT:  Let me set a couple of deadlines with

5  respect to that.

6  Any claimed losses must be reported to the Probation

7  Office by September 8th.

8  Does the defense waive an in-person appearance for

9  any final determination of restitution?

10  MR. PUGH:  We do, Your Honor.

11  THE COURT:  Any briefs on restitution must be filed

12  by September 22nd.

13  And then I will be sure to enter an amended judgment

14  with restitution before October 4th, which, by my calculations,

15  is 90 days from today.  And under Section 3664, that's the

16  statutory deadline to finalize restitution.

17  When thinking about and addressing restitution, I'd

18  ask the parties to address Section 2259(b)(2), which, as I read

19  it, sets a minimum of not less than $3,000 in restitution.  At

20  least with respect to Count Three.  And I believe that would be

21  $3,000 each as to Minor 2 and Minor 3.

22  But I'd just flag that for the parties to make sure

23  you have thought about that in your submissions.

24  MS. GUZMAN:  Yes, Your Honor.

25  THE COURT:  Next, let's talk about forfeiture.

1    I didn't see a written motion for a preliminary order

2  of forfeiture as to the forfeiture allegation in the

3  indictment.

4    Do you want to make an oral motion for that?

5    MS. GUZMAN:  Yes, Your Honor.

6    THE COURT:  And pursuant to the terms of the plea

7  agreement, I think there is no objection to a preliminary order

8  of forfeiture?

9    MR. PUGH:  There is not, Your Honor.

10    THE COURT:  So, Ms. Guzman, if you could submit a

11  proposed order on the forfeiture allegation, that motion's

12  granted, and we'll enter a preliminary order of forfeiture as

13  part of the judgment.

14    MS. GUZMAN:  Thank you, Your Honor.

15    THE COURT:  What are the parties' positions about a

16  fine?  The Probation Office has recommended a fine of $50,000.

17    What's the government's position about a fine?

18    MS. GUZMAN:  The government agrees with that, Your

19  Honor.

20    THE COURT:  Mr. Pugh, or whichever member of the

21  defense team is addressing it?

22    MR. PUGH:  I think that we'd like to withhold our

23  position until we can resolve the issue in terms of

24  restitution.  I think that that does affect a fine, considering

25  Mr. Harris' -- his ability to pay will not exist.

1    So to the extent that the Court feels a fine is

2    appropriate, under the circumstances, since I haven't seen any

3    of the losses in terms of restitution, it's hard to speak to

4    that issue.  I hope you can understand that.

5    THE COURT:  I do understand that, but I have to make

6    a decision about a fine today.  And, as the lawyers know,

7    restitution is not treated as satisfaction of a fine or any

8    other penalty.

9    MR. PUGH:  Our position is that Mr. Harris is not

10   going to be in any position to pay a fine.  There's a large

11   civil lawsuit also pending against him due to these conducts,

12   and so he's not going to be in a position.  And, of course, I

13   think the Court's well aware that upon his release, his

14   employment options are going to be incredibly limited.

15   So I do not see this as a case where a fine in the

16   amount of 50,000 is appropriate based on his ability to pay.

17   THE COURT:  Okay.  I will take that under advisement

18   and resolve the issue of the fine when I impose sentence at the

19   end.

20   But let's talk about special assessments.  There will

21   be a total of $100 per count, for a total of $200, in special

22   assessments.

23   Then I do find that Mr. Harris is not indigent, and

24   as a result, there is an additional $5,000 per count assessed

25   pursuant to the Justice For Victims of Trafficking Act, 18

1    U.S.C. Section 3014.

2              And then there is the assessment, under 2259A(a)(2),

3    of up to $35,000, for which I am supposed to consider the

4    3553(a) factors and the 3572 factors.

5              And I appreciate that there is some uncertainty about

6    Mr. Harris' future income and assets and earning capacity, but

7    he does have a current positive net worth, as reported in the

8    PSR, which would be sufficient to pay this assessment.

9              This assessment is supposed to be in place to

10   contribute to the Child Pornography Victims Reserve Fund, which

11   would be appropriate in a case such as this.  And this special

12   assessment has a higher priority and disbursement than a fine.

13             So I am considering imposing the special assessment,

14   under this provision of the Act, of up to $35,000.  I will

15   resolve that at the end, after I have heard all of the

16   arguments about the 3553(a) factors.  But I am flagging that

17   for the parties now.

18             I think that resolves or at least sets the table for

19   the preliminary issues.  And with that, we can now turn to the

20   formal presentations from the parties.

21             And, as I said, I'll have the defense go first.  Mr.

22   Pugh, how would you like to proceed?

23             MR. PUGH:  Judge, Mr. Herman is going to ask that the

24   witness be sworn.

25             MR. HERMAN:  Judge, good morning.  Ms. Cynthia Short

1    will testify.  She's been the defense mitigation expert

2    throughout the case.

3           And as a brief preview, we will be introducing

4    material that has been submitted to the Court in advance as

5    attachments to the defense version, as well as in the binders

6    that have been delivered to the Court and the government.

7           It is a lengthy presentation.  I will do my best to

8    streamline.  We are ending with selections of the videos that

9    we have submitted to the Court.  And I have advised the

10   government, Ms. Guzman, about the nature and the length of the

11   presentation in case there's anyone in the courtroom who may

12   not want to be present for it.

13          THE COURT:  What's your estimate for how long the

14   presentation is?

15          MR. HERMAN:  Hour and a half.  And the video is maybe

16   another half an hour.

17          THE COURT:  Well, let's get started.

18          And let me just say that you, on behalf of the

19   defense, have submitted a lot of materials in writing and by

20   video, and I have read them all.  It won't be particularly

21   useful to me to retread ground that's already in all the

22   filings.

23          And so if I interrupt and say, "I think this subject

24   is adequately covered in what you have submitted," again, I am

25   not -- I don't mean to be rude, but I want you to use your time

1    effectively to, frankly, the audience that matters.

2              MR. HERMAN:  Correct.

3              THE COURT:  Which is me.

4              MR. HERMAN:  We'll take that direction in stride and

5    adjust accordingly.  We do think that Ms. Short, given her

6    background and her expertise, is necessary to contextualize

7    where some of this material came from, and we'll focus on those

8    particular aspects.  It may not be apparent from the face of

9    the documents and videos themselves.

10             THE COURT:  Understood.  And I may very well have

11   some questions of either Ms. Short or of counsel during your

12   actual argument.  So that's all reasonable and appropriate.

13   And why don't we get started.

14             Ms. Short, why don't you take the witness stand.  And

15   if you want, you can set those books on the bench.  I think

16   you'll be able to reach them.

17             THE WITNESS:  Yes.

18             THE COURT:  And please raise your right hand.

19        (Witness duly sworn.)

20             THE COURT:  Please be seated.

21             THE WITNESS:  Judge, may I take off my mask?

22             THE COURT:  I think you might as well just keep the

23   mask on.

24             THE WITNESS:  Okay.

25             MR. HERMAN:  And, Judge, I should have asked.  May I

Short - direct by Herman                          **23**

1    approach to the podium?

2              THE COURT:  You may.

3              MR. HERMAN:  Thank you.

4              THE COURT:  And you may proceed.

5              MR. HERMAN:  Thank you.

6              May we please have the presentation published?

7              THE COURT:  I think it's on the screens.

8              MR. HERMAN:  Okay.  Great.  Thank you.

9              CYNTHIA SHORT, DEFENSE WITNESS, SWORN

10                   DIRECT EXAMINATION

11   BY MR. HERMAN:

12   **Q.**  Ma'am, could you please identify yourself for the Court.

13   **A.**  My name is Cynthia Short.

14   **Q.**  And, Ms. Short, what do you do for a living?

15   **A.**  I am an attorney, and I am also a mitigation specialist.

16   **Q.**  Where are you licensed to practice?

17   **A.**  I am licensed to practice law in the state of Missouri.

18   **Q.**  And what's your formal education?

19   **A.**  I have a law degree from St. Louis University, and I have

20   an undergraduate degree from St. Mary's College in Notre Dame,

21   Indiana.

22   **Q.**  Okay.  And do you currently own your own mitigation

23   profession --

24   **A.**  Yes.

25   **Q.**  -- or professional company?

Short - direct by Herman                    **24**

1    **A.**  Yes.  I have a company called CLS Mitigation And Consulting

2    Services in Kansas City, Missouri.

3    **Q.**  And do you have staff that work for you?

4    **A.**  I do.  I have a group of social workers and others who work

5    for me, yes.

6    **Q.**  Okay.  What's your role in this case?

7    **A.**  I was approached to work in this case as a mitigation

8    specialist.

9    **Q.**  And could you tell the Court what a mitigation specialist

10   is?

11   **A.**  So a mitigation specialist is a person who comes in and

12   works on -- frankly, Judge, on sentencing cases.  We look at

13   the background of individuals who are facing sentencing,

14   whether it's in a capital context, which is where most of my

15   background lies, or in a noncapital context, such as Mr.

16   Harris' case, and we take a look at the individual in all

17   aspects of their life, their biopsychosocial history, by

18   interviewing witnesses, collecting records, really trying to

19   understand the individual's life from birth to present.

20   **Q.**  Is there a general process that you implement in your

21   mitigation process?

22   **A.**  So every case is approached the same.  We start with

23   conversations, certainly, with the attorneys, but we really

24   focus on the client.  I begin my work directly with the client.

25   And I met with Mr. Harris on many occasions.

1    I employ a team approach.  So there's another

2  mitigation specialist in my office who worked on the case, and

3  her name is Kate Siska.  She was in the field.  And then I had

4  another woman, a documents clerk, and her name is Rachel

5  Brasel.

6        So a large part of all of these cases is the

7  collection of records, of history.  And so any document that

8  has Mr. Harris' name on it we pursued, whether it was an

9  education record, a medical record, a disability record,

10  anything that would tell us about his life history.

11  **Q.**  You mentioned earlier meeting with Mr. Harris.  Is that

12  correct?

13  **A.**  Yes.

14  **Q.**  Where did you meet with Mr. Harris?

15  **A.**  All my meetings with Mr. Harris were in the Metropolitan

16  Correctional Center.

17  **Q.**  And how many times did you meet with him after you were

18  retained as a mitigation expert in this case?

19  **A.**  So over the last 22 months, I have met with Mr. Harris on

20  14 occasions.

21  **Q.**  About how many hours have you spent with Mr. Harris?

22  **A.**  Approximately 70.

23  **Q.**  70?  7-0?

24  **A.**  70 hours, yes.

25  **Q.**  And in terms of the records that you have collected, Ms.

Short - direct by Herman                                    **26**

1    Short, could you describe the records that you collected in

2    this particular case?

3    **A.**  Yes.  So I'm sure, Judge, you have noticed at the back of

4    each of the chronologies, there's a list of sources.  And so

5    the records are everything from birth certificates to birth

6    records, educational records from elementary school, middle

7    school, high school, from his junior college, also Social

8    Security records.  So any record that we could find that,

9    again, had his name on it and would provide us information

10   about his development, his walk in life.

11   **Q.**  Did you also, in the course of your work on this case,

12   review the discovery material that was produced by the

13   government?

14   **A.**  Yes.  Part of mitigation is to understand the context that

15   brings the individual to the courthouse.  And so in that

16   context, I did review the discovery.

17   **Q.**  So you were aware of the statements that were made against

18   Mr. Harris?

19   **A.**  I was.

20   **Q.**  And you were aware of Mr. Harris' own statements?

21   **A.**  Yes.

22   **Q.**  And you were aware of the guilty plea in this case,

23   correct?

24   **A.**  Yes.  I followed the case and discussed the case as it's

25   progressed with counsel and with Mr. Harris.

1  **Q.** And you're also a lawyer with experience in criminal law,

2  correct?

3  **A.** Yes.

4  **Q.** So you -- were -- is it fair to say you were reviewing the

5  material with that eye as well in addition to being a

6  mitigation specialist?

7  **A.** Yes. As I said, I am also a criminal defense attorney. So

8  in addition to my mitigation work, I also represent individuals

9  in criminal cases in the state of Missouri.

10 **Q.** Okay. Now, you mentioned also, as part of your general

11 process, that you have interviewed individuals in this case; is

12 that correct?

13 **A.** Yes. Yes, we -- yes.

14 **Q.** Are some of those individuals actually sitting in this

15 room?

16 **A.** Yes.

17 **Q.** Okay. About how many people have you inter -- you and your

18 team -- and when I say "you," I mean your team.

19 **A.** Yes.

20 **Q.** Have you interviewed in this case?

21 **A.** In excess of 70.

22 **Q.** Okay. And did you collect letters?

23 **A.** We did.

24 **Q.** And did you collect or create videos?

25 **A.** We did.

1   **Q.** Okay. Ms. Short, you've got two binders up there, correct?
2   A black binder and a white binder?
3   **A.** I do.
4   **Q.** Okay. You're familiar with those binders?
5   **A.** I am.
6   **Q.** And you're aware that those binders have been provided to
7   the Court and the government?
8   **A.** Yes.
9   **Q.** Does the black binder contain all of the letters that you
10  have -- you and your team have collected, as tabbed in that
11  binder?
12  **A.** Yes.
13  **Q.** Now, when you approach an interview subject, do you tell
14  them about what the charges are, or the allegations, in a
15  particular case?
16  **A.** Yes.
17  **Q.** Okay. Is that type of transparency important when you're
18  approaching individuals?
19  **A.** Yes.
20  **Q.** Why?
21  **A.** Well, I think it's very important because you want to make
22  sure that the people that are participating, particularly in
23  writing character letters to a court, that they understand the
24  serious nature of the offense, so that when they are providing
25  or supporting -- providing support for the individual, like Mr.

1   Harris, that they're doing it knowingly.

2          And so, as I sat down with family members, cheer

3   family members, students, teammates, it was important for them

4   to understand the seriousness of the allegations against Mr.

5   Harris before they decided whether or not that they would write

6   a letter of support or participate in the video project.

7   **Q.**  And in the discussions after -- with those interview

8   subjects, after telling them about the serious nature of the

9   charges, did the subject of whether or not Jeremiah could

10  return to their homes ever come up?

11  **A.**  Yes.

12  **Q.**  Did -- let me take one step back.

13         After explaining the serious nature of the charges to

14  your interview subjects, did anybody refuse to talk to you?

15  **A.**  No, no.

16  **Q.**  And after having those same discussions and talking about

17  Jeremiah's eventual release from custody, did anybody ever tell

18  you that he could not return to their homes?

19  **A.**  Yeah, home-planning in cases that are noncapital is often a

20  subject of discussion because it is of interest to me, in terms

21  of being able to present to a court or to the defense team or

22  to the prosecution, what kind of home plan would be available

23  to Mr. Harris or someone in his position.

24         And so in the discussions with the family, it was

25  important to know who would provide a home knowing the

1    conditions of that kind of opportunity.  And so it was

2    important for people to be very, very aware, have their eyes

3    open.  And what I found was that there was a large number of

4    people who were willing, under these circumstances, to offer

5    Mr. Harris a home.

6    **Q.**  How long have you been in the mitigation business?

7    **A.**  Since 1994.

8    **Q.**  And in a case of this -- and you have also done capital

9    cases?

10   **A.**  Yeah.  The majority of my work has been in capital work.

11   **Q.**  Okay.  And in noncapital cases, when there's an opportunity

12   for release, have you ever encountered that sentiment in any of

13   your work?

14   **A.**  This has been a unique investigation in many respects.  But

15   I think that the outpouring of support for this young man has

16   been remarkable.  And I have to say, Judge, that I have not

17   seen this kind of support for any single individual in my

18   career.

19   **Q.**  Now, you spoke about creating -- well, in your collection

20   of records, Ms. Short, is there any way that you synthesized

21   the records into a kind of digestible document or way to

22   understand them?

23   **A.**  So when I began my work in capital litigation, one of the

24   things you learn very quickly is that capital litigation is

25   complex litigation, very similar to white collar, because

1    you're dealing with a large number of documents.

2            So one of the things you have to start to understand

3    is how am I going to organize these documents, how am I going

4    to make them understandable first to me, then to experts, and

5    then to other parties.  And so really the best way to do that

6    is to go through each document and put them into a timeline.

7            What we find is that once we start looking at

8    information gathered from records and from witnesses and other

9    subjects, that we have a better understanding of the flow of an

10   individual's life and their life experiences when we're able to

11   put it into a timeline.

12   Q.  And that timeline, Ms. Short, is collected in what we're

13   calling the life chronologies?

14   A.  And that's what we call them, is life chronologies, yes.

15   Q.  And up with you, there's a white binder, correct?

16   A.  Yes.

17   Q.  Is that white binder -- and you understand that that white

18   binder has been provided to the government and the Court?

19   A.  Yes.

20           MR. HERMAN:  Okay.  And, Judge, since we're not in a

21   trial proceeding, otherwise I'd move them into evidence, but

22   they have been provided in various forms and would like the

23   record to note as much.

24           THE COURT:  They are part of a submission --

25           MR. HERMAN:  Thank you, Your Honor.

1        THE COURT:  -- and filed with the Court.

2        And let me interrupt to ask a question that popped in

3    my head a few moments ago.

4        Could you give me an example of how you described the

5    seriousness of the charges in this case?

6        THE WITNESS:  Yes.  Could I give you an example of

7    how I described the seriousness of the offenses?

8        THE COURT:  Right.  So the question was:  When you

9    approached people, did you tell them the seriousness of the

10   allegations?  And you said yes.

11       THE WITNESS:  Yes.  So --

12       THE COURT:  But what does that mean?  There are a lot

13   of details, and, frankly, it is unclear to me --

14       (Witness nods.)

15       THE COURT:  -- how much people knew about the

16   underlying facts of this case --

17       THE WITNESS:  Right.

18       THE COURT:  -- when they submitted materials.  And I

19   appreciate what you're saying about how your process works, but

20   if you can --

21       THE WITNESS:  Yes.

22       THE COURT:  -- maybe give me a little more context

23   for that, that would be helpful to me.

24       THE WITNESS:  Yes.  With understanding and preserving

25   confidentiality, I explained that there were both offenses that

1   involved the exchange of pictures over the internet,

2   particularly with Mr. Harris soliciting those, asking boys that

3   were underage, when he was in late adolescence or in college,

4   for pictures that were inappropriate, that is, nudes, both

5   their genitalia as well as their buttocks.

6           I also explained that there had been invitations for

7   those boys to meet in places during competitions, so that there

8   would be contact between him and underage boys; that there was

9   an occasion where, in fact, one of the boys and Mr. Harris had

10  had sexual contact that was inappropriate based upon their

11  ages.

12          So I explained both the contact and the noncontact.

13          THE COURT:  And so your description of the contact,

14  though, did not include that the minor in that instance was

15  reporting that it was not consensual?

16          Because you described it as it was inappropriate

17  because of the age difference, but there are facts in this

18  case that --

19          THE WITNESS:  Well, what I would --

20          THE COURT:  -- go beyond that.

21          THE WITNESS:  -- describe -- yeah.  What I would

22  describe to them is that it was a crime, and that the -- that

23  Mr. Harris was the one that asked for the in -- the minor to

24  come to the bathroom, that that was certainly inappropriate,

25  that that was a relationship that had been going on for a

Short - direct by Herman                34

1  couple of years in terms of the two of them communicating and

2  nudes being exchanged.  That that is a crime.  And particularly

3  with a minor, that that would be statutory rape.  So explained

4  those things to them.

5         THE COURT:  Thank you.  You can proceed.

6         MR. HERMAN:  Thank you.

7  BY MR. HERMAN:

8  Q.  Ms. Short, before I proceed to the next section here, in

9  your background, is there anything in your personal life that

10 gave you greater insight into this particular case?

11 A.  Well, in addition to -- well, ironically, I had experience

12 in this particular community.  I am also a cheer mom.  My

13 daughter participated in cheer from 2005 until 2015, including

14 in the all-star cheer community.  She cheered for a team called

15 KC Cheer.  She's one year older than Mr. Harris, and so was

16 competing at the same competitions and at the same level as Mr.

17 Harris and his team at Illinois Cheer Elite.

18 Q.  So when you reviewed the discovery or spoke with interview

19 subjects and they talked about particular teams and events,

20 were you familiar with those locations and competitions?

21 A.  I had, in fact, been at all of those competitions,

22 including in Orlando and Dallas and Fort Worth and other

23 locations, as a result of our involvement in cheer.

24 Q.  Okay.  So effectively, you spoke the same language?

25 A.  Yes.

1    **Q.**  But you did not know Mr. Harris at all?

2    **A.**  I did not know and was not really familiar with ICE.

3    **Q.**  Okay.  Where we left off before the additional questioning

4    was creating these life chronologies.

5            In the white binder that you have with you, those

6    have the life chronologies, correct?

7    **A.**  They do.

8    **Q.**  And the life chronologies are divided into separate

9    chapters, correct?

10   **A.**  Yes.

11   **Q.**  Those chapters are -- would you describe what -- the

12   differentiation between the chapters?

13   **A.**  So the chapter 1, which is not included, would be a

14   chronology that predates Mr. Harris' birth.  And so it's about

15   his birth family.

16           Looking at someone's family is important.  So we

17   start with that as chapter 1, but it's not included.

18           Then chapter 1 is his life, his developmental life

19   from 0 to 10.  Chapter 2 is 11 to 15, then 16 to 18, and,

20   finally, 18 to 21.

21   **Q.**  And is there a reason why the chapters were divided into

22   those different age categories?

23   **A.**  Yeah.  So we're looking at developmental differences, you

24   know, in terms of a person's developmental and cognitive

25   growth.

1        Also, we had a lot of records in this particular

2   case.  And it's easier, I think, to understand, again, a

3   person's life path by looking at it in smaller chunks.

4   Q.  And your investigation for chapter 1 effectively began at

5   birth, correct?

6   A.  Yes.

7   Q.  And what type of records did you collect regarding that

8   starting point?

9   A.  And so this is a good example of kind of looking at the

10  different data points and how they come together.

11       And so you start with the birth certificate, the

12  birth records, and also interviews of family members,

13  particularly his sisters, his brother, provided information

14  about his birth.

15  Q.  And what we're seeing on the screen right now is an actual

16  screenshot of the first page of -- the first chapter of the

17  life chronology in the white binder, is that correct?

18  A.  Yes.

19  Q.  And understanding that the Court has reviewed all of this

20  material, Ms. Short, could you briefly summarize what you

21  identified based on the birth records, collateral interviews,

22  and other documentation regarding any challenges that Jeremiah

23  had at the very outset of his life?

24  A.  So Jerry was born prematurely and to a mother who was 40.

25  She had had gestational diabetes.  And he was born with

1    respiratory distress, was put on a ventilator and began his

2    life in the ICU, and was discharged approximately five days

3    after his birth.

4    Q.  And we'll touch on some of those developmental challenges

5    that Jeremiah had, but is it fair to say, in the collection of

6    hundreds and hundreds of pages of records, numerous collateral

7    interviews, disability records, that those challenges continued

8    with Jeremiah through the rest of his life?

9    A.  Well, so what we see, particularly from a health

10   standpoint, that the respiratory distress will continue.  We

11   will see him admitted to the ER on multiple occasions for

12   asthma.

13            And then from the very beginning of his life, we will

14   see developmental delays, both from the standpoints of early

15   childhood markers, but as he moves into school, we'll see

16   delays in speech.  ADHD will be diagnosed eventually.  And

17   we'll see social and emotional delays which will track with him

18   throughout his childhood.

19   Q.  You mentioned Jeremiah's mother.  What was her name?

20   A.  Her name was Lizzie Bowman.

21   Q.  Is it fair to say that Ms. Bowman, there were positives and

22   negatives to her relationship with Jeremiah?

23   A.  Yes.

24   Q.  And your assessment of that nature is based on numerous

25   interviews that you have done with immediate family members,

Short - direct by Herman                    **38**

1   correct?

2   **A.** Yes.

3   **Q.** Okay.  Can you summarize what the positive aspects were

4   from big picture?

5   **A.** Well, of course, like any mother, Lizzie loved Jerry very

6   much, and they were inseparable.  He was a late baby for her,

7   that the -- his sister was 12 years older and other siblings

8   were quite a bit older than that.  And so she paid special

9   attention to him.

10          I think she did two things that were really important

11   to his development.  One was to get him admitted into the high

12   school in Aurora, Illinois, which was really important to his

13   development.  And then, secondly, was allowing him to get into

14   cheer when he was first six years old and then again in fifth

15   grade.

16   **Q.** And what about the negative aspects?  Is it possible to

17   summarize, based on your interviews, rather than going through

18   the actual letters, is it -- what are some of the negatives

19   that stand out to you?

20   **A.** Lizzie was -- and I think family members really talked

21   about this first.  She had a very different kind of bond with

22   Jerry, and it was, in many ways, inappropriate.

23          She babied him from the time he was born until he was

24   really in middle school.  She --

25   **Q.** Can I stop you?  When you say "baby him," is there anything

1    that sticks out in your mind?

2    **A.**  She didn't let him grow naturally in his developmental

3    stages.  So she was still babying him as if he were a toddler

4    when he was in middle school.  She was still wiping his butt

5    when he was in middle school.  She was feeding him things that

6    were very -- not very nutritious, and he was gaining weight

7    until he was morbidly obese.

8            She was also -- instead of providing Jerry the

9    privacy he needed as he was growing up, the two of them were

10   sharing a couch as a bed in a public space within the home.

11   And then later on when they moved into a hotel, the two of them

12   shared a bed in a motel that was really designed for two

13   people, not six, which is how many lived there.

14   **Q.**  Did you interview any family members who said anything

15   about Jeremiah using a pacifier until late in life?

16   **A.**  Yeah.  Jeremiah --

17   **Q.**  Or late childhood?

18   **A.**  -- used a pacifier until he was about -- until he was eight

19   years old and then -- and sucked his thumb until he was twelve.

20           The other thing that was unusual was that even in

21   evaluations that were conducted with Jeremiah through

22   elementary school, when asked about who his friends were, he

23   would say that it was his mother.

24           His sister also commented that Jerry didn't really

25   have same-age peers, that his friend, his main friend, was his

1    mother.

2    **Q.** And this sister was who?

3    **A.** Mahogany. Mahogany Harris.

4    **Q.** Mahogany submitted a letter to the Court, correct?

5    **A.** She did.

6    **Q.** Okay. Do you recall Mahogany or any other family members

7    talking about how they observed Lizzie isolating Jeremiah from

8    the rest of the family and the world generally?

9    **A.** Yes. And it was something that they were concerned about.

10   And this was particularly problematic when the family lost

11   their home and moved into a motel.

12   **Q.** Okay. Did you also speak with family members about

13   Jeremiah's father?

14   **A.** Yes.

15   **Q.** Okay. What's Jeremiah's father's name?

16   **A.** His name is N.H. Harris.

17   **Q.** Do you know what N.H. Harris stands for? N.H. stands for?

18   **A.** No.

19   **Q.** In your interviews with Jeremiah, does he know his father's

20   real name?

21   **A.** No.

22   **Q.** Did your investigation and interviews of immediate family

23   members uncover any incidents of abuse between N.H. and other

24   family members?

25   **A.** Yes.

Short - direct by Herman                    **41**

1    **Q.** Did that abuse also include incidents of physical abuse

2    directed towards Jeremiah?

3    **A.** Yes.

4    **Q.** Did you interview others and corroborate these incidents of

5    abuse?

6    **A.** Yes.

7    **Q.** Could you briefly explain to the Court if there was one

8    incident that particularly stuck out?

9    **A.** Yeah. So when Jeremiah was eight or nine years old, there

10   was an incident that happened within the home in which his

11   father beat him severely enough that for Jeremiah, that broke

12   his spirit, particularly as it pertained to the relationship

13   with his father. He really felt as if he was now detached from

14   his father, whose presence in the home was more absent than

15   present, even when he was physically in the home.

16           A lot of the abuse N.H. perpetrated in the home was

17   directed more at Deandre, but that was something that was also

18   witnessed by Jeremiah and made him afraid.

19   **Q.** In your -- in the course of your investigation, did you

20   determine whether or not Jeremiah ever developed a relationship

21   with his father?

22   **A.** He did not.

23   **Q.** Okay. In fact, in the life chronology, do you recall a

24   financial aid document where Jeremiah said words to the effect

25   that, "I have a legally forced and strained relationship with

1    my biological father and only have a relationship with him due

2    to the death of my mother"?

3    **A.**  Yeah.  And I think significantly also that the many people

4    who loved and supported him in the cheer community and who had

5    watched him since he was 11 years old were unaware that he had

6    a father until the death of his mother at the age of 16.

7    **Q.**  Did your investigation regarding -- turning back to Lizzie.

8    Did your investigation reveal anything regarding how she

9    instructed Jeremiah to keep secrets or anything?

10            I don't want to put -- in your own words or the words

11   of the people that you interviewed, was that a theme?

12   **A.**  Yeah.  So one of the things with Lizzie -- and this was

13   certainly something that was repeated through many family

14   members.  Her daughter, Tomeika, her niece -- or grandchild, I

15   guess, Deja, Willie Bowman, Mahogany, and others, is that

16   Lizzie was a secret-keeper.  I think most pronounced was the

17   fact that when they lost their home, when they were evicted,

18   when Jeremiah was in the eighth grade, she really disappeared

19   from the family and did not ask for the help that they needed,

20   which really stranded this family.  And she convinced her son

21   Jeremiah that the rest of the family was not available to help

22   them.

23            And so I think one of the things she really taught

24   Jeremiah was not to ask for help when you need it.  And she

25   also taught him that there were many things that were shameful

1    for which you did not tell people outside of your home.  And I

2    think that those were lessons that were not helpful to this

3    young man.

4    **Q.**  In the course of collecting records, did you also collect

5    school records?

6    **A.**  Yes.

7    **Q.**  And those school records, did they go back -- how far back

8    did they go?

9    **A.**  All the way back to kindergarten.

10   **Q.**  And did those records that you collected and reviewed and

11   made part of the life chronology indicate anything regarding

12   developmental concerns regarding Jeremiah?

13   **A.**  Yes.  So it's a little bit unusual to see the number of

14   times that Jeremiah was tested over the course of his

15   educational career.  Ms. Bowman was very attentive to

16   Jeremiah's school and education, and she repeatedly asked for

17   testing.

18            Very early on in the testing, he was identified as a

19   child who needed special education, and that began with speech

20   therapy.

21            I think consistently through the education, we saw

22   that even as young as six years old, he was diagnosed with

23   depression.  And one of the things that the school was

24   consistently worried about were family stressors within the

25   home.

Short - direct by Herman                    **44**

1    **Q.**  So is -- and I have displayed on the screen a document.

2              Do you recognize this to be another screenshot from

3    the life chronology?

4    **A.**  Yes.

5    **Q.**  Okay.  And it indicates -- did you actually speak with his

6    kindergarten and/or first grade teacher?

7    **A.**  I spoke with his first grade teacher, yes.

8    **Q.**  And the records indicated that he was displaying as

9    nonverbal?

10   **A.**  Yes.  He entered kindergarten nonverbal.  And, in fact, his

11   mother was afraid that he was autistic going into school.

12   **Q.**  Now, in summary, Mr. Harris -- did your investigation

13   uncover whether or not Mr. Harris would continue to have IEPs

14   throughout his school career?

15   **A.**  All the way through high school.

16   **Q.**  Okay.  And could you explain what type of testing or

17   summarize what type of testing was recommended in these IEPs or

18   that actually occurred?

19   **A.**  Yeah.  So a lot of the times, there was neuropsychological

20   testing.  So they would do IQ testing, they would do

21   educational testing.  They'd look at his reading abilities, his

22   verbal abilities, his math abilities, his comprehension

23   abilities.  They were also looking at emotional and cognitive

24   abilities.  And oftentimes they -- as I said before, they were

25   diagnosing him most often with depression and also that he was

1   emotionally and socially immature.

2   **Q.**  Okay.  When you say "emotionally and socially immature,"

3   was -- did the records contain a comparison between Mr. -- or

4   between Jeremiah and his same-age peers?

5   **A.**  Yes.  So consistently starting in elementary school, what

6   we saw was that Jeremiah was -- identified year after year as

7   being behind his same-age peers when it came to social and

8   cognitive development.

9          THE COURT:  Would you agree that, in summary, that

10  the educational records show a fair amount of interventions and

11  review and testing and plans throughout his educational career?

12         And do you have a comment on how those interventions

13  relate to what you were saying earlier about how his mother

14  wouldn't ask for help, yet in some areas, it seemed she was

15  actually quite a fierce advocate and persistent seeker of

16  assistance, at least with respect to educational resources,

17  which included, as you mentioned, neuropsychological

18  evaluations, other kinds of testing?

19         And as well on the -- and I imagine that Mr. Herman

20  will get to this as well, but wrapped up in this is also the

21  Social Security efforts to obtain benefits and assistance.

22         So I guess, to summarize, would you agree that, at

23  least along some axes, there is quite a demonstrated and

24  persistent record of intervention and seeking of help and help

25  being provided?

Short - direct by Herman                                    **46**

1       THE WITNESS:  I --

2       THE COURT:  While at the same time, there is this

3  other dynamic that's going on that is an absence of other kind

4  of prosocial interventions and development?

5       THE WITNESS:  Yes.

6       THE COURT:  A fair summary?  And do you have any

7  comment on how to reconcile that tension?

8       THE WITNESS:  Yeah.  So I do agree.  And, as I said

9  earlier, I think that in the area of his education, and

10  particularly as he gets through middle school and her decision

11  to get him into this Waubonsie High School, I think the fact

12  that she was there and talking to teachers and participating in

13  IEPs and insisting on testing, even when the schools didn't

14  want to, was one of the positive things that she did within the

15  context of his education.

16       I don't think she followed through oftentimes when

17  the school wanted him, for example, to get therapy outside of

18  the school, or they felt he needed medication.  They often --

19  there was, for example, Judge, at one point where they referred

20  her to Division of Family Services because she wasn't getting

21  the medication that he needed, particularly for the depression

22  that they saw.

23       There was also some identification of the -- what

24  were significant family stressors within the home.  And one

25  solution that they offered at one point for this little boy,

1   who was so worried about his mother and his mother's care, that

2   one of the accommodations was to allow him to call home every

3   day to make sure that she was okay.

4        So I think that there was many things she was doing

5   in the school buildings to try to help him, but there was a

6   lack of follow-through at home.  And some of the things that

7   were happening at home were interfering with what she was

8   hoping to achieve at the school, if that makes sense.

9        THE COURT:  Thank you.

10        Mr. Herman, you can continue.

11        MR. HERMAN:  Thank you, Judge.

12        THE COURT:  And I also hope that through my question,

13   I have indicated to you that I have read these materials --

14        MR. HERMAN:  Yes.  I'm trying to --

15        THE COURT:  -- and I am familiar with them.

16        MR. HERMAN:  I understand, Judge.  Thank you.

17   BY MR. HERMAN:

18   **Q.**  Just -- and to underscore one point, Ms. Short, have -- in

19   your record review, was there any indication of ongoing

20   psychiatric care for Jeremiah?

21   **A.**  Between 2005 and 2010, he was seeing a Dr. Pecen, or Pecen,

22   and she was providing Concerta.  That was discontinued against

23   the recommendation of testers in school.

24        He also regularly saw a pediatrician, which he saw

25   every single week because of the severe obesity that he had and

1    the ongoing problems with the asthma, which caused several

2    hospitalizations for him as a young man.

3    **Q.** So 2005 to 2010, he's between five and ten years old?

4    **A.** Yes.

5    **Q.** And the concern is for ADHD?

6    **A.** Typically, that's what that's given for.

7    **Q.** And there was no other indication in your review of all of

8    the records, including his childhood medical records, that he

9    received any type of therapy that -- on an ongoing or material

10   basis?

11   **A.** No therapy, no.

12   **Q.** Now, at some point, you mentioned earlier that Mr. Harris,

13   Jeremiah, and his family were evicted from their home?

14   **A.** Yes.

15   **Q.** Okay. And briefly, what happened after that? Just if you

16   could --

17   **A.** They were evicted when Jeremiah was in eighth grade, and

18   they moved into a hotel, a Ramada Inn. And they initially

19   during that summer, as they were trying to figure out what they

20   would do, stayed at the Ramada during the week and then on the

21   weekends would bounce around until they could get back into the

22   Ramada on Monday.

23   **Q.** And did they stay at the Ramada or go into another motel?

24   **A.** Eventually, they landed at the LaQuinta Inn.

25            And we're talking about a family of six. And they

1    would stay in one room, which had two double beds, a small

2    microwave oven, a small refrigerator -- no kitchenette -- and a

3    bathroom.  And so six people, when Deandre joined them, lived

4    in this small space with two double beds.

5    **Q.**  How many years did the family stay in the LaQuinta Hotel?

6    **A.**  They finally left the LaQuinta Hotel in February of 2017.

7    And they got there, I believe, in 2012.

8    **Q.**  And during this time period, Jeremiah's living with

9    multiple family members, still going to high school and middle

10   school and --

11   **A.**  Yeah.  So it was at the end of -- it was middle school.

12   And then so all through high school, his high school career, he

13   lived in the LaQuinta Hotel until the last couple of months of

14   high school.

15   **Q.**  And from speaking with immediate family members who were

16   actually in that hotel room with Jeremiah, did you understand

17   there to be a kitchen?

18   **A.**  There was not.

19          And so there was a lot of food insecurity during this

20   period of time.  There was a lot of chaos in terms of the

21   relationships between the people there.  And then, of course,

22   Lizzie becomes ill, and her health will slowly deteriorate over

23   the period of time they lived in this hotel.

24   **Q.**  During this time period, were -- of Jeremiah's

25   middle-school age, in particular, and early high school, did

1    your investigation reveal any evidence of bullying or abuse by

2    others?

3    **A.**  Yes.  So Jeremiah began to experience severe bullying

4    starting in about the fifth grade.

5    **Q.**  For what reasons?

6    **A.**  For a number of reasons.  One was because he was severely

7    overweight.  And another reason was because he was immature.

8    He also had significant hygiene issues.  He also was a kid

9    that, you know, wore Goodwill clothes and just didn't fit in

10   with the other kids, which was something that all of his

11   siblings, Mahogany, Deandre, Deja, who you've got pulled up

12   here, all recognize that this was a kid that just didn't fit in

13   with the other kids.  And so the bullying was really

14   significant and caused a great deal of stress for Jerry.

15   **Q.**  I want to shift gears slightly and briefly touch on if your

16   investigation also included collecting information about any

17   sexual abuse that Jeremiah personally suffered during this time

18   period.

19   **A.**  Yes.

20   **Q.**  Okay.  Did it also uncover whether or not he was ever

21   exposed to online pornography?

22   **A.**  Yes.

23   **Q.**  When did that first occur?

24   **A.**  So when the Harris-Bowman family lived in Bolingbrook in

25   their house, there was a computer in the house that was in a

1   public space and was primarily used by Mahogany Harris, who was

2   12 years older than Jerry, but Jerry also had access to the

3   computer.

4          Neither of the parents, N.H. or Lizzie, used the

5   computer, nor did they have any real skills to monitor the use

6   of the computer by Jerry.

7   **Q.**  And did your investigation include collecting information

8   about Jeremiah watching, in particular, gay pornography

9   eventually?

10  **A.**  Yeah.  So Jeremiah started getting on the computer really

11  to look up cheer videos.  He -- Mahogany had been a

12  cheerleader, and so his initial interest in cheer was

13  introduced by her involvement in cheerleading.

14         And then through the computer, he started to watch

15  whatever cheerleading events he could find there, on YouTube,

16  et cetera.  But eventually, like a lot of kids, he found

17  pornography.  He also found gay love stories, which was

18  something that he really loved to watch.  And so those were two

19  other things that he started to watch on the internet.

20  **Q.**  Did you -- was another thing that he learned from this

21  unsupervised exposure online involve sending nudes of himself?

22  **A.**  So as a -- so as an 11-year-old, he, while on the internet,

23  was befriended by an individual in Miami, Florida, and that

24  individual became his friend, or he thought that the individual

25  was his friend, and eventually the conversations turned to

1    exchanging nudes.

2              Jeremiah was not familiar with that as an

3    11-year-old.  And so this individual first sent him nudes and

4    then instructed him how to send nudes back to him.

5              Jeremiah really thought that this guy was his

6    boyfriend and started to investigate how he might get down to

7    Miami to visit him.

8    Q.  And how old was Jeremiah at this time?

9    A.  He was 11.

10   Q.  Were there any incidents of Jeremiah being the victim of

11   contact offenses?

12   A.  Yes.

13   Q.  When -- how old was he at the time of the first contact

14   offense?

15   A.  13.

16   Q.  How old was the perpetrator?

17   A.  19.

18   Q.  Was there any relationship between the two?  How did they

19   know each other?

20   A.  This was an individual that he'd seen at a cheer gym called

21   ICC.

22   Q.  Was there a second incident of sexual abuse?

23   A.  Yes.

24   Q.  How old was Jeremiah at that time?

25   A.  15.

1   **Q.**  Who was the perpetrator?

2   **A.**  It was a stranger.  It was a cab driver.

3   **Q.**  How -- based on your investigation and your interviews, how

4   did they interact?  Or how did they come to be together?

5   **A.**  So in the fall of 2015, when Jeremiah was 15 and a junior

6   in high school, his mother had become progressively more ill

7   and she had to be admitted into the hospital for surgery.

8        Jeremiah was staying with her in the hospital but,

9   because he was a minor, was not allowed to stay overnight.  And

10  so the hospital social workers arranged for him to have a

11  voucher for a taxicab to take him back to his hotel.  And as

12  that was occurring, the cab driver propositioned him, pulled --

13  **Q.**  And this was propositioned him -- basically sex for money?

14  **A.**  Correct.

15  **Q.**  Okay.  And Jeremiah was paid sex to -- or paid money to

16  have sex with the cab driver, correct?

17  **A.**  The individual pulled over and got in the back of the car

18  and had anal sex with him, yes.

19  **Q.**  Now, we've talked a lot about Jeremiah's mother.

20       Her presence had a significant role in his life, and

21  so did her death, correct?

22  **A.**  Yes.

23  **Q.**  When did she die?

24  **A.**  She died in March of 2016 when he was a junior in high

25  school.

1    **Q.** And --

2              THE COURT:  Before you move on --

3              MR. HERMAN:  Yes.

4              THE COURT:  -- to that subject, I'd like to move back

5    to the chronology with a timing question that I had --

6              THE WITNESS:  Sure.

7              THE COURT:  -- in the materials.  Because in the

8    chronology, you have some entries that aren't specifically

9    dated.  They're just events that are occurring around the same

10   time.

11        (Witness nods.)

12             THE COURT:  And I was curious if you had a more

13   precise timing for when Mr. Harris, at age 13, gets in trouble

14   at Pro Athletics for his online communications with a

15   12-year-old, and he is told he's having inappropriate

16   communications and would get in trouble for those

17   communications.

18             When is that event happening in -- so, for example,

19   in relation to the assault, when he was a victim of an assault,

20   which also happened within that same year, but I couldn't quite

21   tell --

22             THE WITNESS:  Right.

23             THE COURT:  -- from the materials --

24             THE WITNESS:  How he before --

25             THE COURT:  -- how to situate that --

1          THE WITNESS:  -- or after?

2          THE COURT:  -- and if -- correct.

3          THE WITNESS:  Yeah.  So that's a good example, Judge,

4     in the chronology, is when you have events being reported to

5     you by a reporter, but they don't know exactly the dates of

6     when that happened.

7          And so, as I sit here today, my belief is that the

8     events that you're talking about, between the 13- and

9     12-year-old where he was called in and told that the behavior

10    was inappropriate, happened before the event with the teenager.

11         THE COURT:  Thank you.

12         You can proceed.

13         MR. HERMAN:  Thank you.

14    BY MR. HERMAN:

15    Q.  Focusing -- turning our attention to --

16         THE WITNESS:  And just --

17         MR. HERMAN:  Yes.  I'm sorry.

18         THE WITNESS:  Can I say one other thing about that?

19         The one thing that was unfortunate about that

20    counseling that he received at the gym was that his mother was

21    not called in to be counseled as well.

22         I think that it would have been very important for

23    any parent in that circumstance to have been advised that that

24    kind of behavior was going on, and unfortunately the choice was

25    not made to counsel with mother.

1    BY MR. HERMAN:

2    **Q.**  Thank you.  Turning back to Lizzie's death.

3              What was the cause of her death?

4    **A.**  She died of stage 4 lung cancer.

5    **Q.**  And how long had she been ill based on your investigation?

6    **A.**  Well, at least over a year.

7              She was not forthcoming with what the nature of her

8    illness was.  And, of course, it is unknown how long she had

9    been aware of her -- the actual status or diagnosis of her

10   illness.

11   **Q.**  And during this time when she was ill and suffering from

12   cancer, was she -- this is the time period when they're living

13   in the LaQuinta Hotel?

14   **A.**  Yes.  The -- certainly, the worst parts of her illness are

15   experienced within the context of living in the motel.

16   **Q.**  And Jeremiah's still sharing a bed with her?

17   **A.**  The entire time they lived in the motel, they shared a bed,

18   yes.

19   **Q.**  And he's 16 years old at this time?

20   **A.**  And understand, this is lung cancer and she is receiving

21   treatment.  And so he is seeing his mother deteriorate.  He's

22   also seeing the effects of the types of cancer treatment that

23   she would have, including nausea, throwing up, the other

24   effects of the medication.  He would often lay his head on her

25   chest to see if she was still breathing.

1   **Q.** Did his mother leave any type of plan for his care after

2   her passing?

3   **A.** I think because Lizzie really was not acknowledging her own

4   terminal illness, she did not make any kind of plans for him

5   financially from the standpoint of housing or the continuation

6   of his education.

7   **Q.** During this time period, in fact right at the same time

8   period of Lizzie's passing, could you describe generally what

9   the role of cheer played in his life?

10  **A.** What the role of cheer played?

11  **Q.** Cheer, cheerleading.

12  **A.** So I think the most poignant example of the role that cheer

13  played for him -- I mean, Jerry, like all of us, was a kid that

14  was looking to be loved.  And in his own family, there was a

15  lack of that love except for with his mother.  And that was, in

16  large part, a situation that had been created by Lizzie who had

17  caused estrangement between this young man and his family.

18          And so as -- on the day of his mother's death, there

19  was a competition.  And Jerry came to the gym prepared to

20  compete, and family members and the coaches told him that he

21  didn't need to compete, that it was perfectly fine for him to

22  not compete, and he said that his mother would want him to

23  compete.  And I think really, Judge, that what he wanted and

24  needed was to be surrounded by the love of these people in the

25  cheer community.

1    And so he took the stage.  And I heard from family

2    members, from teammates, and from many of the people that I

3    interviewed that in this large auditorium where this particular

4    competition took place, whether you were a member of the ICE

5    gym or you were a member of the other competitor teams,

6    everyone in the whole auditorium watched him compete, came to

7    their feet, cheered his name, and really surrounded him in the

8    love that they felt for him.  And it was a very poignant, you

9    know, moment in his life and I think, you know, what he needed

10   in this very, very sad day of his life.

11         He has said many times to me that he thinks very

12   often of wanting to be with her.

13   **Q.**  Ms. Short, you've interviewed others in the cheer

14   community, and their letters are in there, in the black binder

15   that has been submitted, correct?

16   **A.**  Yes.

17   **Q.**  Is one of those individuals Ernie Valdez?

18   **A.**  Yes.

19   **Q.**  And Mr. Valdez was his long-term coach?

20   **A.**  Yes.

21   **Q.**  Did Mr. Valdez, knowing about the allegations of -- and

22   charges and offense conduct, now did he still have positive

23   things to say about Jeremiah?

24   **A.**  Yes.

25   **Q.**  Now, I want to touch on an issue of Jeremiah's sexuality.

1    Was this something that, based on your interviews, his

2    immediate family members, your understanding, was that

3    something that he could share with any others in his family,

4    his immediate family?

5    **A.**  So I think Jerry's not different from a lot of adolescents

6    who are gay or LG -- going to get the initials mixed up.  But

7    he's not -- he's like a lot of kids in that space.

8             And his mother, in particular, was not going to be

9    open to him being gay, and so it was isolating for him within

10   his family.  It was not someplace that he could be open about

11   his identity as it was -- as he was trying to understand it

12   himself.

13   **Q.**  Switching gears.

14            You also participated, in your capacity as a

15   mitigation expert and investigator, in helping identify experts

16   to provide forensic evaluations of Jeremiah; is that correct?

17   **A.**  Yes, yes.

18   **Q.**  And there were, in fact, two forensic evaluations prepared?

19   **A.**  Yes.

20   **Q.**  And are you familiar -- or do you know whether or not those

21   evaluations are in the binder and have been prepared -- or

22   provided to the Court?

23   **A.**  Yes.

24   **Q.**  Okay.  We're not going to go through the evaluations, given

25   that everybody 's reviewed them, but, briefly, is one of the

Short - direct by Herman                                    **60**

1    experts Dr. Antoinette McGarrahan?

2    **A.** Yes.

3    **Q.** And who is Dr. McGarrahan?

4    **A.** Well, Dr. McGarrahan is a neuro -- a forensic

5    neuropsychologist from Dallas, Texas.

6    **Q.** And you know that she provides risk assessments?

7    **A.** She does, yes.

8    **Q.** Did you know her before this case?

9    **A.** Yes.

10   **Q.** Have you worked with her before?

11   **A.** Yes.

12   **Q.** Do you have any knowledge about whether or not she's been

13   qualified as an expert to testify in formal criminal

14   proceedings?

15   **A.** Yes.

16   **Q.** Based on your personal knowledge, has she worked with law

17   enforcement before?

18   **A.** Yes.

19   **Q.** Do you know where Dr. McGarrahan is right now?

20   **A.** She's in France.

21   **Q.** And what is she doing in France?

22   **A.** She's presenting a paper to -- at a law enforcement

23   conference in the -- in France.

24   **Q.** And you're familiar that the key takeaways from -- well,

25   before I get to that, the second expert is Dr. Marilyn

Short - direct by Herman                    **61**

1    Hutchinson?

2    **A.**  Yes.

3    **Q.**  What's her specialty?

4    **A.**  She's a forensic psychologist.

5    **Q.**  And were you familiar with her before this case?

6    **A.**  Yes.

7    **Q.**  Have you, in fact, put her on a witness stand and examined

8    her?

9    **A.**  Yes.

10   **Q.**  Okay.  Are you -- her -- and she also arrived at certain

11   conclusions based on reviewing the records and the evidence in

12   this case?

13   **A.**  Yes.

14   **Q.**  Okay.  And everything she reviewed is included in the

15   reports that have been submitted to the Court, correct?

16   **A.**  Yes, yes.

17   **Q.**  And is it fair to say that the key takeaways from these two

18   experts are that Jeremiah does not suffer from a sexual

19   deviance disorder?

20   **A.**  Yes.

21   **Q.**  And Jeremiah poses a low risk for recidivism?

22   **A.**  Yes.

23   **Q.**  And you're aware that Dr. McGarrahan included in her

24   analysis the pattern tool that the Bureau of Prisons actually

25   uses?

Short - direct by Herman                                    **62**

1    **A.**  Yes.

2    **Q.**  For risk assessment?

3    **A.**  Yes.

4    **Q.**  And that the consensus from these two experts are that

5    Jeremiah has a strong potential for rehabilitation?

6    **A.**  Yes.

7    **Q.**  And it's fair to say that those are the takeaways from

8    these particular reports, right?

9    **A.**  Yes.

10   **Q.**  Okay.  The -- quickly, the diagnoses for Jeremiah presently

11   from Dr. Hutchinson are what, if you recall?

12   **A.**  Major depression and post-traumatic stress disorder.

13   **Q.**  And you also reviewed Bureau of Prisons records in this

14   particular case?

15   **A.**  I have, yes.

16   **Q.**  From Jeremiah's current stay at the MCC?

17   **A.**  Yes.

18   **Q.**  Do those records indicate whether or not he's availing

19   himself to treatment and therapy?

20   **A.**  He has been availing himself to treatment and therapy.

21   **Q.**  Do they show whether or not he's actively participated?

22   **A.**  He's actively participated in both individual therapy with

23   Dr. Watkins as well as group therapy.

24              MR. HERMAN:  Judge, I'm skipping forward given the

25   Court's familiarity.

Short - direct by Herman **63**

1  BY MR. HERMAN:

2  **Q.**  Now, you also prepared as an exhibit, your team, an exhibit

3  that was submitted to the Court under seal.  We'll call it the

4  Square/Venmo exhibit.  Is that correct?

5  **A.**  Yes.

6  **Q.**  Okay.  Now, you're aware of certain -- of admissions that

7  Mr. -- that Jeremiah has made regarding payment to 17-year-olds

8  for nude photos?

9  **A.**  Yes.

10  **Q.**  And he's admitted to those, correct?

11  **A.**  Yes.

12  **Q.**  As part of your investigation, did you and your team

13  collect financial information regarding transactions that

14  Jeremiah made during this time period of the offense conduct?

15  **A.**  Well, we took the information that had been provided by the

16  government and looked at every single one of the transactions

17  and who they were made to.

18  **Q.**  Okay.  And did you identify -- and you created a chart

19  regarding --

20  **A.**  Yes.

21  **Q.**  -- that information?

22  **A.**  Yes.

23  **Q.**  Okay.  You're aware of information that -- or a

24  characterization that Jeremiah used his money from -- after the

25  documentary was published to buy nudes from others?

Short - direct by Herman                    **64**

1   **A.** Yes.

2   **Q.** Is that -- you're aware of that?

3   **A.** Yes.

4   **Q.** In your thorough review of the financial records that the

5   government provided, other than the offense conduct present

6   here through Square and Venmo, is that substantiated by the

7   record evidence?

8   **A.** No.  Every other -- every other transaction that was on the

9   Square and Venmo exhibit was made to a college student, that

10  is, an adult or a peer.

11  **Q.** Okay.  Sorry to jump around, but there's one thing I forgot

12  about Dr. McGarrahan.

13           You've reviewed the government's sentencing pleading

14  in this case?

15  **A.** Yes.

16  **Q.** Okay.  And are you familiar whether or not there's a

17  section in that pleading addressing Dr. McGarrahan's report?

18  **A.** Yes.

19  **Q.** And in that section, is it correct that the government

20  faults Dr. McGarrahan for using the word "allegations"?

21  **A.** Yes.

22  **Q.** Did you have a -- subsequent to reviewing that pleading,

23  did you have a conversation with Dr. McGarrahan about that

24  criticism?

25  **A.** Yes.

1    **Q.** Did Dr. McGarrahan explain to you why she used the word

2    "allegations"?

3    **A.** Yes.

4    **Q.** What did she say?

5    **A.** So at the time of the evaluation, Mr. Harris had not yet

6    entered a plea, and so the word "allegation" was more

7    appropriate from a legal standpoint.

8            But in terms of the evaluation itself, she considered

9    anything in the government's pleadings to be factual.

10           And so although the word "allegation" is there, she

11   took everything to be true in rendering her opinion and

12   considering the evidence.

13   **Q.** Did she indicate to you whether or not her opinion would

14   have changed in any manner after Jeremiah had pled guilty to

15   the charges?

16   **A.** No, because the way in which she conducted the evaluation

17   was to consider all of the factual elements in the government's

18   complaint -- or indictment to be true.

19           MR. HERMAN:  Okay.  Thank you.

20           One second, please, Judge.

21       (Counsel conferring.)

22           MR. HERMAN:  Judge, at this point, we have

23   streamlined the presentation, but we do have some videos.

24   There's one --

25           THE COURT:  That's fine.  But before you do that, let

Short - direct by Herman                **66**

1    me follow up with one question on the subject matter --

2                MR. HERMAN:  Of course.

3                THE COURT:  -- that you have touched on.

4                Ms. Short, have you had any follow-up conversations

5    with Dr. Hutchinson?

6                THE WITNESS:  In terms of?

7                THE COURT:  In terms of her report?  I mean, because

8    she's not here.

9                I have a question about parts of her report, and

10   either I can ask Ms. Short for her take on my questions or I

11   can direct them to counsel when it's your time for argument.

12               But since you have just touched upon what the experts

13   are saying, I'll --

14               MR. HERMAN:  We had a conversation with -- I know

15   that Ms. Short had a conversation with Dr. McGarrahan.  I am

16   not sure if there was one with Dr. Hutchinson.

17               She can answer if she knows.  If she doesn't know the

18   answer, I think that Mr. Pugh or myself can do our best to

19   address it.

20               THE COURT:  So I'll ask the question of you, Ms.

21   Short.  And then --

22               THE WITNESS:  Okay.

23               THE COURT:  -- counsel, you'll know that I have this

24   question on my mind, and you can address it --

25               MR. HERMAN:  Thank you.

1    THE COURT:  -- when you're arguing.  There's -- and

2    this was on the slide with respect to the lack of any finding

3    or opinion of what the psychologists would term "sexually

4    deviant behavior."

5    But in the reports, there's also the opinion that Mr.

6    Harris is not sexually attracted to children, and I wanted to

7    see if you have any further understanding of what that means in

8    light of the offense conduct in this case.  And does it mean

9    that if the offense conduct isn't about sexual attraction, it

10   is about something else?

11   THE WITNESS:  Yes.

12   THE COURT:  Which could be a lot of different things.

13   But sometimes it's about power and dominance --

14   (Witness nods.)

15   THE COURT:  -- as an example.  And so I was just

16   wondering if you had a comment about what the experts' opinion

17   about the lack of sexual attraction to children means in the

18   factual context that we have in the case.

19   THE WITNESS:  I want to preface this by saying, first

20   of all, that I am not a psychologist.

21   THE COURT:  Understood.  Which is why I asked if you

22   had any follow-up conversations with the experts that you can

23   then at this point, second- or thirdhand --

24   THE WITNESS:  Yes.

25   THE COURT:  -- channel what they might be saying

1    about that, or what they really mean --

2           THE WITNESS:  Sure.

3           THE COURT:  -- by that, and whether -- frankly,

4    whether it has any value, whether that opinion has any value in

5    a case like this.

6           THE WITNESS:  So I think one of the -- I think both

7    experts are looking at -- and I think stated in the reports,

8    looking at things contextually.  Also considering that the fact

9    that Mr. Harris is himself an adolescent and looking at the age

10   ranges of the young people that are involved in this case.

11          Also maybe more particularly talking to Dr.

12   McGarrahan.  And I think the Court -- might be helpful to know

13   that Dr. McGarrahan regularly does risk assessments in the

14   state of Texas for the government and does a lot of SDP work.

15   And so we were more particularly interested in how she reached

16   her conclusion that he would not be classified as a pedophile

17   or a hebephile.  And a lot of it came down to the specific

18   definitions within the DSM-V and the ages of the individuals

19   that were involved.

20          But also I think, more particularly, the -- what --

21   when you look at McGarrahan's report, the protective factors

22   that were involved, the contexts, in particular, of the cheer

23   community and the way in which we were blending the different

24   ages together, also looking at the social and emotional

25   immaturity of Mr. Harris over a period of his adolescence, the

Short - direct by Herman                69

1    fact that Mr. Harris was in late adolescence while these

2    individuals, minors were in middle adolescence.  The -- that

3    most of the individuals involved, it was about a four-year gap.

4           So there were a number of factors in those bullet

5    points, I would say, that contributed to the diagnosis by both

6    of them, that he was not -- did not fall within the category of

7    sexual deviance disorder and that it was better described

8    without using that particular label.

9           THE COURT:  Thank you.

10          MR. HERMAN:  Judge, could I have a brief follow-up on

11   that --

12          THE COURT:  Sure.

13          MR. HERMAN:  -- to maybe add some additional gloss?

14   And specifically -- and if you don't mind if I lead?  Because

15   it's in the report.

16   BY MR. HERMAN:

17   Q.  Specifically, Ms. Short, did Dr. Hutchinson and Dr.

18   McGarrahan, for that matter, consider the emotional and

19   cognitive delays that Jeremiah displayed throughout his entire

20   life, as documented in the records and anecdotal evidence?

21   A.  Yeah.  And so I think one of the things that was

22   important -- and when we're doing the investigations, Judge,

23   we're trying to look for information that is corroborated along

24   several avenues.  And so we -- particularly with the

25   emotional/cognitive delays with Mr. Harris, we were seeing it

1  early in childhood and reports from family members, then

2  reports from schools, then reports from records, then reports

3  from coaches, and then reports from individuals that were able

4  to watch him from the age of about 11 through the age of 18,

5  and we were really getting a wide range of consistency through

6  many different data points on that particular issue.

7            And so that social immaturity and the fact that he

8  was more comfortable with peers that were anywhere between two

9  to four years younger than him, just in a normal socialization

10 situation, was significant, I think, to both experts.

11           The other thing I think was significant to both

12 experts was that he was generally a very prosocial individual,

13 not antisocial, and, you know, very much a kid that was

14 amenable to instruction and education and therapy.

15           THE COURT:  And there's a reference in the

16 chronology, when Mr. Harris is 20 years old, that one of the

17 people that you interviewed talked to you or your interviewer

18 about meeting Mr. Harris' boyfriend at the time.

19           THE WITNESS:  Yes.

20           THE COURT:  I infer from that that it was an

21 age-appropriate relationship.  And so that at age 20, Mr.

22 Harris was capable of forming age-appropriate relationships.

23           THE WITNESS:  Well, and so what we also saw happen

24 was in the summer before he went out to the University of

25 Louisville, which is where he went the first semester of his

1    junior year, is, I think, a period of growth for Mr. Harris in

2    terms of his adolescence, catching up to where he was.

3         Most of the people who were responsible for him going

4    into college did not want him to go to a regular college

5    because they just did not feel he had the social or emotional

6    maturity, which is why they wanted him in a junior college

7    environment where he would be more monitored.

8         When he got to the University of Louisville, which

9    was, you know, your typical college experience, and he got into

10   what was a, you know, vibrant gay community, the relationships

11   were normalized, and he was dating and enjoying and partying

12   with kids that were his same age.  And that's what our

13   expectation would be going forward based on my conversations

14   with both Dr. McGarrahan and Dr. Hutchinson.

15        THE COURT:  Thank you.

16        MR. HERMAN:  Thank you, Ms. Short.

17        Judge, regarding these videos, as you're aware, we've

18   submitted 24 videos.  And if this was the normal case, and

19   without the technology, we may be calling up witness after

20   witness.  But we've culled maybe one full video ten minutes of

21   length and four or five clips and then some of the individuals,

22   Shannon Young, which we think are important, and we have the

23   Bodymap at the end.

24   BY MR. HERMAN:

25   Q.  So, Ms. Short, did you interview somebody named Adrian

1  Ringo?

2  **A.**  I did, yes.

3  **Q.**  And who is Ms. Ringo?

4  **A.**  Ms. Ringo is an important person in Mr. Harris' life.

5  She's one of the mothers that he met through cheer and is an

6  important person in his support system currently.

7  **Q.**  Did -- was she -- Jeremiah's involvement in cheer was

8  unique for a couple of reasons because of his race and

9  ethnicity and gender, correct?

10  **A.**  Yes.

11  **Q.**  And did Ms. Ringo have some association with that that she

12  spoke about in her video?

13  **A.**  She did.  So she was able to specifically address some of

14  the issues of Jeremiah being both African-American and a gay

15  youth in a sport that -- I don't know how familiar you are with

16  cheer, but it's a very suburban/white sport.  We don't see a

17  lot of Jeremiahs in the gyms.

18  **Q.**  And it's an expensive sport, too, based on your personal --

19  **A.**  I can attest that it is a very expensive sport.

20        MR. HERMAN:  Okay.  If I may publish this video of

21  Ms. Ringo?

22      (Said video played in open court.)

23  BY MR. HERMAN:

24  **Q.**  Is that sentiment that Ms. Ringo ended with about support

25  throughout this case and afterwards whenever release is, was

 1   that echoed in every single video that your team made?

 2   **A.** Yes.

 3            And I want to reiterate, Judge -- and I felt my

 4   answer earlier was incomplete to you.  But this event where we

 5   did the video, I met with 40 different sets of parents, and

 6   this was where we had these hard conversations about the

 7   seriousness of these offenses.

 8            And I don't want to leave you with the impression

 9   that I was mealy-mouthed about it or that I didn't particularly

10   help them understand the seriousness of what life looks like

11   after conviction and prison.  And so I -- and those

12   conversations happened with Ms. Ringo and with the other videos

13   that you've seen.

14   **Q.** You also interviewed someone named Lauri Hamilton, correct?

15   **A.** I did.

16   **Q.** And I believe Ms. Hamilton is in court right now.

17   **A.** Yes.

18   **Q.** Did you -- amongst other subjects, did you happen to speak

19   to her about a moment when Jeremiah started living with her

20   after the death of his mother?

21   **A.** I did.

22   **Q.** And this was temporary -- a temporary stay with her,

23   correct?

24   **A.** Yes, yes.

25   **Q.** And --

Short - direct by Herman                    **74**

1    **A.** As people were trying to figure out what -- you know, what

2    would happen to Jeremiah next.

3    **Q.** Did she share her impressions of Jeremiah's, you know,

4    fragile psyche at that time with you?

5    **A.** Yes.

6         (Said video played in open court.)

7    BY MR. HERMAN:

8    **Q.** And you also spoke with Jim and Shannon Whelan, correct?

9    **A.** Yes.

10   **Q.** And Jeremiah ended up moving in with the Whelans?

11   **A.** Yes.  He was able to finally move in with them in the

12   spring of his senior year of high school.

13   **Q.** In addition to the actual medical records that followed

14   Jeremiah throughout his life, was there anecdotal evidence of

15   firsthand observations of Jeremiah being emotionally younger

16   than he actually was in terms of a number?

17   **A.** Yeah.  There were many people who had close relationships

18   with Jeremiah, both teachers at Waubonsie High School,

19   counselors there, as well as family members who took him in,

20   who had opportunities to observe him, that had opinions about

21   his stunted emotional/social growth.

22   **Q.** And Jim and Shannon Whelan also commented on that, correct?

23   **A.** Yes.

24        (Said video played in open court.)

25   BY MR. HERMAN:

1   **Q.** And Natasha Pryor was another individual who you

2   interviewed, correct?

3   **A.** Yes.

4   **Q.** Do you also recall about her -- if she shared with you her

5   impressions of Jeremiah's maturity in his adolescence?

6   **A.** Yes.

7       (Said video played in open court.)

8   BY MR. HERMAN:

9   **Q.** You testified earlier that you spoke with individuals

10  outside of the cheer family, correct?

11  **A.** Yes.

12  **Q.** Was one of the individuals Mr. Shannon Young, who is on

13  your screen?

14  **A.** Yes.

15  **Q.** Okay.  Who is Shannon Young?

16  **A.** Well, Shannon Young is a coach, a cheerleading coach, and a

17  co-owner at ICE All-Stars, which is Illinois Cheer Elite, which

18  is the gym that Jerry started with in fifth grade and was there

19  through his senior year in high school.

20  **Q.** And you sat down and you had a long video interview with

21  Mr. Young, correct?

22  **A.** Yes.

23  **Q.** And Mr. Young told you about how he personally knew

24  Jeremiah?

25  **A.** Yes.

Short - direct by Herman                          **76**

1    **Q.** Okay. Did Mr. Young also offer some critiques about the
2    cheer community itself?
3    **A.** Yes.
4    **Q.** Were you surprised to hear those from him?
5    **A.** Yes.
6    **Q.** Why is that?
7    **A.** Well, because of his position in the cheer community. I
8    thought that it was courageous of him to speak so openly and
9    honestly about the ways in which this cheerleading has evolved
10   in a way that's really not particularly healthy, I think, for
11   its athletes.
12   **Q.** Was one of his criticisms about the blending of different
13   age groups?
14   **A.** Yes.
15   **Q.** Okay. And he spoke about that to you?
16   **A.** Yes.
17   **Q.** Okay.
18           MR. HERMAN: I'm going to play a clip of the -- maybe
19   a clip of the clip here.
20           THE WITNESS: Okay.
21       (Said video played in open court.)
22           MR. HERMAN: Just to jump forward two minutes for the
23   record.
24       (Said video continued to be played in open court.)
25           MR. HERMAN: Now, the last video -- last part of the

1    presentation that I'd like to play is this Bodymap.

2            THE COURT:  Before we do --

3            MR. HERMAN:  Yes.

4            THE COURT:  -- Bodymap, can I ask a question --

5            MR. HERMAN:  Of course.

6            THE COURT:  -- about the section of Mr. Young's

7    comment that maybe you, Ms. Short, can situate within Mr.

8    Harris' life chronology that you have prepared?

9            I don't see so much of a direct connection between

10   the problem that Mr. Young is talking about and the offense

11   conduct here, and even the chronology of Mr. Harris' life.

12           So while I can appreciate that that may be a

13   background phenomenon that is happening within cheer, this

14   age-blending --

15           THE WITNESS:  Uh-huh.

16           THE COURT:  -- I don't see it having all that

17   particular a direct application to this case.  So I thought I

18   would give you an opportunity to explain why I might be wrong

19   about that.

20           THE WITNESS:  Okay.  So the one thing that I think is

21   important to understand is that when these kids are coming to

22   these cheer gyms, they're coming from all different schools and

23   even regionally coming into these teams.  The teams come in in

24   May and they're formed.

25           So Jerry was always on teams where he was not with

1    all same-age kids, right?  So on his teams, there would be a

2    range of ages.  Even when he was on a level 2, level 4, then he

3    was level 5 at the end.

4              And so the flyers, the kids that are being tossed up

5    into the air, those kids all range in age anywhere probably

6    between 8 and 12.  So Jerry might be an 18-year-old or a

7    17-year-old, ready to turn 18, and his flyers might be 8 or 9

8    or 10 years old.

9              So you would be socializing and bonding with those

10   teams.  Does that make sense?

11             THE COURT:  No, I understand the point.  I am

12   wondering -- and it might not be so much a direct connection.

13   It's just a --

14             THE WITNESS:  So then --

15             THE COURT:  -- phenomenon and --

16             THE WITNESS:  -- the other --

17             THE COURT:  But the offense conduct here is of a

18   particular kind, and I am wondering how attributable it is to

19   the nature of these cheer teams and the culture of cheer, or

20   whether it's attributable to something else or it's part of it.

21   But how direct a connection is it really to the offenses?

22             THE WITNESS:  Well, I think the other thing that --

23   perhaps is that there are a small number, a small percentage of

24   boys that participate in cheer, and it gets larger as you get

25   older.

1          Within Jerry's gym at ICE, there was a smaller

2    percentage of boys that were participating, and most of the

3    teams would have been girls.

4          But the other thing that happens in the cheer

5    community, with the proliferation, certainly, of social media,

6    Twitter, Snapchat, et cetera, is that the kids are growing

7    their networks across the country.  And so when we would arrive

8    at these different venues around the country, the kids would be

9    socializing with kids from other teams that they met over the

10   internet, and those kids would, again, range in ages based upon

11   what level teams they were on.

12         And so I think the kids naturally saw each other as

13   peers, particularly if they were competing on same-level teams.

14   So on level 2, you're a level 2.  You're a flyer.  You're eight

15   years old.  I'm a backspot or I'm a sidespot, or whatever.  And

16   the kids -- you could see it when you were at competitions,

17   Judge.  And I've been to very many competitions.  And the kids

18   all running around together, all varying ages, and most of them

19   on their phones, you know, talking to each other and exchanging

20   information.

21         Girls that I interviewed in this case would often

22   tell me that they might be 16, but their best friend was 13

23   because of the way, you know, they socialize on -- through

24   cheer.

25         So I think that the kids didn't see the lines drawn

1    the same way they might have if we were running cheer the way

2    Shannon talked about and the way it traditionally was run.

3             THE COURT:  Thank you.

4             MS. GUZMAN:  Judge, I'm sorry to interrupt.  I don't

5    know if this is the last video, but I know it's 20 or 30

6    minutes, and I was going to ask the Court if we could have a

7    restroom break soon?  I apologize.

8             MR. PUGH:  I'll join in that motion.

9             THE COURT:  And this --

10            MR. HERMAN:  This is the last --

11            THE COURT:  Are you playing the whole Bodymap video?

12            MR. HERMAN:  We play the whole Bodymap.  And this is

13   the last --

14            THE COURT:  But it is -- the Bodymap video is about

15   26 --

16            MR. HERMAN:  About 20 minutes.

17            THE COURT:  Yeah.  We can take a break.  Why don't we

18   take a break for -- I know there's a lot of people, and now

19   there's going to be a lot of moving parts, but if we could keep

20   it to as close to five minutes as possible so that we can

21   reconvene, that would be, I think, helpful for everyone.

22            So let's take a short recess.

23        (Recess.)

24            THE CLERK:  Recalling 20 CR 637, United States versus

25   Harris.

1        THE COURT:  Mr. Herman, you may resume.

2        MR. HERMAN:  Thank you, Judge.

3   BY MR. HERMAN:

4   **Q.**  Ms. Short, we left off with the last video of -- for today.

5        You're familiar with something called a Bodymap

6   video?

7   **A.**  Yes.

8   **Q.**  Who prepared this video?

9   **A.**  Dr. Julie Urbanik.

10  **Q.**  And briefly, could you explain to the Court what a Bodymap

11  video is?

12  **A.**  So the Court received a report from Dr. Urbanik which lays

13  out the process that Dr. Urbanik used, and the purpose of the

14  Bodymap.  But basically the Bodymap is a qualitative research

15  instrument that Dr. Urbanik has used in her practice as a

16  social geographer, and it serves as a way to work with Jeremiah

17  to help us see his own life experiences, his experiences in the

18  community, and how well he can be self-reflective about those

19  experiences.

20  **Q.**  And Dr. Urbanik, you're aware that she met with Jeremiah at

21  the MCC to actually prepare the material used in this video --

22  **A.**  Yes.

23  **Q.**  -- correct?

24  **A.**  She -- this was a two-day process, yes.

25  **Q.**  And those meetings occurred, again, at the MCC?

Short - cross by Guzman                               **82**

1   **A.**  They did, yes.

2   **Q.**  Okay.  And you referenced that Dr. Urbanik also provided a

3   report, which has been tendered to the Court and the government

4   and Probation, along with the video, correct?

5   **A.**  Correct.

6   **Q.**  And you have reviewed the Bodymap video?

7   **A.**  I have.

8   **Q.**  And the video -- I'm about to play the Bodymap video.  And

9   you've seen this actual copy before, and it's the copy that Dr.

10  Urbanik prepared, right?

11  **A.**  I have.

12  **Q.**  Okay.

13       (Said video played in open court.)

14           MR. HERMAN:  Judge, I have nothing further.

15           THE COURT:  Ms. Guzman, do you have any questions

16  you'd like to pose of Ms. Short?

17           MS. GUZMAN:  Yes, Your Honor.

18           THE COURT:  Go ahead.

19           MS. GUZMAN:  Do you want me to do it seated or can I

20  use the podium?

21           THE COURT:  You can use the podium.

22                         CROSS-EXAMINATION

23  BY MS. GUZMAN:

24  **Q.**  Good afternoon.  It's Ms. Short, right?

25  **A.**  Yes.

1    **Q.**  Is it -- Ms. Short, you're a lawyer by profession, right?

2    **A.**  Yes.

3    **Q.**  And now you're a mitigation consultant, correct?

4    **A.**  Yes.

5    **Q.**  Okay.  And so you're being paid for your services in this

6    case, is that right?

7    **A.**  Yes.

8    **Q.**  And paid for your testimony today?

9    **A.**  No, not being paid for my testimony.  I'm being paid for my

10   time.

11   **Q.**  Okay.  And how much are you being paid for your time in

12   this case?

13   **A.**  I get paid $125 an hour.

14   **Q.**  Okay.  And you said as a mitigation consultant, it's your

15   job to find and portray for the court mitigation information,

16   right?

17   **A.**  Correct.

18   **Q.**  And it's your job to find as much mitigation information as

19   you can, correct?

20   **A.**  To develop the life history of the individual, yes.

21   **Q.**  And this is a service that you provide to defendants

22   exclusively, right?

23   **A.**  Correct.

24   **Q.**  Okay.  You're never hired by the government or by the

25   prosecution, correct?

Short - cross by Guzman                                    **84**

1    **A.**  That's correct.

2    **Q.**  And in this case, you said you had done approximately 70

3    hours or 14 meetings with Mr. Harris, correct?

4    **A.**  True.

5    **Q.**  And you'd also conducted over 70 interviews of witnesses

6    and people in Mr. Harris' life, is that right?

7    **A.**  Yes.

8    **Q.**  As part of your preparation in this case, did you meet with

9    any of the investigating agents or law enforcement officers in

10   this case?

11   **A.**  I did not.

12   **Q.**  And did you meet with any of the victims of this -- these

13   offenses?

14   **A.**  I did not, but I -- no.

15   **Q.**  That's not part of the context that you're providing to the

16   Court today, correct?

17   **A.**  No, I don't -- I don't think that's my role.  But no.

18   **Q.**  And you said when you met with these over 70 people to talk

19   with them about Jerry Harris and who he is and what they think

20   of him, you did talk with him -- with them about the offense

21   conduct, right?

22   **A.**  Yes.

23   **Q.**  And I think you said -- well, first of all, did you tell

24   them that these were allegations or that they were convictions?

25   **A.**  Mr. Harris had made admissions to the conduct based upon

1    what I had read from the government's discovery.

2    **Q.**  Okay.  And I think you said that you told them -- well,

3    actually, let me ask you, did you tell them how many kids he

4    had assaulted and harassed?

5    **A.**  I discussed it based upon the discovery that was provided

6    and the -- so there are seven minors.

7    **Q.**  Okay.  So did you tell them there were seven victims?

8    **A.**  Yes.

9    **Q.**  And did you tell them that there were seven main victims in

10   this case, but that Mr. Harris had admitted there were five to

11   ten that he knew that he'd done this with?

12   **A.**  Yes.  During the conversation that he had with the FBI

13   agent that he had identified, as I recall, five to ten.

14   **Q.**  Okay.  And did you tell the people that you were speaking

15   with that he threatened to post photos, that the sexually

16   explicit photos that they sent, if they didn't agree to send

17   him more?

18   **A.**  Well, your memory and my memory may differ on that

19   particular point.  But I do not recall giving that specific

20   piece of information.

21   **Q.**  So you didn't tell them that he'd threatened them?

22   **A.**  I -- again, your memory and my memory may differ on that

23   particular point, so I don't -- I did not provide that piece of

24   information.

25   **Q.**  And you also said that you told them that he had given

1  invitations to send nude photos?  Is that the way that you

2  characterized it?

3  **A.**  If that's the word that I used today, that's a -- that

4  would be the wrong word.  And so "invitation" would not be the

5  right word.

6  **Q.**  So what would be the right word?

7  **A.**  Solicited.

8  **Q.**  Okay.  And is that the word that you used when you talked

9  to these 70 people?

10  **A.**  Yes.

11  **Q.**  Okay.  Did you tell them that he repeatedly attempted to

12  solicit and did solicit these, even after each of these victims

13  declined?

14  **A.**  Well, what my recollection is is that there was

15  solicitation of nude photographs that were -- was repeated over

16  time with each of the minors involved, and that that was

17  communicated to the individuals in these various family groups.

18  **Q.**  Okay.  Did you tell them that this conduct went on for

19  months and months?

20  **A.**  Yes.

21  **Q.**  And did you tell them that he pressured and influenced

22  these victims to send these photos?

23  **A.**  I do not believe that I probably used the language that

24  you're using, but I did make it clear that there was a

25  difference in age and that Mr. Harris' behavior was wrong and

1    inappropriate.

2    Q.  But you didn't use the word "pressure" or "influence"?

3    A.  I -- I cannot -- these are conversations we had a year ago,

4    and so it'd be impossible for me to tell you exactly which

5    words that I used.

6    Q.  Did you tell them that it wasn't just photos; that he was

7    also pressuring them to send videos of themselves masturbating?

8    A.  That there were photos and images, and that the images were

9    all solicited over the internet, and that they were all

10   inappropriate and involved genitalia and anal pictures.

11   Q.  And did you tell them that he raped a 15-year-old boy?

12   A.  They were aware that there was a contact offense involving

13   a 15-year-old boy.

14   Q.  And is that how you described it to them, as a contact

15   offense?

16   A.  Again, these are conversations we had a year ago.  But I

17   made it clear that the offense conduct was -- like probably the

18   term I used was "statutory rape."

19   Q.  Did you tell them that he performed oral sex on a

20   15-year-old boy?

21   A.  I can't tell you right now whether I distinguished the

22   character -- or characterized what the rape was, but that the

23   conduct was classified as rape.

24   Q.  And so do you recall whether you told them that he then

25   asked the 15-year-old boy to perform oral sex on him?  Do you

1    remember whether you told any of them that?

2    **A.** I don't believe that I got into that specific of detail.

3    **Q.** And so then you wouldn't also have told them that after

4    that 15-year-old boy said, "No, I don't want to do that," he

5    turned the 15-year-old around and anally penetrated him in a

6    bathroom stall?  Did you tell any of those 70 people that?

7    **A.** I don't believe I got into that specific detail.

8    **Q.** Okay.  But you told them that it was inappropriate based on

9    age?

10   **A.** No.  I told -- I just said that it was -- I described it as

11   "statutory rape," using the word "rape."

12   **Q.** You talked about and provided the Court with a lot of

13   educational records in this case.

14   **A.** Yes.

15   **Q.** The purpose of an IEP, an individualized education plan, is

16   to make sure that when kids have special needs, those needs are

17   met by their educators, right?

18   **A.** That's the -- yes.  That is the purpose.

19   **Q.** Okay.  And Mr. Harris always had an IEP?

20   **A.** Yes.

21   **Q.** And his educational records also show that school was, by

22   and large, a very positive experience for him, correct?

23   **A.** No, I would not say that.  I think in middle school, it was

24   a negative experience for him.  There was a lot of bullying

25   that he experienced in middle school.

1    **Q.**  In late middle school and in high school, his teachers said

2    that he was well-liked by his teachers, correct?

3    **A.**  In high school, he had a very positive experience.  I would

4    agree with that.

5    **Q.**  And he got along with his classmates, correct?

6    **A.**  Yes.  He got along with classmates, he got along with

7    teachers, he got along with staff.  So he had a very positive

8    experience in high school.

9    **Q.**  And, in fact, one teacher even commented that he was very

10   skilled at getting other kids to follow instructions and still

11   remaining friends with them, correct?

12   **A.**  Well, he had lots of friends in high school.

13   **Q.**  All right.  And he didn't have any trouble following

14   instructions or completing his homework, correct?

15   **A.**  Well, it depends on the period of time.  In his freshman

16   and sophomore year, he had more trouble in terms of completing

17   homework assignments and doing the work that needed to be done.

18   He did better in his junior and particularly his senior year,

19   when he had more support both outside the home as well as in

20   the classroom.

21   **Q.**  And you'd agree that he got the support that he needed, and

22   his grades went up because of it, correct?

23   **A.**  Senior year, yes, he did.

24   **Q.**  Okay.

25   **A.**  Yeah.  When he was provided structure and guidance and

1   rules, he did very well.

2   **Q.** I have a couple questions about the Bodymap.

3          What is a Bodymap?  I've never heard that term before

4   this case.

5   **A.** Yeah.  So it is a qualitative research tool that is used by

6   -- Dr. Urbanik actually is a social geographer.  And it's a

7   research tool that she's used in other forums; not necessarily

8   in mitigation, but in other work that she's done.

9   **Q.** When you say "qualitative research tool," but I don't

10  understand.  What is that?  What's a qualitative research tool?

11  **A.** Well, qualitative as opposed to quantitative.  So

12  qualitative would be more where you are gathering information

13  from a single individual, as we were doing with Mr. Harris, as

14  opposed to quantitative or things that are more measurable.

15         I don't know if that helps, but --

16  **Q.** Okay.  And so what was -- were you there when Ms. Urbanik

17  met with Mr. Harris to create this Bodymap?

18  **A.** I was.

19  **Q.** And did she explain the Bodymap concept to Mr. Harris?

20  **A.** She did.

21  **Q.** And what instruction was he given on how to create a

22  Bodymap?

23  **A.** Well, he was shown -- there were tools.  So there was a

24  poster board and there was an outline of a body on that.  He

25  was interviewed by her, first of all.  And as he went through

1   different life experiences, he was asked to create images that

2   might help him to explain things that had happened in his life,

3   and he created those images.

4   Q.  And as he was going through life experiences, was he doing

5   this in response to questions that she was posing to him?

6   A.  Yes.

7   Q.  And was she making suggestions about what types of images

8   he might include in the Bodymap?

9   A.  No.  That would be up to him to decide what images best

10  represented life experiences that he had had.

11  Q.  And the recorded narration that's spliced into the video,

12  is that Jerry Harris answering Dr. Urbanik's questions?

13       I'm sorry.  I didn't hear your answer.

14  A.  Yes.

15  Q.  Okay.

16  A.  Uh-huh.

17  Q.  Was it his idea to just draw a circle with ages in it for

18  the other ages of the kids on his team?

19  A.  Yes.

20  Q.  And was it his idea to talk about his lack of guidance and

21  oversight of his social media accounts?

22  A.  Yes.

23  Q.  I want to ask you some questions about Dr. Hutchinson's

24  report in this case.

25       You didn't write this report, correct?

1    **A.**  I did not, no.

2    **Q.**  But you did review it, right?

3    **A.**  I have, yes.

4    **Q.**  Okay.  And -- sorry.  I'm going to direct your attention,

5    if I may, to page 12.

6           Referral question 4 deals with how the Court should

7    understand Mr. Harris' decision-making regarding asking high

8    school seniors in July 2020 to send nudes with financial

9    compensation, how to understand that conduct, right?

10   **A.**  Yes.

11   **Q.**  This is referring to the offenses involving Minors 2 and 3

12   in this case, correct?

13   **A.**  I'll take your word for that.

14   **Q.**  Okay.  Well, did you review any of the interviews of the

15   victims in this case?

16   **A.**  I did.

17   **Q.**  Did you review the interviews of Minors 2 and 3?

18   **A.**  If these are the 17-year-olds?

19   **Q.**  Yes.

20   **A.**  Yes.

21   **Q.**  In July and August of 2020?

22   **A.**  Yes.

23   **Q.**  So Dr. Hutchinson says:  "It is hard for this examiner to

24   see the high school seniors as victims in this scenario."

25          Would you agree with that statement?  Are Minors 2

1   and 3 not victims in this scenario?

2   **A.**  They are victims in this scenario.

3   **Q.**  And the next sentence that she writes is:  "The boys were

4   suburban, white high school seniors."

5          Do you know why the fact that they were suburban or

6   white is relevant to her or to whether they're victims?

7   **A.**  I do not know.

8   **Q.**  Okay.  And she describes that:  "It was only after texting

9   with one of the boys for two weeks that Mr. Harris asked him to

10  send a nude photo."

11         First of all, it was a sexually explicit photograph,

12  correct?

13  **A.**  Are you asking me what language was used in the texts?  I

14  don't know.

15  **Q.**  No.  What was actually sent.

16         It was a sexually explicit photograph, correct?

17  **A.**  It was a -- it was a nude photograph.

18  **Q.**  Okay.  And do you know where she got that two-week period

19  from?  Is that your understanding of the offense conduct?

20  **A.**  I assume it was in the discovery.

21  **Q.**  Well, do you remember from your review of Minor 2 -- of the

22  interview of Minor 2?

23  **A.**  I don't have specific memory right now.

24  **Q.**  Do you know that Minor 2 actually said that it was after

25  sending several Snapchats that Mr. Harris asked to see his

1    butt?

2    **A.**  I don't have a recollection of that right now.  You'd have

3    to show it to me.

4    **Q.**  Okay.  And do you know that Minor 2 declined and said "No"

5    to that request at first?

6    **A.**  I'll take your word for it.

7    **Q.**  And are you aware that Mr. Harris then, in response,

8    unfriended Minor 2 for two weeks?

9    **A.**  Okay.

10   **Q.**  And do you think that might be where Dr. Hutchinson got

11   that two-week period from?

12   **A.**  That could be.  That could be.

13   **Q.**  Okay.

14   **A.**  That sounds like it.

15   **Q.**  So that might have been a mistake in Dr. Hutchinson's

16   report?

17   **A.**  Perhaps.

18   **Q.**  Okay.  And then Dr. Hutchinson also writes:  "That young

19   man and a friend contrived and presented the idea that they

20   would send nude pictures in exchange for money."

21            Do you see where she writes that?

22   **A.**  I do.

23   **Q.**  That mischaracterizes the offense conduct, doesn't it?

24   **A.**  That is her language, and my understanding is that there

25   was an exchange of money for nude photographs.

1   **Q.** And based on your review of the reports and your interviews

2   of Mr. Harris, is it your understanding that Mr. Harris offered

3   to pay or that Minors 2 and 3 solicited money from Mr. Harris?

4   **A.** My understanding is that money was exchanged in -- that

5   money was exchanged for nude photographs.

6   **Q.** So are you not aware, then, of the statement by Minor 2

7   that Mr. Harris asked him for pictures of his butt for three

8   hours, and that Minor 2 declined and refused to provide them

9   during that whole time?

10  **A.** I don't recall. You'd have to show that to me.

11  **Q.** And are you not aware, then, of the statement by Minor 2

12  that when he refused to send the photos, it was then that Mr.

13  Harris offered to pay him money?

14  **A.** Again, you'd have to show me the --

15  **Q.** So you don't --

16  **A.** I don't --

17  **Q.** -- recall that?

18  **A.** I don't recall at this moment.

19  **Q.** And Mr. Harris sent a hundred dollars first before even

20  receiving any images to prove to Minor 2 that he would send the

21  money.

22          Do you recall that?

23  **A.** I do.

24  **Q.** You do recall that? Okay.

25  **A.** I recall that money was sent before an image. I do recall

1    that.

2    **Q.**  And you just don't recall as you sit here today whether Mr.

3    Harris sent the money to try to get them to send the photos or

4    whether it was their idea?

5    **A.**  I'd have to look at the discovery again to remember the

6    details that you're describing.

7    **Q.**  And if the discovery said that Minor 2 said he was refusing

8    to send the photos, and that's when Mr. Harris offered to send

9    him money, then Dr. Hutchinson's report would be wrong about

10   that, right?

11   **A.**  I would trust the -- what the discovery said to be

12   accurate.

13   **Q.**  In this same section, Dr. Hutchinson also says:  "It is

14   possible that this was a game to these young men."

15          She's referring to Minors 2 and 3 there, right?

16   Correct?

17   **A.**  As I read the paragraph, that's the way I would interpret

18   it.

19   **Q.**  And they are victims in this case, correct?

20   **A.**  They are.

21   **Q.**  She didn't interview them, did she?

22   **A.**  No.

23   **Q.**  Neither did you, right?

24   **A.**  No.

25   **Q.**  So she doesn't really know, does she?

Short - cross by Guzman                      **97**

1    **A.**  No.

2    **Q.**  It's also possible that they were pressured into doing

3    something that they were intensely uncomfortable with by

4    somebody who was older than them, right?

5    **A.**  It's possible.

6    **Q.**  Okay.  And was Dr. Hutchinson aware that Minor 3 reported

7    that he felt super-regretful, self-conscious, used, and

8    uncomfortable after this encounter with Mr. Harris?

9    **A.**  Minor 3?

10   **Q.**  Minor 3, yes.

11   **A.**  I -- is that in the discovery?

12   **Q.**  Yes, it is.

13   **A.**  Okay.  If it was in the discovery, then she is aware of it.

14   **Q.**  Okay.  And so if that was in the discovery, then this

15   report, when it says it's "a game to these young men," that's

16   wrong, too, right?

17   **A.**  You're asking me to comment on what she's written?

18   **Q.**  Yes.  Is Dr. Hutchinson's report right or wrong when it

19   says that Mr. Harris' conduct was a game to Minors 2 and 3?

20   **A.**  It's not the way I would write it up.

21   **Q.**  Dr. Hutchinson also states -- makes several statements

22   about Mr. Harris' awareness of whether what he was doing was

23   wrong or right.

24          Specifically on page 11, Dr. Hutchinson writes:

25   "Until his cheer parents cautioned Jeremiah about not having

Short - cross by Guzman                    **98**

1   online contact with underage minors after he achieved a

2   celebrity status, Jeremiah had no awareness or knowledge that

3   his friendships with younger boys, including the mutual sending

4   of nude pictures, was in any way a problem."

5        Do you see that?

6   **A.**  Where are you?

7   **Q.**  Page 11.

8   **A.**  Yes.

9   **Q.**  So my first question to you is:  When Dr. Hutchinson

10  describes the offense conduct here as the "mutual sending of

11  nude pictures," do you think that's an accurate

12  characterization of the offense conduct?

13  **A.**  No.

14  **Q.**  Are you aware in anything that you reviewed or in any of

15  the discovery of -- well, strike -- I'll strike that question.

16       All right.  My second question is:  This isn't true,

17  right?  Because, like the judge asked you, Mr. Harris is

18  actually told at 13 that having inappropriate contact with

19  younger kids was inappropriate, was wrong, right?

20  **A.**  Yeah.  I think what he was told is sending nudes was

21  inappropriate.

22  **Q.**  That's right.

23  **A.**  And I think any child would be told that sending nudes is

24  inappropriate.

25  **Q.**  Okay.  And so contrary to what Dr. Hutchinson wrote, Mr.

1    Harris did know that sending nudes was inappropriate?

2    **A.**  Yes.

3    **Q.**  Is that right?

4    **A.**  And I think also that what was known is that,

5    unfortunately, among our youth, a lot of youth are sending

6    nudes using their phones and other electronic devices.

7    **Q.**  And Dr. Hutchinson also writes that Mr. Harris was -- on

8    page 14 -- "completely oblivious to the reality that he was

9    engaging in actions that were illegal and could potentially be

10   harmful to his young friends."

11          Do you agree that he was completely oblivious to the

12   reality that his actions were illegal and harmful?

13   **A.**  It depends on at what point in time we're talking about.

14   **Q.**  At what point in time do you think he was completely

15   oblivious?  You tell me.

16   **A.**  Well, I think that sending nudes, unfortunately, had been

17   part of what had been happening with him since he was pretty

18   young.  And I think a lot of his peers sent nudes.  A lot of

19   the -- again, a lot of the kids that I interviewed in this case

20   send nudes to each other.  It's prevalent through middle school

21   and high school.  It was --

22   **Q.**  So you're talking --

23   **A.**  -- prevalent within his family, members of his family to

24   also send nudes, and had since they were -- so it's --

25   unfortunately, sending nudes has become more normalized than we

1    would like it to be.

2    **Q.**  And you're talking about sending nudes, but the offense

3    conduct here was asking other people to produce sexually

4    explicit content, right?

5    **A.**  And I think --

6    **Q.**  Not just sending, but asking other people to produce those

7    images for him personally, correct?

8    **A.**  That is true.  And I think that --

9    **Q.**  That's what Mr. Harris is doing, right?

10   **A.**  I --

11              MR. PUGH:  Judge, could I ask that Ms. Guzman allow

12   Ms. Short to finish her answers, please?

13              THE COURT:  That objection is sustained.

14              Just both of you need to not talk over each other

15   because the court reporter is trying to take everything down.

16              MS. GUZMAN:  Thank you, Judge.

17              THE COURT:  You can proceed.

18   BY THE WITNESS:

19   **A.**  And I would only modify my answer, Ms. Guzman, by saying

20   that when I talk about our youth and what's happening in terms

21   of their use of their digital devices is that young people are

22   both asking for nudes to be sent to them and they are sending

23   nudes, and this is more prevalent than we would like it to be.

24   BY MS. GUZMAN:

25   **Q.**  But Mr. Harris wasn't just asking, was he?

1    **A.** Yes, I think he was asking.

2    **Q.** And so when the victims in this case said "No," did Mr.

3    Harris stop asking them?

4    **A.** Sometimes.

5    **Q.** Which victim did he stop asking with?

6    **A.** Well, I don't know their numbers, which numbers they would

7    associate with which of the individuals, but I believe --

8    **Q.** Can you describe by offense conduct or date or location of

9    the incident?

10   **A.** I don't have them memorized as you do.  I could give you

11   initials, maybe.  I don't know if that would help you.

12              MS. GUZMAN:  Is that okay with Your Honor?

13              THE COURT:  You may use initials.

14   BY THE WITNESS:

15   **A.** L.L.

16   BY MS. GUZMAN:

17   **Q.** Okay.  And did you read in that individual's report that he

18   said that he was made very uncomfortable by Mr. Harris'

19   advances at the first cheerleading competition that he met with

20   him at?

21              Is that a yes?

22   **A.** It -- in that he gave him a hug or something, I think.

23              I do remember that, yes.

24   **Q.** Yes.  And that after minor -- that minor said that he was

25   made to feel uncomfortable, Mr. Harris asked to meet him again

1    at the next competition a month later, right?

2    **A.**  He may have.

3    **Q.**  Okay.  And Mr. Harris also threatened to post photos online

4    of Minor 1 and Minor 5 if they didn't keep sending images,

5    right?

6    **A.**  I recall one of the minors did say that Mr. Harris had made

7    that threat, and I believe it was Minor 5.  I don't remember

8    anything like that with respect to Minor 1.  But that doesn't

9    mean that it's not in the discovery.

10   **Q.**  So that would be one, possibly two other instances where

11   Mr. Harris didn't stop asking after they said "no," right?

12   **A.**  Well, and then I think with -- I think it's Minor 2 who

13   also said that he didn't want to receive any more texts from

14   Mr. Harris.  Then Mr. Harris moved on.

15   **Q.**  Okay.  And are you aware that Minor 1 and Minor 1's brother

16   both described Mr. Harris as pushy and demanding?

17   **A.**  I did.  I am.

18   **Q.**  And that they both described that he made them feel guilty

19   when they didn't send him the pictures and videos that he was

20   asking for?

21   **A.**  I am.

22   **Q.**  Okay.  And is making somebody feel guilty and being pushy

23   and demanding part of the normal mutual sending of nudes that's

24   not a problem?

25   **A.**  I am not saying -- in fact, I would assert that adolescents

1    sending and receiving nudes, requesting nudes is a problem, and

2    that it is something that we, as a community, have not done a

3    very good job in terms of providing young people with digital

4    consciousness.  And it's something that we should be educating

5    children starting in kindergarten, but we haven't done that.

6            Waubonsie High School started to provide digital

7    education to their teenagers, starting Jeremiah's senior year,

8    to their freshmen, recognizing that we have a serious problem

9    in terms of our adolescents asking for and sending

10   inappropriate sexualized images over their digital instruments.

11           We've given them these very, very powerful tools, and

12   they're misusing them.  And we haven't prepared them for these

13   tools and then we find ourselves in these terrible situations.

14   **Q.**  And so is it your opinion, then -- do you agree with Dr.

15   Hutchinson -- that part of the situation here is that Mr.

16   Harris was actually completely oblivious that what he was doing

17   was illegal and harmful to others?

18   **A.**  I think that our adolescents -- unfortunately, this has

19   become normalized behavior, and that at what point in time do

20   these young people realize that they have crossed a line.

21   **Q.**  But do you agree with Dr. Hutchinson that Mr. Harris

22   specifically was completely oblivious?

23   **A.**  I don't know that I'd use the word "completely oblivious,"

24   but it depends that at what age.

25   **Q.**  Mr. Harris himself said, "I was an adult, and I took

1   advantage of these teen boys," correct?

2   **A.**  Yes.  And Mr. Harris has taken full responsibility for the

3   conduct behavior in this case.

4   **Q.**  Contrary to what Dr. Hutchinson said, Mr. Harris says, "I

5   was selfish and I exploited their weakness.  I realized what I

6   did was wrong" --

7   **A.**  Yes.

8   **Q.**  -- correct?

9   **A.**  That's correct.

10  **Q.**  Okay.  So was Mr. Harris lying or is Dr. Hutchinson wrong

11  about whether he's completely oblivious?

12            MR. PUGH:  Objection, Judge.  I mean, this --

13  we've -- I know this is sentencing, and I was given some

14  latitude, but I don't know what we're achieving here with Ms.

15  Short asking to opine on the correctness of this report, and

16  particularly that question.

17            THE COURT:  The objection is overruled.  It's a

18  function of the defense decision to present the expert through

19  this medium of the mitigation specialist.  This is how the

20  expert's report has been presented.

21            The government is entitled to suggest that that

22  expert's report isn't as reliable as perhaps the defense might

23  want it to be.  And so through cross-examination, I'll allow

24  the government to effectively attempt to impeach Dr.

25  Hutchinson, which is what this attempt is.

1    And so that objection is overruled.

2  BY THE WITNESS:

3  **A.** You'll have to restate the question.

4  BY MS. GUZMAN:

5  **Q.** Dr. Hutchinson says that Mr. Harris was completely

6  oblivious of what he was doing was wrong.  Mr. Harris says he

7  knows "what I did was wrong."

8    Was Mr. Harris lying or is Dr. Hutchinson incorrect

9  about Mr. Harris?

10  **A.** Without going back and looking at the context in which Dr.

11  Hutchinson has made the statement about being oblivious, Mr.

12  Harris has and continues to take full responsibility for the

13  conduct that brings us to this courtroom today.

14  **Q.** So Dr. Hutchinson was wrong?

15    THE COURT:  I think you've got the answer that you're

16  going to get on that.  You can move on.

17  BY MS. GUZMAN:

18  **Q.** You talked on direct examination about an adult

19  relationship that Mr. Harris was in.

20  **A.** Yes.

21  **Q.** And can you -- that's significant to you because it

22  indicates that he's able to form an adult, emotional, genuine

23  relationship with somebody, correct?

24  **A.** Yes.

25  **Q.** Okay.  Do you know how long that relationship lasted?

Short - cross by Guzman                    **106**

1    **A.**  Not very long.

2    **Q.**  Do you know when it occurred?

3    **A.**  It was while he was at the University of Louisville, his --

4    what would have been his third semester of college.

5    **Q.**  So you'd agree that he is capable of being in an adult

6    relationship, correct?

7    **A.**  Yes.  And that's what my expectation would be going

8    forward.

9    **Q.**  And are you aware that while that relationship was

10   occurring, it was during the same period of time that he was

11   harassing the victims in this case?

12   **A.**  So it was in the fall of 2019.  Yes.  And so he was also

13   having communication with Minors 1 and 2.

14          Is that what you're saying?

15   **Q.**  Yes.  In the fall of 2019, he was having communications

16   with Minor 1, Minor 2 -- I'm sorry, Minor 4, Minor -- and Minor

17   5.

18   **A.**  All right.  I -- if that's what it says in the discovery,

19   then I will not dispute that.

20   **Q.**  Okay.

21          MS. GUZMAN:  I have no further questions.

22          THE COURT:  Mr. Herman, do you want to follow up?

23          MR. HERMAN:  One second, please.

24      (Counsel conferring.)

25          MR. HERMAN:  No, Judge.  Thank you.

1    THE COURT:  Ms. Short, you may step down.  Thank you.

2    THE WITNESS:  Thank you, Judge.

3    (Witness excused.)

4    THE COURT:  What I thought we would do next would be

5    that I would hear the 3553 argument from the defense, but I

6    wonder if it might make more sense to hear if there are any --

7    if there's anyone else who wants to be heard, including any

8    victims, to hear that first before I let the defense make their

9    3553 argument.

10    Does anyone have any issue with that procedure?

11    MR. PUGH:  I do not, Your Honor.

12    MS. GUZMAN:  That's fine, Your Honor.

13    THE COURT:  So I'll ask you, Ms. Guzman, are there

14    any victims who would like to be heard at this time?

15    MS. GUZMAN:  Yes, Your Honor.  Minor 5 has sent a

16    statement that one of our victim-witness specialists will read

17    into the record.  And then Minor 1 and his brother and his

18    mother are here, and I believe they have statements prepared as

19    well.

20    THE COURT:  Why don't we start, then, with the

21    written statement from Minor 5, and I'll allow the government

22    representative to read it into the record.

23    And if you can step up to the microphone, please.

24    And for our purposes, if you could state your name, please, for

25    the record.

1    MS. MENDOZA:  Sure.  Celia Mendoza, victim-witness

2    coordinator for the U.S. Attorney's Office.

3    THE COURT:  You may read the statement from Minor 5,

4    please.

5    MS. MENDOZA:  "Hello.  I am Victim 5.  Cheerleading

6    is my life.  I love cheerleading because it is a way for me to

7    express myself without being judged by the wrong people.  In

8    cheerleading, I go out on that stage and entertain people with

9    my athletic abilities and energy.  I get to be me, a great

10    athlete, enthusiastic and full of spunk.

11    "Jerry was not famous when he first messaged me when

12    I was only 13 years old.  He asked me how old I was and

13    continued on, even though he knew I was only 13 at the time.

14    "Then it happened.  I was at a cheerleading

15    competition that Jerry knew I was at.  Before I realized it, I

16    was stuck, frozen in time.  I couldn't get away.  I couldn't

17    even process what was happening.  The voice inside me was

18    screaming, 'Stop,' but nothing would come out.  Like a deer in

19    headlights, I could not move.  I was a child being taken

20    advantage of by an adult, an adult that knew exactly what he

21    was doing, and I knew nothing.  Jerry took away my innocence at

22    an age when I still didn't even know who I was or how I wanted

23    to live my life.

24    "It was then that my life forever changed.  I started

25    to hate the sport that I had been doing since I was seven.  I

1    eventually ended up quitting all-star cheer because I couldn't

2    stand being in a gym after what had happened.  My grades

3    started to drop in school, and I didn't even know I was going

4    to be able to graduate or go to college and do some of the

5    careers I wanted to badly be able to achieve.

6              "The act that took place at my safe space, a highly

7    populated cheerleading competition filled with so many people,

8    was something that I struggle to wrap my mind around.  It took

9    me three years for me to finally begin to mentally deal with my

10   rape, but no matter how much I continue to try, I will never be

11   the same.  I can't remember the last time I went a full day

12   without thinking about what had happened to me.

13             "After a very long three years, I am finally

14   understanding how to close this painful chapter in my life.

15   However, the pain will never be forgotten.  I only ask that

16   justice is served on Jerry Harris, just" -- "but not just for

17   me, but for all the other victims who have survived Jerry's

18   sexual assault.

19             "Sincerely, Victim 5."

20             THE COURT:  Thank you.

21             Now, if the others would like to make a statement,

22   you may do so.

23        (Members of the public approach.)

24             THE COURT:  Good afternoon.

25             MOTHER OF MINOR 1:  Good afternoon.

1    THE COURT:  I understand that you are who we've been

2  referring to as the parent of Minor 1, is that correct?

3    MOTHER OF MINOR 1:  Yes, sir.

4    THE COURT:  And you'd like to read a statement?

5    MOTHER OF MINOR 1:  Yes, sir.

6    So I'm the mother of minors who were referred to in

7  the initial criminal complaint as Minor 1 and Minor 2.  And

8  then in subsequent documents, Minor 1 and his brother.

9    And just thank you for the opportunity to address you

10  and this court today.

11    In a few minutes, my sons are going to describe in

12  their own words how Jerry Harris has impacted their young

13  lives.  But to preface their statements, I'd like to offer a

14  mother's outside, but up-close point of view of the damage done

15  to my boys by the defendant.

16    There are aspects of what they've experienced that

17  are too raw and too private to be shared.  And some of their

18  feelings, some of what they've been through goes beyond any of

19  our ability to find words for it.  But hopefully among the

20  three of us, we'll be able to flesh out enough of the human

21  impact that this has had on our family so that you're able to

22  fashion a sentence that takes that impact into account.

23    Today, Mr. Harris' attorneys have detailed his family

24  history and his background of hardship and abuse.  They've

25  pulled at our heart strings and sought to persuade us that the

1    real Jerry Harris is not a serial pedophile but is, in fact,

2    the charismatic young man with a hard-luck story that we all

3    fell in love with when we binge-watched him on Netflix back in

4    2020.  They have expanded on that narrative today and have made

5    it as easy as possible for all of us to feel sympathy for the

6    defendant.

7            And there's no denying that prior to his arrest, most

8    people experienced Jerry Harris as an exceptionally sunny,

9    unselfish, uplifting individual.  There's also no disputing

10   that Jerry faced a number of challenges in his early life.  His

11   attorneys and his supporters have pointed to these things as

12   justification for a lenient punishment for his crimes, but as

13   the mother of two of his victims, I have a different

14   perspective on that.

15           From my point of view, Jerry's outsized positive

16   personality and the sympathy that the cheer community felt

17   regarding his mother's death and the other hardships that he

18   had experienced were the key factors that gave him easy access

19   to victims, made it exceptionally difficult for the boys he

20   abused to speak up, and excused him from the accountability or

21   any accountability for the earliest instances of his predatory

22   behavior.  And so far from mitigating his conduct, these

23   prosocial traits and this widely-known history of hardship and

24   loss actually facilitated his crimes.

25           Most victims of child sexual abuse and child

1  pornography very understandably choose to remain nameless and

2  faceless.  My family is here today, however, because the

3  unintended consequence of this namelessness and facelessness is

4  that it serves to shield the public, and maybe, in a sense,

5  even the Court, from the shattering and really lifelong impact

6  that child sexual abuse and child pornography exacts from its

7  young victims.

8       You know, Mr. Harris' attorneys stated in their memo

9  that a simplistic soundbite narrative would not do justice to

10  the facts of this case, and I a hundred percent agree with

11  that.  I am here today to go beyond soundbites and respectfully

12  remind everyone in this courtroom that my sons' and Jerry's

13  other victims have names and faces.  I am here to describe some

14  of the ways in which my sons' bodies and souls and minds have

15  been profoundly altered by what Jerry did to them, and explain

16  how this harm continues to impact them on a daily and even

17  hourly basis.

18       Just pause for a second here.

19       (Takes a drink.)

20       MOTHER OF MINOR 1:  In order to explain the impact of

21  this crime on my sons, I have to take you back to 2017.

22       My identical twin sons were 11 years old at the time.

23  My son, Sam, had grown too tall for competitive gymnastics, and

24  so he switched to all-star cheerleading, a sport where his long

25  arms and long legs would be an asset rather than a liability.

1    And it didn't take long for both of my boys to
2  conclude that, in cheerleading, they had finally found a
3  community where it was safe as gay young men to be a hundred
4  percent themselves.  They jumped in with both feet -- Sam as an
5  athlete and Charlie as an avid fan -- and immersed themselves
6  in a sports culture.  As starry-eyed newcomers, they regarded
7  athletes on the top-level teams at the most prominent gyms with
8  awe.

9    Although it was long before Netflix had made Jerry
10 Harris a household name, in 2017, he had already established
11 himself as an icon within the cheerleading community.  He had a
12 large social media following, and his team, the Cheer Athletics
13 Cheetahs, was at the very pinnacle of the sport.  The Cheetahs
14 were the subject of a popular YouTube channel that my sons
15 avidly watched over the course of the 2017-2018 season.  And
16 Jerry, who was the most popular member of that team, was
17 prominently featured in those videos.

18    Something that was unique about Jerry, however, was
19 that he was universally beloved in the cheer community.  He had
20 this sort of cheer-lebrity status, a cheerleader who was a
21 celebrity status, not for his athletic ability but for his
22 character.

23    Everyone knew that his mother had died and that Jerry
24 had remained brave and positive and focused on supporting those
25 around him.  People within the cheer community said "be a

1   Jerry," when what they meant was be a good person.  Fans sought

2   him out at competitions, eager to bask in the glow of his

3   positive attitude.  Parents and coaches pointed to him as an

4   exemplar of what every cheerleader ought to be, hard-working,

5   optimistic, an unselfish teammate and friend.  And at the end

6   of the 2017-2018 season, his coaches even awarded him a special

7   trophy, the Jerry Harris Award, for being the life of everyone

8   around him, loved more than he will ever know.

9           So by 2018, my son Charlie was tired of watching from

10  the stands, and so he joined his brother as an all-star

11  athlete.  In contrast with Sam, who had impressed his coaches

12  and teammates on his very first day with the exceptional

13  tumbling skills he had learned over the three years that he was

14  a competitive gymnast, Charlie could hardly turn a cartwheel.

15  Although he was thrilled to finally be an official cheerleader,

16  he was also very insecure.  He was a 12-year-old kid, no-name

17  kid, who had barely made a low-level team at a no-name gym.

18  And he was a bit clumsy and he was a bit awkward, and he was

19  very, very eager to step out of his identical twin's shadow and

20  be accepted in his own right in this new community.

21          So a few months later, when Jerry contacted Charlie

22  out of the clear-blue sky via Instagram direct message, Charlie

23  was wide-eyed enough to think that it was his lucky day.  Given

24  Jerry's squeaky-clean reputation, Charlie had no reason to be

25  guarded.  He was thrilled to be noticed by someone so popular,

1  and he understandably hoped that a friendship with this beloved

2  adult athlete would be a step toward the inclusion and

3  acceptance within this new community that he so desired.

4        Jerry's very first question of Charlie was, "How old

5  are you?"  And Charlie replied truthfully that he was 13.

6  Immediately, Jerry asked for "pics."  Specifically, he

7  clarified that he wanted "booty pics."  And innocent as he was

8  at the time, Charlie responded by saying, "What do you mean

9  'booty pics'?"  But then star-struck, eager to make a new

10  friend, and clearly very naive, Charlie sent two photos of his

11  face.

12        Each time I look at those first two photos that

13  Charlie sent to Jerry, my heart clenches because they remind me

14  of what my twin boys were like before Jerry Harris became part

15  of our lives.  They were children.  Their faces were smooth and

16  free of acne and whiskers.  They still insisted that I come

17  into their bedroom each evening and tuck them in and kiss them

18  good night.  They were still young enough to be thrilled when I

19  came and had lunch with them in the school cafeteria a few

20  weeks earlier for their 13th birthday.  Their smiles were

21  crooked because they hadn't yet lost all of their baby teeth

22  and were, therefore, not yet ready for braces.  They each had a

23  favorite animal, a stuffed animal that they slept with every

24  night.

25        You know, at that time, certainly both of my sons

1    could be described as quirky, but they projected a genuine

2    self-assurance that caused people to accept them and to like

3    them.  They loved school, and strong grades came easily for

4    them, even in gifted and talented classes.  They laughed easily

5    and they slept soundly, and they were voracious eaters.  They

6    were physically and emotionally healthy.  By every single

7    measure, they were thriving.

8           But in the months that followed that December 2018

9    direct message, I watched, helpless and, at the time,

10   completely clueless about the message itself and the cause in

11   my sons that ensued, as my once happy, confident children began

12   to fall to pieces.  They became anxious.  Friendships started

13   falling by the wayside.  Grades started slipping.  They stopped

14   laughing.  They started struggling to sleep.  Arguments between

15   the two of them became vicious and constant.

16          In early 2019, I noticed that the snacks and the

17   drinks that I packed in Charlie's school backpack were coming

18   home untouched.  When I expressed concern and I asked for

19   answers about why, Sam told me that Charlie was no longer

20   eating or drinking at school because he was scared to use

21   public restrooms.

22          I started getting desperate text messages from

23   Charlie during the school day, pleading with me to let him come

24   home because he was having yet another panic attack.  If our

25   family didn't cajole him constantly, Charlie would go days

1    without eating.  He vomited frequently.  He became very thin.
2    He stopped growing.
3              Sam changed as well.  Once one of the most
4    single-minded, focused, and diligent people I have ever met, he
5    became nervous and hopelessly distracted, and hours of his day
6    were consumed with compulsive fidgeting.
7              As the months passed, things got worse with both
8    boys.  Previously cautious and compliant kids, they started
9    behaving recklessly and engaging in self-destructive and
10   dangerous behaviors.
11             My husband and I were and are involved, diligent
12   parents.  We were and are present, front and center, in all
13   aspects of our kids' lives, their school activities, sports,
14   Boy Scouts, everything.  In the face of evidence that something
15   was very wrong, we asked questions.  We expressed urgent
16   concern.  We prodded the boys and pled with them for answers.
17   We begged them to tell us what was wrong.
18             In response, I now know motivated by a misguided
19   desire to protect Jerry and in a continued effort to put a
20   "friend's needs" above their own, they told us that they just
21   hated middle school, but that everything was fine.
22             We were not convinced.  We met with school guidance
23   counselors, teachers, and coaches.  Although we had always
24   checked our kids' phones on a regular basis, I became
25   aggressively nosy.  It was because of that nosiness that I

1    finally discovered what was, in fact, wrong.

2              What I now know is that, after that initial contact

3    through Instagram, from December 2018 to April 2020, Jerry

4    Harris used Facetime and Snapchat to badger my young sons

5    incessantly to produce sexually explicit photos and videos of

6    themselves for him.  He also relentlessly pushed them to engage

7    in sexual acts with him on Facetime and pled with them to meet

8    him in person for sex.

9              This was not mutual interaction between adolescents.

10   This was not sexting that we should all be concerned about.

11   This was not my sons' "misusing" their digital devices.  This

12   was children who were being badgered and coerced by an adult.

13             In stark contrast with his public persona, Jerry was

14   not kind to my sons.  He deliberately exploited Charlie's

15   insecurities and desire to be accepted.  He used guilt and

16   manipulation.  He threatened and pressured.  If Charlie did not

17   respond to Jerry's messages immediately or if he tried to

18   rebuff his demands, Jerry accused Charlie of not loving him or

19   of using him.

20             Charlie's best qualities, his kindness, his empathy,

21   his compassion, his generosity, his impulse to put the wants of

22   other people above his own, all of these things were used by

23   Jerry for his sexual gratification.  Jerry used everything that

24   was good in my son to trap him in exploitation from which it

25   felt to him like there was no escape.

1    These were not impulsive or occasional transgressions

2    on Jerry's part.  His abuse of my sons was extremely persistent

3    and extended over 16 long months.

4    And my sons were not Jerry's first victims.  Shortly

5    after our family spoke out, another mother contacted me to tell

6    me that Jerry had done exactly the same thing to her son years

7    earlier, when Jerry was a minor himself.  The mother reported

8    this to leaders in the cheer community, but at the time,

9    tragically, the opportunity to hold him accountable and put a

10   stop to his predatory behavior before it became a firmly

11   entrenched pattern was missed.

12   We also now know that Jerry had been abusing Minor 5

13   for over a year, starting in August 2017, before he contacted

14   Charlie for the first time.

15   During the 16 months that he abused my sons, Jerry

16   got deep, deep inside Charlie's head, in particular.  This is

17   no surprise as relentless as he was and as long as the abuse

18   went on.  It is no surprise given that it was his voice

19   speaking in Charlie's ear, at times many times a day, during

20   the vulnerable period in which he was just beginning to come to

21   terms with his sexuality.

22   I now know that Charlie was unable to use a public

23   restroom for nearly three years, because when he was just 13

24   years old, Charlie assaulted him in a bathroom at a

25   cheerleading competition.

1        I now know that Charlie's anxiety surrounding gaining

2    even a single pound, his intense discomfort with every sign

3    that his body was maturing, his disordered eating, his frequent

4    vomiting, that all of these things started with his efforts to

5    preserve the extremely slender, prepubescent appearance that

6    Jerry admired.

7        Sam also received messages from Jerry.  Sam also was

8    repeatedly pressured to produce explicit photos and videos.  He

9    also had to struggle to escape Jerry's persistent and very

10   unwelcomed physical contact, including full-body hugs and

11   constant attempts to touch his butt and thighs when they

12   encountered each other at cheerleading competitions.

13       In addition, Sam was Charlie's only confidant for the

14   16 months of abuse that Charlie experienced at Jerry's hands.

15   Sam was overwhelmed with concern for his brother but was, at

16   age 13 and 14, completely unqualified to make decisions about

17   what to do or how to help.  He shared Charlie's urgent desire

18   to keep this secret and protect Jerry from consequences.  He

19   shared Charlie's intense shame and his sense of utter

20   isolation.  He shared Charlie's terror about the devastating

21   social consequences of speaking out about somebody so

22   universally beloved, initially just by the cheer community, but

23   then eventually by the whole world.  But Sam could see that

24   Charlie was falling to pieces, and he felt desperate to help,

25   and responsible for fixing the problem.

1        During the 16 months of their abuse, both my boys

2    were paralyzed between a rock and a hard place.  On one hand,

3    every interaction that they had with Jerry left their skin

4    crawling and made them feel ashamed and dirty.  There was

5    nothing about this relationship that was mutual or felt good.

6        On the other hand, immersed as they were in the

7    cheerleading community, they were surrounded by two very clear

8    messages.  First, Jerry Harris was absolutely above reproach.

9    He was everyone's best friend, every coach's and every mother's

10   favorite, the heart of every team he was on, deserving of

11   special trophies just for being himself.

12       Second, what they were experiencing was par for the

13   course for boys in the sport.  When they had hinted to friends

14   about what had happened to them or was happening to them, no

15   one seemed surprised or concerned.  Although, in retrospect, it

16   is clear that Jerry was an exceptionally persistent perpetrator

17   of a particularly egregious form of abuse, the fact that an

18   adult male in the sport was seeking sexual interaction with 13-

19   or 14-year-old boys was not unusual.

20       Being stuck between the rock of what their

21   consciences were telling them and the hard place of a

22   perpetrator with an unassailable reputation who was committing

23   a crime that no one in their community seemed to recognize as

24   any big deal, left them feeling confused, powerless, and very

25   isolated.

1       This double bind kept them silent and deeply impacted

2   their ability to trust their intuition, assess risk, and form

3   trusting relationships.  All of these things are harms that

4   persist for them to this day.

5       When my husband and I found out that Jerry Harris had

6   assaulted, abused, and exploited our sons and was doing the

7   same thing to other boys, we took action.  We exhausted every

8   available private channel in our urgent efforts to stop him.  I

9   provided the owner of Jerry's gym with proof of his abuse of my

10  sons.  I filed two reports with the United States All Star

11  Federation.  I contacted local law enforcement a dozen times in

12  a single month.  I submitted myself to over an hour of

13  questioning by a team of attorneys hired by Varsity Brands, the

14  entity that controls virtually every aspect of the sport,

15  having been told that by doing so, I would be assisting in

16  their efforts to protect athletes and prevent abuse and

17  misconduct.  Yet, I was shouting into the wind.  No one put a

18  stop to Jerry, and his star continued to rise.

19      Within weeks, he catapulted from being a big fish in

20  a small pond of all-star cheer to interacting with Oprah and

21  Ellen, sharing a red carpet with A-list Hollywood celebrities,

22  and conducting interviews with the president.  As his celebrity

23  and influence grew, so did his reach, and he continued to

24  victimize other boys.

25      When it became clear that months of private efforts

1    to put a stop to Jerry were not working, our family was faced

2    with a gut-wrenching choice:  Keep quiet and put all of our

3    focus on my sons' own healing or speak out publicly in hopes of

4    saving other boys from the pain that my sons were suffering.

5           We were still wrestling with that decision when,

6    exactly two years ago, during Fourth of July weekend 2020,

7    Charlie could not bite his tongue any longer.  He impulsively

8    confided in a group of people he thought were trusted friends

9    and told them what Jerry had done to him, describing it

10   truthfully in terms of abuse and assault.  The response was

11   swift and it was severe.  He was told to shut up.  He was told

12   that someone needed to put him in his place.  He was reminded

13   that Jerry's mother had died.  It was made very clear to him

14   that everyone loved Jerry.  No one would believe him.  No one

15   would take his side.  And if he persisted in these claims, that

16   he would lose every single one of his friends and his life

17   would be over.

18          Given this extremely hostile initial response to

19   disclosure that was an act of remarkable courage, a few weeks

20   later, when there was still no sign of Jerry being stopped, my

21   then 14-year-old sons sat down in front of bright lights and a

22   big camera and told a *USA Today* reporter the truth, knowing it

23   would be nothing but their word against that of a celebrity who

24   was loved by millions of fans.

25          My sons did this not because they had anything to

1    gain from speaking publicly.  In fact, they had an awful lot to
2    lose.  But because they knew that other children were being
3    harmed, and the adults in charge were not doing what needed to
4    be done to make it stop.  As my son Sam said at the time, if no
5    one speaks up, then nothing is going to change.

6            What people don't realize is that public disclosure
7    is the last resort for victims.  It is only employed when
8    private channels fail, usually because those in authority
9    refuse to act.

10           Our family would have given just about anything to
11   deal privately with the trauma perpetrated on my sons by Jerry
12   Harris.  Unfortunately, we were robbed of that choice.  The
13   entities that control all-star cheerleading took that choice
14   from us when they failed to put a stop to Jerry, despite my
15   multiple reports.  Local law enforcement took that choice from
16   us when they failed to so much as return my phone calls,
17   despite my urgent and repeated pleas for help.  Jerry himself
18   took that choice from us when he persisted in abusing other
19   boys, even when he was told by his gym owner that I knew what
20   he had done and he was being investigated.

21           Over the past two years, a lot of people have asked
22   me if I hate Jerry Harris, and the answer to that question is
23   no.  To be honest, I have an uncomfortably mixed assortment of
24   feelings toward him.  As a mother, I am heartbroken for him.  I
25   have a very intimate understanding at this point of what sexual

1  abuse does to a boy, and I feel a deep sense of sympathy for

2  any victim of such abuse, including Jerry.

3          My husband can tell you, I have shed real tears for

4  Jerry and for the people who care about him dozens of times

5  since he was arrested.  I am sincere in my appreciation for the

6  fact that he admitted to what he did, pled guilty to his

7  crimes, and did not drag my sons and his other victims through

8  a trial.

9          I absolutely understand that Jerry did not commit his

10  crimes in a vacuum.  His attorneys have pointed out that

11  all-star cheerleading is an environment where sexual predators

12  are largely unchecked, and that Jerry himself was exploited,

13  manipulated, and sexually abused in this environment.

14          Through the civil legal process, our family has

15  sought to hold the entities that control all-star cheerleading

16  accountable for this culture of tolerance of abuse that exists

17  within the sport, and for their failures to protect athletes.

18          This fight has, of course, primarily been on behalf

19  of my sons, but we have fought on Jerry's behalf as well,

20  knowing that, as his attorneys so poignantly put it in their

21  memo, that the cheer community was both his lifeline and his

22  undoing.

23          It makes me very angry that the path to the reforms

24  that are necessary to ensure athletes' safety are going to be

25  made a lot longer in all-star cheerleading because the entities

1   in charge would like us to believe that Jerry Harris' crimes

2   are isolated occurrences, unique to him, as opposed to

3   acknowledging that he is a tragic product of a toxic culture.

4           Amidst all of this heartbreak and anger that I feel,

5   though, the overriding emotion that I experience is grief.  I

6   grieve what has been taken from my sons and from our family.

7   Jerry took things from my boys that they are never, ever, ever

8   going to get back.  He took their innocence.  He robbed them of

9   the simplicity of late childhood.  He exploited the good in

10  them and left them filled with self-hatred and shame.

11          Despite grueling efforts and therapy as a direct

12  result of what Jerry did to them, they are still intensely

13  uncomfortable in their own skin.  No matter how upright their

14  conduct, they still feel soiled and dirty.  Trusting others

15  feels dangerous to them.  Being kind to others feels fraught

16  with the risk of exploitation.  Countless days of Sam's life

17  have been lost to disassociation and compulsive behaviors.

18  Charlie still struggles to eat.  He didn't grow for nearly

19  three years.  And there's a good chance that his stature will

20  be permanently stunted.

21          At this point in their young lives, Sam and Charlie's

22  focus ought to be on algebra tests, Friday night plans with

23  friends, and finding a part-time job so they can afford a used

24  car.  Instead, their day-to-day concerns include the unending

25  violations of their privacy and dignity associated with the law

1    enforcement and legal processes surrounding this case, cruel

2    lies and malicious gossip spread by zealous friends of Jerry's

3    who are still seeking to discredit them and avenge him, and a

4    constant daily effort required to create the appearance that

5    they are just normal teenagers.

6            My boys talk a lot these days about how much they

7    ache to just be normal.  But the reality is no matter what

8    happens here today, their lives are never going to be

9    completely normal again.

10           "Hurt people hurt people" is a cliché that is often

11   trotted out to explain situations such as these.  I have come

12   to really hate this saying, though, because it implies that

13   we're all nothing more than products of our past circumstances.

14           As Sam and Charlie have shown, we always have the

15   choice to use our pain not as justification or as an excuse,

16   but as an impetus to support and safeguard others who are

17   suffering similarly.

18           Jerry Harris is clearly a hurt person, but, as the

19   government has pointed out, his status as a victim does not

20   represent a blank check to commit sex offenses against minors.

21   His history, as tragic as it is, does not absolve him of

22   responsibility for the countless choices, small and large, made

23   over the course of many years as he relentlessly perpetrated a

24   pattern of harm from his own life into the lives of children,

25   seemingly either incapable of or unwilling to stop himself.

1      Justice cannot be served in this case without a

2  sentence that reflects the fact that, through Mr. Harris'

3  persistent, brazen, consciously-chosen, and carefully-planned

4  actions, he has effectively sentenced his victims not to six

5  years, not to fifteen years, but to a lifetime of consequences.

6      Thank you.

7      THE COURT:  Thank you.  If another person or persons

8  would like to step forward and make a statement, now would be

9  the time to do so.

10     (Minor 1's brother approaches.)

11     THE COURT:  Good afternoon.

12     MINOR 1's BROTHER:  Good afternoon.

13     THE COURT:  We've been using certain code words to

14  describe people involved in the case.  Often we've used the

15  term "Minor 1" or "Minor 1's brother."

16     How would you like to identify yourself?  You are

17  entitled to privacy under our laws and statutes, but for

18  purposes of our record, we need to identify you.

19     MINOR 1's BROTHER:  Minor 1 is okay.

20     MOTHER OF MINOR 1:  You are not Minor 1.  You are

21  Minor 1's brother.

22     MINOR 1's BROTHER:  Minor 1's brother.

23     MOTHER OF MINOR 1:  But you're also Sam.

24     THE COURT:  Then I understand you'd like to make a

25  statement to me?

1          MINOR 1's BROTHER:  Yes.

2          THE COURT:  You may proceed.

3          MINOR 1's BROTHER:  Thank you, Judge, for allowing me

4     to speak.

5               I am addressing you and the whole court today, but it

6     was easiest to think through what I needed to say by writing it

7     as a letter to Jerry.

8               Dear Jerry, over and over again in the sentencing

9     memo, your lawyers say that you have remorse, but I don't think

10    it is possible for you to have real remorse yet for one reason:

11    You have not heard directly from your victims about the actual

12    impact of your actions.

13              I think about now what you really feel is regret.

14    You wish you didn't do what you did because you are facing

15    punishment.  But regret is different from remorse.  In order to

16    feel remorse, you have to deeply understand how what you did

17    harmed another person.

18              I am here today because in order for you to ever have

19    the chance to be legitimately remorseful, you need to hear

20    directly from our family about the physical and emotional

21    impact of what you did.

22              You have forever changed the trajectory of my life

23    with your actions.  I was once an ambitious 13-year-old, full

24    of joy and did not have a worry in the world.  School came

25    easily.  I had friends.  And I was full of dreams about my

1    future.  You took that from my brother and I when you literally

2    preyed on my brother and I like some animal that was hungry for

3    young, impressionable small children.

4              Your psychologist says that you weren't attracted to

5    children, but the first question that you asked every boy you

6    messaged was how old they were.  You weren't put off when my

7    brother told you he was 13.  Instead, you immediately asked him

8    for nudes.  And then from there, you kept asking and asking,

9    constantly hassling and pressuring and manipulating us over for

10   a year.

11             I watched my identical twin become afraid to eat

12   because he was afraid that you would want -- that you would

13   stop wanting him if he lost the skinny, childlike physique that

14   you craved.

15             Your attorneys say that you weren't a pedophile

16   because you didn't search for child porn on your phone, but you

17   didn't need to search for porn on your phone.  You had real

18   boys who you pressured constantly to take photos and videos and

19   send them to you.  You had real boys that you coerced into

20   doing sexual stuff with you on Facetime and in person.  You

21   exploited real children.  You had real boys produce photos and

22   videos according to your instructions, specifically to satisfy

23   your sick kinks.  In my opinion, that's way worse than Googling

24   child porn.

25             Because of our relationship with you, my identical

1   twin and I went from being extremely extroverted, confident,

2   creative, happy people to hating ourselves.

3          I firsthand watched my brother literally wasted away

4   physically and emotionally, and I watched his life being taken

5   over and consumed by doing everything he could to avoid hurting

6   you, all while you coerced him and groomed him multiple times a

7   day.

8          Jerry, you manipulated and pressured other young and

9   impressionable boys, too, a lot more boys than we are talking

10  about in court today.  You knew what you were doing, and yet

11  you kept going, hungry for more innocence, innocence that

12  myself, my brother, and other boys will never get back.  You

13  have robbed us of that.

14         Jerry, you even talked to my mom on Facetime and

15  wanted our parents to invite you to have dinner with our

16  family.  You told us you could come to our home if one of us

17  would just have sex with you.  It was so sick that you tried to

18  use my mom to manipulate us in that way.

19         You were so brazen.  Nothing could get in your way.

20  No common decency or common sense could stop you from cornering

21  my brother into a bathroom stall, pressuring him to have sex

22  with you at a cheer competition, right before he was about to

23  go do warmups.  Even when he tried to getting away and said

24  "No" over and over, you would not stop.  Not even to mention

25  that this was his first year of cheer, ever.  And it was one of

1    his first competitions, ever.  And you made that an extremely
2    traumatic experience for him.  I remember how shaken up and
3    distraught he was after that.

4         Jerry, you left me feeling so dirty and disgusted
5    about myself.  After doing what you did to Charlie, you decided
6    to do it to me, too.  Touching me in ways that I did not want
7    to be touched every chance you got, and trying to pressure me
8    into photos and sex with you.  I should have been able to focus
9    on my team and my performance at cheer competitions, but
10   instead I had to constantly avoid you and struggled to get away
11   from you.  I just could not believe, after what you did to
12   Charlie, you wanted to do the same thing to me.

13        Being Charlie's only confidant throughout that entire
14   time took a huge toll on me.  It made me feel so trapped and
15   responsible.  Because I was a little kid, I had no idea what to
16   do.  I know what you were doing was wrong, and Charlie and I
17   wanted to do something, but we didn't want to hurt you.  You
18   were consuming our innocence.  I didn't care at all about how
19   you were hurting us.  But all we could think about was how to
20   avoid hurting you or messing up your life.  It is impossible to
21   explain all the ways what you did harmed me physically and
22   emotionally.

23        What you did to us was constantly normalized in the
24   cheer world.  So at first, we thought the only way to move on
25   from this was to just deal with it, like we had been told by

1    other people.  Then we realized that what you have done, Jerry,

2    was bigger than we initially thought; that you weren't just

3    doing this to us, but many other boys, too.  It made us realize

4    that we could not stay quiet, that we had to speak up, no

5    matter how much it cost us, and it cost us so much.

6            We lost so many friends, and people made up so many

7    lies about us.  Some of the lies are from random strangers on

8    the internet, but the worst ones actually come from people who

9    know you personally and are, to this day, trying to tear down

10   me and my bother because they still take your side.

11           That's the other thing that makes me feel dirty,

12   knowing that lots of people believe really nasty lies made up

13   by your friends about my brother and I.

14           That sense of dirtiness has given me crippling

15   body-image issues to the point where I stand in a mirror for

16   hours just crying because I feel so uncomfortable in my own

17   skin.  Because of what you did to me and what I watched you do

18   to my brother, and all the lies that your friends have spread

19   about me since you were arrested, I developed PTSD along with

20   other physical damage, and now literally hours and hours of my

21   day get consumed with compulsions that I cannot stop.

22           I hate myself because I cannot stop, and I am so

23   ashamed.  Every morning I wake up and the first thing I think

24   about is how much of my day is going to get wasted on

25   compulsions and whether I'll ever get over the crippling

1    anxiety stemming from PTSD.

2            At one point in time, I used to be so interested in

3    creative things like drawing and origami, and I had so much

4    life in my heart.  It was easy for me to be single-minded and

5    to achieve all the goals I set for myself.  I read books and

6    spent hours and hours on the trampoline mastering tumbling

7    skills, and learned about things that fascinated me, and

8    dreamed about my future.  Those attributes of me quickly

9    disappeared when you came into our lives and were replaced with

10   constant spiraling anxiety and depression to the point where

11   doing simple things throughout the day seemed impossible.  My

12   brain feels like it is completely different than it used to be,

13   and now I waste so much time on my compulsions that it is like

14   weeks and months are literally stolen from me.

15           I have panic attacks and used to have suicidal

16   ideations.  Even though I am going to a really good

17   psychiatrist, we still haven't found the medications needed to

18   make my compulsions stop so that I can even live a seminormal

19   life.

20           You have made it feel so impossible for me and

21   Charlie to trust people.  Even in casual friendships, we are

22   always on guard for how our trust could get exploited.  We try

23   hard to make friends and to appear normal, but we cannot talk

24   about what's really on our minds, because if we do, it kills

25   the mood and makes other people feel uncomfortable and weird.

1    So instead, we just pretend that we are normal 16-year-olds.
2    Even though it looks like we are surrounded by people, we feel
3    isolated and alone.

4         I remember when it was so easy for me to make
5    friends.  I remember when it was so easy for me to laugh.  I
6    worry about whether I will ever feel that way again.

7         In the past couple years, I have missed out on so
8    much.  I cannot remember the last time I have felt in control
9    and normal since I was a seventh grader.  There has been so
10   many instances when I have had to lock myself in the bathroom
11   and hide in social settings because I felt so uncomfortable in
12   my own skin.  And I have missed out on high school, because
13   simply showing up at school was too much for me.  Me and
14   Charlie would frequently have to leave class because we would
15   be having panic attacks, and showing up at school was getting
16   too much for us.

17        When we started middle school, me and Charlie were a
18   part of a group of kids that the teachers expected to be in the
19   top 10% in high school.  Now, because of everything we have
20   been through, we are barely class -- we are barely passing our
21   classes.

22        In contrast with us, everyone says that you were a
23   standout student in high school.  And in one episode of *Cheer*,
24   you got recognized for getting straight As in college.  And in
25   another, it showed you getting a scholarship to Louisville

1    because of your good grades.

2           That makes me confused about some of what your

3    lawyers have said about you.  They talked a lot about you

4    having cognitive issues and a low IQ, and says that you're

5    delayed, and that you're basically a child, even when you were

6    19 or 20 or 21, but the whole time, we knew you had tons of

7    friends your own age.  And it wasn't like these people were

8    friends of you because they felt sorry for you for being slow.

9    The truth of the matter is that you are actually way above

10   average when it comes to making people trust you and like you.

11   In that area, you are a genius.

12          You made me lose trust in the sport I love so much,

13   the sport that I've been dreaming about succeeding in literally

14   since I was seven years old.  But we are determined not to let

15   you take our lives away from us, though, Jerry.  A lot of

16   people expected us to quit cheer when we started speaking up

17   about what you did to us.  But you have already stolen almost

18   everything from us.  We weren't going to give up the sport that

19   used to make us happy.

20          We had to make -- we had to move to a new gym because

21   the people at our old gym didn't agree with us speaking out,

22   and now my mom has to drive almost 1,000 miles a week for us to

23   still cheer.  At times, it causes so much anxiety for me,

24   because every time we go to competitions, we have to face the

25   people who still support you and whisper about us.  The

1    organizations and people that minimized what you did and didn't

2    help us stop you are still in charge of the sport.

3           There have been many times when my trauma therapy was

4    scheduled too close to cheer practice, and I have had to run

5    out of practice in the middle of a full-out to throw up,

6    because my brain was still disregulated from therapy and I was

7    so anxious, but I did not give up.

8           In this past season, my team won World.  That was a

9    big deal for me, because even though you've taken so much from

10   me, I proved that I am stronger than your abuse.

11          Thank you for letting me speak.

12          THE COURT:  Thank you.  If someone else would like to

13   make a statement, now would be the time.

14       (Minor 1 approaches.)

15          THE COURT:  Good afternoon.

16          MINOR 1:  Good afternoon.

17          THE COURT:  I understand --

18          MINOR 1:  Thank you for letting me speak.

19          THE COURT:  You're welcome.  I understand that you

20   are the person we have been referring to as Minor 1.  Is that

21   right?

22          MINOR 1:  Yes, sir.

23          THE COURT:  And you'd like to make a statement today?

24          MINOR 1:  Yes, sir.

25          THE COURT:  Please proceed.

1    MINOR 1:  Seventh grade is when my whole life was

2    changed.  It was my first year of cheerleading.  It was the

3    year where I came out as gay.  I was a child, and I was

4    innocent, but I had a life.  I loved and respected myself.

5    Even though I was kind of a weird kid, I felt good about myself

6    and my future.

7         In 2018, when I first started cheer, I was nervous

8    because I knew everyone would compare me to my identical twin,

9    Sam, who had amazing tumbling skills because he was in

10   competitive gymnastics before he started cheer.  I was little

11   12-year-old Charlie.  I had no cheer experience and no cheer

12   friends.  I was not sexual, and I never sent nudes before I

13   knew Jerry.

14        At that time, I was not athletic at all.  Because I

15   was insecure, I was really happy when, about six months into my

16   first season, Jerry reached out to me.  He was a famous

17   cheerleader I knew from blogs on YouTube and from social media.

18   Everyone in the cheer world looked up to him and loved him.  In

19   my naive brain, it seemed like he valued me and actually wanted

20   to be my friend.

21        Pretty much immediately, I felt wrong about what

22   Jerry was asking me to do, and I felt ashamed.  But I did not

23   want him to not want me anymore, and I knew he would not want

24   me anymore if I didn't give him my body.

25        Basically, Jerry took over my life.  He constantly

1    pressured me to take photos and videos for him.  Sometimes he
2    badgered me many, many times a day.  He also constantly wanted
3    me to get on Facetime or to meet him in person to do sexual
4    things.  If I did not submit and give him what he wanted, he
5    would make me feel so guilty.  He would say I did not care
6    about him or that I wanted him for fame, and neither of those
7    things were the case.  The problem is that the only way I could
8    prove to him that that wasn't the case was to submit to
9    everything he asked of me, no matter how bad it made me feel.
10   This went on for almost a year and a half and made me question
11   myself every day.

12        At the time, I thought that I was in full control and
13   deserved to feel guilty and ashamed.  Only recently have I
14   finally understood it was the exact opposite.  I was a child,
15   and he was a grown man.  We were both not young people.  I was
16   not the one who should have felt ashamed.

17        Every cheer competition that Jerry was at, Sam and I
18   had to worry about avoiding him, because when he would see us,
19   he would not stop begging to have sex with us, and would grab
20   us in these hugs that were way too close and way too long.  He
21   would touch our butts and other parts of our bodies and say
22   these creepy, suggestive things to us.  He would actually have
23   to -- we would actually have to physically struggle to get away
24   from him.

25        To avoid him, I had to stress so much, and always

1  have my guard up at competitions to avoid him.  When I couldn't

2  avoid him, things were so bad.

3          At the American Cheerleaders Association competition

4  in 2019, he followed me into the bathroom and locked me into a

5  stall with him and tried to kiss me and begged me to have sex

6  with him.  At the time, he weighed at least a hundred pounds

7  more than I did.  I repeatedly said "no."  He continued to beg

8  and kept touching me and trying to kiss me.  I literally had to

9  struggle to escape him and sprint out of the bathroom to get

10  away from him.

11          After that happened, the only person I could tell was

12  my identical twin, because I felt so ashamed.

13          There were a few times I tried to tell friends about

14  what was happening, but they just laughed it off and said that

15  it's weird, and that it happened to them, too, which made me

16  feel even more alone, for feeling like this was really wrong.

17  I knew in my heart and soul that what Jerry was doing to me and

18  Sam was bad, but everyone was telling me that's just the way

19  Jerry is.  And if I ever were to report him to anyone, that

20  everyone would turn their back on me, because I would have

21  ruined the life of such an amazing person that everyone loved.

22          Being exploited every day and knowing that I could

23  not do anything about it, or if I did do something about it, my

24  whole world would be ruined, was incredibly isolating and

25  horrible.  Actually, the words "isolating" and "horrible" do

1    not even begin to do the justice of what I felt.  What I felt
2    can hardly be put into words.
3            I read that the definition of "shame" is the
4    intensely painful feeling or experience of believing that we
5    are flawed and that we are, therefore, unworthy of love,
6    belonging, and connection.  That definitely explains what I
7    experienced.
8            Because of what Jerry did to my body and my mind, I
9    went from being a confident, happy little kid to having every
10   part of my existence taken over by shame.  During this time,
11   everything about myself changed.  I felt unworthy of doing
12   anything good.  I hated myself.  I lost all sense of belonging
13   and connection.  My grades dropped, and I was failing classes,
14   even the ones that used to be my best subjects and I did not
15   even have to try on.  I had regular panic attacks at school.  I
16   could no longer use the bathroom at school or other public
17   places without getting extreme anxiety and throwing up.  I
18   stopped eating so I didn't have to use the bathroom, so that I
19   would stay skinny, the way Jerry wanted me to be.
20           I distracted myself from everyone I was close with at
21   school.  I distanced myself away from my twin and my parents.
22   When my family tried to talk to me about what was wrong or
23   tried to help me, I got angry and screamed at them and threw
24   things and slammed doors.  I no longer wanted to do things that
25   were things that used to define myself.  I no longer cared

1    about anything.  I no longer wanted to wake up every morning

2    because I knew it would just be a repeat of the day before,

3    dealing with Jerry and battling my self-hating thoughts about

4    the whole situation.  Yet, I thought, I couldn't make it go

5    away.  Because every time I distanced myself, he would beg for

6    me and make me feel like if I didn't give myself over to him,

7    that it was my fault, and that he was angry.  I did not know

8    any better.  I had never been in a relationship with a gay man

9    before, so I thought this was normal.

10          Jerry Harris engraved in my 13-year-old mind that my

11   body was the only thing that was valuable about me, and that it

12   did not matter that I felt horrible about the way I was being

13   treated.  I couldn't stand up for myself.  I was told it was my

14   fault.  I thought, when I felt bad about things, I was just

15   being too overdramatic or too sensitive, and that the problem

16   was with me.

17          Jerry made it seem normal that this kind of thing

18   happens to every gay boy in cheer, so therefore I should not

19   say anything.  He definitely made clear to me that if I did say

20   something, I would ruin his life.

21          Having all of this cemented in my head at 13 makes me

22   feel like no matter how much therapy I get, no matter what

23   medications I take, no matter how much money my parents spend

24   to help me, that it will never go away and I will never be

25   normal.

1      It has been 1,312 days since that first message Jerry

2      sent to me, and I still have to fight for my life every day, to

3      convince myself that I am not a bad person, and that it was not

4      a little 13-year-old boy's fault for this happening to him.

5      I have done so much therapy, and I know that

6      everything I am feeling is normal for a person with PTSD, but

7      that doesn't make it any easier.  I am finally slowly beginning

8      to overcome the shame, but now I am facing a new feeling,

9      mourning everything I have lost because of what Jerry did to

10     me.

11     It has been over two years since I have communicated

12     with Jerry, but I still hear his voice in my head every time I

13     look at my body in the mirror.  When I look at myself, I still

14     hear the perverted things he would say to me and feel what it

15     felt like when he touched me.

16     I still judge myself according to his views on me.  I

17     absolutely hate this.  I do not want Jerry Harris living in my

18     brain.  I don't want to hear his words anymore.  Having him

19     engraved in my brain makes me feel violated over and over and

20     over again and makes it impossible for me to escape.

21     I would give anything to go back to 12-year-old

22     uncomplicated Charlie, the boy who would look in the mirror and

23     smile and feel proud of what he saw there, rather than just

24     seeing my body as an object of Jerry's lust.  No matter how

25     hard I try, I cannot do that.

1     A while ago, I thought I was finally getting better

2     and there was a light at the end of the tunnel.  I was at a

3     very special occasion with my extended family, and I went into

4     a crowded men's bathroom.  I was trying to use a urinal, which

5     I haven't been able to do for years because of my PTSD.

6     Because there's a line for the stall and I didn't want my

7     family to wait for me, as I was standing there, I got

8     completely flooded by feelings and had the worst panic attack

9     I've had in a long time.  Instead of us being able to take part

10    in the family celebration, my mom had to drive me around in the

11    car until I could stop shaking and crying.  I was so

12    embarrassed and overwhelmed.  And the feelings that flooded me

13    during the panic attack made me realize that there's a whole

14    new dimension of consequences of my abuse that I haven't even

15    started to work on in therapy, specifically my future sexual

16    relationships.

17          My therapist and I have worked so much on me being

18    able to eat again and helping me feel okay about gaining weight

19    and no longer looking like a child, but we haven't even begun

20    to work on my sexuality.  Realizing that there is still so much

21    work I still have to do in order to be a happy person and have

22    a normal sexual relationship when I am an adult makes me feel

23    so exhausted and so helpless.  Just like when I was still being

24    abused.  At times, it's hard to get out of bed in the morning.

25          I have lost so much time as a child that I mourn

1    every single day.  I had to quit cheering at my old gym because
2    people there disagreed with me and my family deciding to speak
3    out.  The only true community I had at the time, I felt like I
4    had, was taken away from me for doing the right thing.  To be
5    able to find a gym that supported me and Sam, we have to
6    commute two hours one way just to practice multiple times a
7    week.

8            I can't go to school, so I have missed out on so many
9    normal experiences.  The kids I was close with since we were in
10   preschool have moved on with their lives.  They are driving and
11   have part-time jobs and got to go out to prom and are talking
12   about which English teacher they hope to get next year, and are
13   still laughing about something funny that happened in the
14   cafeteria six months ago, and are at the beach together right
15   now celebrating the Fourth of July.  Meanwhile, me and Sam are
16   left in the dust, left out of everyone's plans, driving
17   ourselves through online school and just trying our best just
18   to survive.

19           Since I was 13, life has not been the same for me.
20   And there's not been one night when I slept normally or one day
21   I don't feel hypervigilant and irritable and have constant
22   intrusive thoughts, not to mention all the other damages and
23   physical consequences that I have suffered.

24           I have zero regrets about speaking up.  But what we
25   did by telling the truth should not be controversial.  I should

1   not have to lose dozens of friends because I told the truth.  I

2   have had thousands of people speculating about me and saying

3   that what happened was my fault and not Jerry's.  People are

4   still making up lies about me and my brother.  The

5   organizations and adults in charge of cheer have tried to

6   dilute what I have went through and have tried to make me back

7   down.

8         My mom now has a dangerous heart arrhythmia that

9   she's probably going to have to get surgery for.  Her heart is

10  literally broken because of the stress of watching me and Sam's

11  lives get destroyed by this, because of her having to fight so

12  hard for us.

13        My dad had to move almost 200 miles away for almost

14  two years to get a job where he could earn enough that my mom

15  could work less so she could help me and Sam, so they could

16  still afford the expensive therapy that we need.

17        Every part of our family's lives have changed,

18  nothing is normal, but I refuse for what Jerry did to be

19  normalized.  I refuse to be silenced any longer.  The culture

20  of secrecy and abuse being normalized just encourages toxic

21  lifestyles and perpetuates trauma into more and more people's

22  lives.

23        There are a lot of people who are paying attention to

24  what happens to Jerry here today.  The sentence he gets will

25  affect the way people will think about a type of abuse that is

1   becoming more and more common.

2          If he gets a lenient sentence, then other victims

3   will think exactly what I thought, that what they are just

4   experiencing is no big deal, that it is not real abuse, and

5   that they just need to keep quiet and try to get over it on

6   their own.

7          If he gets a strong sentence, however, then other

8   victims will know what I really wish I knew four years ago,

9   that what Jerry did is wrong and is a very serious crime; and

10  that if you speak out about doing this, that you will get

11  support, and the legal process will work in the way it's

12  supposed to.

13         Thank you, Your Honor.

14         THE COURT:  Thank you.  You may have a seat.

15         So next, we're at the stage of the case where I would

16  hear the defense argument on the application of the factors.

17  Then I would hear from the government's attorney.  And then I'd

18  hear from Mr. Harris.

19         Does anyone need a break or would you like to start?

20         MR. PUGH:  May we have five, Your Honor?

21         THE COURT:  All right.  We'll take another break.

22  Again, we'll -- there are a lot of moving pieces here, and it's

23  hard to just take a five-minute break, but if you could try and

24  keep it as close to five minutes as possible so we could

25  continue, I would certainly appreciate it.

Colleen M. Conway, Official Court Reporter

1          We will be in a short recess.

2      (Recess.)

3          THE CLERK:  Recalling 20 CR 637, United States versus

4      Harris.

5          THE COURT:  On behalf of the defense, who will be

6      making the argument?

7          MR. PUGH:  That would be me, Your Honor.

8          May I address you from the lectern?

9          THE COURT:  You may.

10         MR. PUGH:  Thank you.

11     (Counsel approaches.)

12         MR. PUGH:  Your Honor, it was very moving to listen

13     to the testimonials of Minors 1 and 2 and the summation that

14     was done by their mother in this case.  And I took some copious

15     notes during it.  And, of course, there was the victim impact

16     statement written by Minor 5 in this case.

17         And some of the takeaways from that I believe

18     reaffirmed many of the central themes of the materials that we

19     provided Your Honor in this case.  And I think the main one is

20     the one that I heard very loud and very clear, which is that

21     trauma and a person's reaction to trauma is not linear; and

22     that you heard the manifestations of what trauma that is

23     occasioned upon an individual, particularly a young individual,

24     and how it can manifest itself in a variety of ways, in a

25     variety of conduct, and a variety of acting out.  And I think

1    one of the most important things to think about when we talk
2    about trauma is how it makes us think of ourselves.

3          You have heard those themes explored in all of the
4    victims' statements, and then you see it through the materials
5    that we provided you in this case, is that trauma causes an
6    individual to think less of themself.  And when that trauma is
7    compounded with shame, then the results are even more
8    egregious.

9          And the young men who courageously came up here today
10   and told you about the results of their trauma need to bear in
11   mind that what has resulted for them because of the actions of
12   Jerry Harris in this case, and as they stood before you today,
13   that was under the -- that was with the backdrop of what
14   appears to be a loving and perfect family, a family with
15   resources.  These were young people that were given
16   intervention in the form of what they told you is trauma
17   therapy and other forms of therapy.  And you know from the
18   materials you have been provided in this case it is absolutely
19   uncontradicted that Jeremiah Harris received none of that.

20         And the other central theme which was, I think,
21   consistent with some of the questions that you had for Ms.
22   Short during her testimony was this aspect of how might the
23   cheer community have contributed to the offense conduct here
24   and whether there was a perfect connection.  And I don't
25   suggest that there is a perfect connection and a perfect causal

1    element here, but what I can say -- and now it is completely
2    uncontradicted -- is that the behaviors of the offense conduct
3    in this case, the crimes that Jeremiah Harris committed in this
4    case had been normalized in this community for a very long
5    time.  And that was affirmed with the recent testimonials that
6    you accepted in this case.

7              THE COURT:  Do you think that's mitigating?

8              MR. PUGH:  I don't know if it's mitigating.  I think
9    it is, though.  Because it is absolutely uncontradicted that
10   Jeremiah Harris, starting at 11 years old, without adult
11   supervision, in a household where he was gay and not accepted,
12   and trying to understand his own sexuality, his own sexual
13   identity, the only teaching mechanism that was provided to him
14   under the circumstances was the internet and pornography,
15   unsupervised.

16             And, again, one of the things that we have to talk
17   about here is that in order for there to be disclosure, there
18   must be acceptance.  And an individual who is not accepted will
19   never disclose.

20             And you know that the household where Jeremiah Harris
21   was raised was not a household where he could find acceptance
22   so that he can make disclosures.  There was no opportunity to
23   say, "I was on the computer, and I saw these activities going
24   on, and I don't understand them."

25             Ms. Short told you that Jerry self-reported that at

1    11 years old, he was obsessed with the love stories that he was
2    seeing on the internet.

3          And we know what the ill-effects of pornography are.
4    We know what they are on adults, let alone on children, and
5    children where it's not being talked about and it's not being
6    supervised.

7          Add to that, you begin with online relationships
8    between a minor, minor Jerry Harris, and somebody much older,
9    through the internet, where he's being solicited and asked for
10   photographs of himself, prurient sexual photographs, to
11   somebody that he believed at the time was his "boyfriend."
12   And, again, nobody in the household to talk to about that.

13         When you look at the letters -- and I apologize.  My
14   glasses keep fogging up, Judge.

15         But when you read the letters that were written by
16   Jeremiah's family of origin, there's a central theme that you
17   can pick up from there, very, I think in some cases, extremely
18   well-intentioned people.  But even to this day, they never
19   describe Jerry as "gay."  They use terms like he was picked on
20   because he "liked cheer."  Or in one of the letters was he was
21   "funny."  And I don't mean "funny" in terms of ha-ha.  But
22   these are the terms.  This was just a family that has never
23   come to terms with Jerry's sexuality.

24         And how was Jerry, at 11 years old, supposed to
25   understand his own sexuality?  And he got some very bad lessons

1    and he encountered some very bad actors in an environment

2    which, Minor 1's mother told you, when it was self-reported by

3    them, they were told that that's just the way it is.  That's

4    how this community is.

5              And I think, Judge, it is mitigating because it

6    explains, to a certain extent, how the conduct manifested

7    itself.

8              Justice Frankfurter said in *United States versus*

9    *Rabinowitz* that:  "Where one comes out on a case depends on

10   where one goes in."  And we have asked you, Your Honor, to

11   consider, first and foremost in this case, the concept of what

12   is just punishment.

13             And before you is a 22-year-old young man whose

14   offense conduct occurred between the ages of 18 and 20.  That

15   he has unequivocally not had difficulties but been subjected to

16   repeated traumas throughout his life.  And that has been

17   universal of everyone who has ever come into contact with him

18   since he was in kindergarten, that he was always a joyful,

19   kind, and a light in people's lives.

20             But one of the things that you don't read -- and I

21   think a closer inspection helps the Court -- is in his young

22   years, until he found acceptance in the cheer community,

23   despite the fact that his teachers liked him and he was a

24   helpful little boy, he didn't have friends.  He was the child

25   that ate alone, and he was the child who was raised in an area

1    of differentness because he was different.

2          And the submissions given by the government in this

3    case and some of the statements that have been made here have

4    asked for a sentence that is harsh based upon the crimes.  And

5    we talk about things like 72 months or 180 months or 120 months

6    or anything, or these numbers along these lines, because that's

7    how the federal system is designed.  But what we're really

8    talking about here is a life.  And that is the job that you

9    have before you today, is what impact will your decision visit

10   upon a very young person's life.

11         And that I have asked from time to time at a

12   sentencing -- and I got this from another judge.  But when

13   thinking in terms of sending somebody to the Bureau of Prisons,

14   the Department of Corrections, or things along those lines,

15   sometimes a very helpful exercise, particularly for people who

16   are asking for many, many years, is to take out their phone, as

17   we all have, and open up the photo section of that phone that

18   we -- and my phone will go back ten or eleven years of photos.

19   And they're catalogued chronologically.  When you look at that

20   chronology, that chronology of those photographs encapsulates

21   the moments in our life.  And how many years would any of us be

22   willing to wipe out, to remove us from those pictures, to

23   remove us from those birthdays, those holidays, those

24   significant events to come up with something that is just

25   punishment?

1       And for the people that have come here to say that

2    there is some kind of lenience that is going to come out of

3    this courtroom, Your Honor, you know that that is not the case;

4    that as an entry-level position in this case, Congress has

5    mandated that Jerry Harris must serve at least 60 months in the

6    Bureau of Prisons.  You already said it would be followed by a

7    term of eight years of supervised release.  But there are a lot

8    of collateral consequences for this type of offense, and it is

9    important and proper for a court to consider what will be the

10    other consequences of this conviction and sentencing.

11       And for those who have asked that Jerry should serve

12    a life sentence, I assured them that he will.  He will become a

13    registered sex offender.  And, actually, under Illinois law, he

14    will be considered a child sex offender or a sexual predator

15    for the rest of his life.

16       Upon his release from the Bureau of Prisons, he will

17    never, ever be able to enter a park, a forest preserve, or any

18    place of public recreation.  He will never be permitted upon

19    school grounds.  He will never be permitted to be in the

20    presence of anyone under 18 years old without supervision.

21       In terms of where he might live, Jerry Harris can

22    never live within 500 feet of a school, a church, a daycare, or

23    any facility that provides services to persons under 18.

24       And for at least ten years after his release from the

25    Bureau of Prisons, under Illinois law, he shall have no contact

1  with any social media whatsoever.  And this would include
2  employment-related or networking activities that would help
3  somebody to get a job or any other type.

4         For the rest of his life, he will be on a public
5  website so that wherever he lives, his neighbors will know that
6  he is living there.

7         His ability to get a job, to rent an apartment, and
8  to buy his basic necessities will be forever compromised.  He
9  will live in constant fear of arrest for being in noncompliance
10 with SORNA.  And if at any point he becomes homeless again, he
11 will, under the law, have to register with the local police
12 department every three days about his status as a homeless
13 person.

14        So, in other words, nothing -- before you even get
15 started with the analysis, which I know you have already
16 started, but before you even get started with the analysis,
17 this is the baseline, this is the minimum that can come out of
18 these proceedings.

19        And for those that are crying for long sentences and
20 to send a message, that is a big, big message and it is a
21 heavy, heavy consequence.

22        And I think it's important, and you already know
23 this, is that sentencing, contrary to popular belief, is that
24 the punishment does not fit the crime but, rather, as our
25 Supreme Court has said as recently as two weeks ago in *United*

1    *States versus Concepcion*, that:  "There is a longstanding

2    tradition in American law, dating back to the dawn of the

3    Republic, that a judge at sentencing considers the whole person

4    before him or her 'as an individual.'"  That:  "Every case as a

5    unique study in the human failings that sometimes mitigate, and

6    sometimes magnify, the crime and the punishment to ensue."

7            What we've submitted to Your Honor, and the testimony

8    you have taken today, I would strongly suggest to you that this

9    case is a unique study in human failings.  The first and

10   foremost failing is Jerry Harris' failure to comply with the

11   requirements of the law.  That is the number one failing.  And

12   he has accepted responsibility for that from the very

13   beginning.

14           And I feel terrible for Minors 1 and 2, when they

15   talked about what they were subjected to, and the lies from

16   other people after their disclosures, but they should know

17   this -- and as you know and the government knows -- from day

18   one, Jerry Harris has not lied.  When Special Agent Goodman

19   interviewed him on the very first day, when the execution of

20   the search warrant, he freely admitted his conduct.  He

21   accepted responsibility almost from the outset.

22           And the only delay in this case getting to the

23   position that it is today, really, was the global pandemic and

24   the shutdown and the inability to get services into the MCC, or

25   we would have been here much sooner.  There was never, for a

1   moment, that Jerry Harris ever took the position that these

2   boys were liars or anything else.

3          So I want them to know that.  And I know that Jerry

4   wants them to know that.

5          But I want to remind the Court and everybody here

6   that the offense conduct did occur at a time when Jeremiah

7   Harris was between the ages of 18 and 20.  It was a time that

8   he was lawfully an adult.  However, the Supreme Court has said

9   in both *Miller versus Alabama* and *Roper versus Simmons*, there

10   is still very much of an adolescent, of the adolescent brain,

11   and that Jerry Harris was very much an adolescent at the time

12   that he committed these offenses.

13          And I'll quote the Supreme Court:  "Developments in

14   psychology and brain science continue to show fundamental

15   differences between juvenile and adult minds; for example, in

16   parts of the brain involved in behavioral control.  We reasoned

17   that those findings -- of transient rashness, proclivity for

18   risk, and inability to assess consequences -- both lessened a

19   child's 'moral culpability' and enhanced the prospect that, as

20   the years go by and neurological developments occur, his

21   'deficiencies will be reformed.'"

22          And in this case, the offense conduct occurred

23   between the ages of 18 and 20, but if you reduce it, the core

24   offense conduct really occurred in the spring of 2019.  That

25   was the time when the offense conduct peaked in this case.  And

1   despite claims that there were other contact victims in this
2   case, there were not.

3          And despite Jerry's stunted emotional and cognitive
4   functioning, he has completely and thoroughly accepted
5   responsibility in this capacity.  His remorse is genuine.  All
6   of the character letters and videos that stretch back to the
7   first grade support the conclusion that being harmful to anyone
8   is the antithesis of who Jerry Harris is.

9          Now, there was something that was brought up earlier
10  about -- I think the government had made mention in their
11  filings that Jerry's situation had improved at some point,
12  while acknowledging that his situation before that hadn't been
13  so great.  And I want to talk about that.

14         But I want to talk about -- a little bit about
15  failure.  Because a person's failure, in this case, Jeremiah
16  Harris' failure -- and this is why the history and
17  characteristics of him are so important -- is that you really
18  can't measure someone's failure until you recognize the tools
19  that person was given for success.

20         In courtrooms such as yours, we have heard over and
21  over and over again the aggravating circumstance that somebody
22  had a good home, had a college education, had everything and
23  then chose to commit criminal acts.  And that is particularly
24  aggravating.  Because that is an individual who had the tools
25  for success and instead failed.

1    I don't think there's any argument here that Jerry

2    Harris was never, as a child, really given the tools for

3    success.  If you go all the way back to his birth records and

4    his formative years, he not only was denied the tools for

5    success, but, in many respects, he was encouraged to fail.

6    And I just want to work backwards through some of the

7    high points of the trauma that Jerry experienced, and to ask

8    the Court to recognize that meaningful professional

9    intervention in these situations never really occurred.  The

10   fact that he had an IEP in school and he had teachers that

11   cared about him did nothing to take away from the fact that

12   there was never any real professional intervention.  Like you

13   heard earlier today, trauma therapy, psychiatrists, medication

14   management.

15   And there's a reason for that.  And you'll read --

16   I'll talk about that in a second.  But it's in the letters that

17   are submitted.

18   But, you know, at age 17, Jerry Harris was

19   essentially sold to the Whelans for $1100 a month in Social

20   Security benefits.  I can't imagine being a teen, or ask

21   anybody to imagine being a teen young boy or man, and realizing

22   that the only way that you would get out of the circumstances

23   you are in is that you would allow your father to keep your

24   $1100 death benefit from your mother so that you could go live

25   at the Whelans' home.

1          And at 16 -- heard about this -- he didn't have any

2     money.  Leaving Loyola Medical Center where his mother was

3     dying and taking a taxicab ride with a grown man who sexually

4     assaulted him in exchange for a hundred dollars.

5          And I think the bullying has been downplayed a little

6     bit through the review of the life chronologies.

7          Jeremiah Harris is an African-American boy who lived

8     in Bolingbrook, who went to a nearly all-white school in

9     Bolingbrook, from elementary school through middle school to

10    the beginning of high school.  It is absolutely uncontradicted,

11    when you look at the school records, he was a kid who was

12    screaming and crying in the nurse's office not wanting to go to

13    school.  And that he was bullied mercilessly, not just because

14    he was obese.  And the fault of his obesity lies strictly on

15    the parenting that he received.  That is a health crisis that

16    they visited upon him.  He was bullied because we know he was

17    gay, and he was interested in things that the boys in this

18    not-so-progressive school in Bolingbrook, they didn't

19    understand either.  But he was also bullied because of race.

20    There was a racial factor in here as well.  They were one of

21    the few black families that attended this school.  And that was

22    certainly an issue for Jerry as well.  And this manifested

23    itself in a home that he got to come home to that was nothing

24    less than just dysfunctional.

25          When I look at his sister's letter that I submitted

1     to you, I mean, what she says is that Jerry was also bullied

2     because of his interest in cheerleading.  But there's nothing

3     about being gay.  It's a family that couldn't accept his

4     sexuality, even to this day.

5              At 13, he was sexually assaulted by a 19-year-old in

6     the cheer community, and the same school where he was so

7     mercilessly bullied for being poor and wearing funny clothes

8     and being overweight.  Can you imagine the trauma there was

9     when the school bus pulled up in front of his house and all of

10    his family's belongings were sitting on the curb, as he had

11    been evicted?  And that the family, just to highlight the

12    dysfunction of where he came from -- we all know, as lawyers,

13    the eviction isn't something you're surprised by.  You know

14    it's coming.  And that Jerry had no idea anything like this was

15    coming.  His family had made no arrangements for what was to

16    occur.  And most of their belongings were just gone.  And they

17    began the process of years of living in and out of hotel rooms

18    around the area of Will County and DuPage County.  And that

19    Jerry shared a bed with his mother right up until her death.

20             It was a household that was filled with domestic

21    violence and law enforcement activity.  We've, you know,

22    sourced and collateralized all of that for you, Judge.  He was

23    diagnosed with depressive disorder in the first grade at age

24    six.  And this was the diagnosis, diagnosis with depressive

25    disorder, obesity, anxiety, crying fits with the nurse at

1    school because he was afraid to attend class.  And there is no

2    evidence at all, no corroboration that from that age forward,

3    that there had been any meaningful psychiatric counseling,

4    medication, or anything else provided to this six-year-old

5    child.

6           Jennifer Houchens, who's here today and did provide a

7    letter and a video for the Court, has known Jerry since he

8    began in cheer in elementary school.  And what she reports to

9    me is that:  Everyone spoke well of Jerry, but he was always an

10   outsider at school who ate his lunch alone.  He was never

11   invited to parties.  It wasn't till much later when the girls

12   in cheer accepted him that he started to enjoy anything close

13   to a normal life.

14          And it really wasn't until he was a senior in high

15   school -- you read this in the letters -- that the moms and the

16   dads and the siblings in this cheer community really understood

17   how hardscrabbled things were at the house Harris-Bowman until

18   they went there and got him out of the hotel when he was a

19   senior in high school, and saw how this family had been living

20   not for an insignificant period of time.

21          And when the government suggests that his situation

22   got better, it did.  But it didn't get better until he was

23   17-and-a-half years old.  And it would be only six or seven

24   months before the offense conduct began in this case, and it

25   was when he was moved to be -- moved to the Whelans' home full

1   time.  He was a senior in high school.  He had been referred

2   for a neuropsychological examination at Central DuPage

3   Hospital.  And you have that very dense report of what was

4   recommended.  But what you don't have is any treatment plan of

5   how any of those were met, that there was any psychiatric

6   counseling that followed that.

7            You know, Jerry had a bright smile, which everybody's

8   talked about, and there's no doubt about it.  He learned some

9   lessons.  And Ms. Short talked about this a little bit.  But

10  his mother taught him to hide the pain and hide the shame.

11  "Don't tell anybody we're homeless."  "Don't tell anybody you

12  have a father."  "Don't tell anybody you can't afford a winter

13  coat."  "Keep our business to ourselves."

14           And on the issue of mental health, what does Deandre

15  Bowman tell you, Judge?  "We didn't believe in medicine for the

16  mind.  God was our counselor.  We needed it, but it was

17  forbidden."  The number one recommendation, when he was at

18  Waubonsie High School, was psychiatric counseling, but this

19  never occurred.

20           As I mentioned earlier, this case is not just a study

21  of human failure, but it's also a study in system failure.

22  Shannon Young talked to you about it.  Minor 1 and Minor 2

23  talked to you about it.  And Minor 1 and 2's mother talked to

24  you about the system failure for the cheer community.

25           But there was also a system failure for the

1    Harris-Bowman family.  Absolutely uncontradicted, that for at
2    least a decade, if not more, there needed to be an intervention
3    in this family and the way the family was living and what was
4    going on there.  And as far as they can tell, in the materials
5    that we reviewed in this case, the only intervention that
6    happened was the execution of a couple of search warrants at
7    that house.  But there was no DCFS intervention.  There were no
8    resources given to this family.  Somebody needed to intervene.

9         And part of it's a system failure, but part of it, I
10   think you've discerned, is a failure of Lizzie Bowman and her
11   inability to ask for help, and her ability to keep secrets, and
12   to isolate Jerry from his family of origin and his extended
13   families.

14        It was absolutely clear from looking at Jerry's birth
15   records, as it says, I believe, in no uncertain terms, that his
16   early birth, his low birth weight, and his respiratory failure
17   that he found himself in as a premie was directly tied, it
18   said, to maternal neglect or maternal fault.

19        So for the people at the hospital, they knew at that
20   time that Jerry was going home to a household that was
21   ill-prepared for this child, and that Jerry would need services
22   for mental health, his physical health, and his sexual health.
23   All of our research demonstrates that these interventions never
24   really occurred.

25        It shouldn't be any surprise, Judge, that Jerry did

1    flourish his senior year in high school.  As Ms. Short alluded

2    to, and I think you now know -- and I think this is incredibly

3    important for you when you start thinking about the issue of

4    rehabilitative potential and when you start thinking about

5    whether or not a custodial or noncustodial punishment is

6    appropriate -- when Jerry was given direction and he was given

7    supervision, he did some pretty amazing things.  You saw that

8    he took himself from pretty much a D student to a 3.5 average

9    at Waubonsie High School his senior year.

10           You heard that at one point in time, Jerry was 380

11   pounds at age 15.  Yet, he got himself in some reasonably good

12   shape by the time he was a senior in high school so that he

13   could go to college.

14           And how about the fact that Jerry actually went to

15   college?

16           When you look at those school records that are there,

17   you see this is a kid who missed anywhere from 38 to 48 days

18   every single year in school and was always lagging behind, but

19   after the death of his mother and this intervention occurred

20   with his extended cheer family, and they began to give him

21   structure, and at least several nights a week he was allowed to

22   stay at their home, where there were clean clothes and

23   functional families going on, and the tutoring that went on

24   with his cheer siblings to get his grades up, that he was able

25   to raise his ACT score by four points.  It's nothing short of

1    miraculous that he was even able to go to Navarro College in

2    this case.  But what it demonstrates for you, Judge, is that

3    this is a guy who will follow the rules.  He has been

4    incredibly invested in therapy since his incarceration in this

5    case.

6            But one of the things, and a ringing theme here, is

7    when did Jerry's offense conduct start?  His offense conduct

8    started after he got to Navarro.  And his support network that

9    had kind of grown around him from the death of his mother until

10   he graduates from Waubonsie High School, that peaks halfway

11   through his senior year.  He gets removed from that fairly

12   quickly and now he's alone.  He's living in Texas, and he's at

13   Navarro, trying to compete on this team at this junior college

14   down there, and that's when the offense conduct really started

15   in this case.

16           And it was during the time that he was without the

17   net, without the sort of village that was being built around

18   him, a time when acceptance had begun and disclosure could

19   start to happen.  Because we don't disclose to people that

20   don't accept us.  And he really was in a new environment.

21           But it's uncontradicted that that is when the offense

22   conduct happened.  And I would suggest that the evidence in

23   this case is that the offense conduct kind of was a bit of a

24   curve that went up and started to sort of go down a little bit

25   probably during the period of time that he was brought out of

1    college, back home to the Whelans in the late spring of 2020,

2    which is at the tail end of the offense conduct in this case.

3           And I don't know what your impression is on this, but

4    there are stipulated offenses in this case that I think range

5    in terms of seriousness and harm to the victims in this case.

6           And I have listened intently to the victims that have

7    presented themself before the Court, and there are victims who

8    have chosen, for one reason or not, to present themselves to

9    this Court.

10          But the conduct in the summer of 2020, that what Dr.

11   Hutchinson described as between a 20-year-old and a

12   17-year-old, from my perspective -- and you may disagree with

13   me -- is very different than a 19-year-old and a 13-year-old,

14   or even a 19-year-old and a 15-year-old.  But nonetheless

15   offense conduct, as you will.

16          But in many respects, as Coach Ernie Valdez says,

17   that while Jerry was chronologically 18, his emotional and

18   social growth had been stunted by trauma, and he still needed

19   the support and guidance of a 15- or 16-year-old.

20          This is what Ernie Valdez said about Jerry when he

21   was leaving for college to Navarro, is that he, who had known

22   him since he was nine -- and you know that from the letters

23   written by Coach Valdez -- who had seen Jerry -- Jerry was --

24   remember, Coach Valdez described Jerry as a kid who showed up

25   at a gym where he was unsure whether he was a boy or a girl.

1 　But knew him since age nine.  And Coach Valdez was the one who

2 　said that Jerry wasn't ready to go away to college from his

3 　perspective.  And the fact that he was behind the curve by a

4 　couple of years, I think, is well-sourced.

5 　　　　　THE COURT:  Let me interrupt with a question that --

6 　　　　　MR. PUGH:  Sure, absolutely.

7 　　　　　THE COURT:  -- crossed my mind in response to what

8 　you said about Mr. Harris being -- having the capacity to be a

9 　rule-follower.

10 　　　　　Do you want to comment at all about the report of

11 　some discipline while at the MCC?  It's paragraph 15 of the

12 　PSR.

13 　　　　　MR. PUGH:  Exactly.  I can comment on that.

14 　　　　　What happened in that situation -- and we were

15 　intimately involved with Mr. Steele and legal counsel -- is

16 　that Jeremiah had been threatened by an organized-crime figure

17 　to take certain action that he didn't know about and to accept

18 　a package on behalf of another one.  I guess, it turned out,

19 　the MCC knew about it the entire time.  They absolutely knew

20 　that Jeremiah was being exploited in that situation, and it was

21 　resolved in that manner.

22 　　　　　THE COURT:  Thank you.

23 　　　　　MR. PUGH:  Which brings me to an interesting point

24 　when we talk about collateral consequences.  And the victims

25 　coming in here and, you know, wanting to make sure that

1  punishment is severe in this case.

2  I don't need to tell you -- and you understand

3  this -- that Jeremiah going in as a relatively well-known

4  person, who is gay and has been convicted of child sex

5  offenses, his time in the Bureau of Prisons is going to be much

6  more difficult than say it would be for somebody on a drug

7  offense or a mail fraud offense or something along those lines.

8  They will be tough years for him.

9  And I think that brings me to one of my -- getting

10  close to one of my final points in this case.

11  Based upon Jeremiah's history and characteristics,

12  where he came from, domestic violence, the -- you know, just

13  the hunger, the obesity, everything that you see in Jerry's

14  life, I don't think any of us would have been surprised that

15  when he got to Navarro, that maybe he had developed a drug

16  problem and began to self-medicate, as many people do who are

17  suffering from untreated depression, untreated ADHD, and

18  untreated trauma.  I think probably if that had been the case

19  and he had acted out like many people who find themselves

20  addicted to a controlled substance do over time, I think we

21  would have found a greater degree of compassion for him.  But

22  Jerry committed crimes against children, and for that, society

23  has very little compassion, regardless of the facts and

24  circumstances that led to it.  And it is understandable.

25  But you did ask some questions earlier, Your Honor,

1     about sort of connections.  And I think it's important to
2     recognize here that while Jerry didn't become a drug addict, he
3     didn't join a street gang because he didn't have any family,
4     didn't have any love -- you know, we've heard all of that
5     before -- he acted out in a sexual way.  But his acting out in
6     a sexual way was because his trauma, looking at his history and
7     characteristics, was very much sexual and intertwined.
8              We have a sexual identity issue in terms of not being
9     able to understand, for instance, as a young boy, like, "Why do
10    I like boys?  "And why does my mother say that's a sin?"  You
11    remember some of the letters and the materials supplied to you
12    in this case that there were a couple of occasions where Jerry
13    had actually tried to disclose, but as he started to do it, he
14    had to change it to he was talking about somebody else because
15    the mother told him the bible -- you know, bible forbid that.
16             So that's the lesson of the 11-year-old, right?  "How
17    I feel, who I am is a sin, and that the only person that I
18    really feel close to and I love, if she knew that about me, she
19    would reject me."  That is trauma.
20             In addition, there was a moment where, after Jerry
21    was sexually assaulted by the cab driver while Lizzie was
22    dying, that he did try to tell one of his friends about it, but
23    as he started to tell the story, her mother intervened and
24    wanted to call somebody.  He was deathly afraid of, like, law
25    enforcement involvement and everything like that under those

1    circumstances, so he told the story as if it happened in

2    another way and he went back to, you know, smiling, happy

3    Jerry.  And that's his defense mechanism and his coping

4    mechanism.  But when you compound that with the sexual abuse

5    that he received, the unsupervised access to gay pornography,

6    the exploitation that happened to him in terms of being

7    solicited, you know, pictures of his body parts as he was a

8    child, that trauma gets wrapped up in his dysfunction and it

9    manifests itself in a certain way.

10           And I heard it when Minor 1 was talking, and I was

11   really, really moved by this.  He mentioned that the trauma

12   that was occasioned upon him by Jerry Harris has affected his

13   sexuality, his view of his sexuality and his view of

14   relationships.

15           So I don't think it's a stretch to say that if you

16   have a child that comes from this environment, like Jeremiah

17   Harris does, you put them into a position of sexual

18   dysfunction, then you sexually abuse them, I don't think it's

19   surprising that we might find that individual, particularly

20   when removed from their support network, would act out.  And

21   perhaps have some very twisted views of themselves as a human,

22   who they are sexually, how they relate to persons of the same

23   sex versus persons of the opposite sex, and really that kind of

24   blurry area of what is right and what is wrong.  Because I

25   disagree with Dr. Hutchinson's conclusion that Jerry was

1   oblivious to the wrongness to it.  I mean, I disagree with

2   that.  But, you know, she -- that's her lane, so she gets her

3   lane.

4           Because I know in the time that I spent with Jerry

5   Harris, is that he certainly did know the things were wrong.

6   And, actually, in February of 2020 -- you know this -- that he

7   asked Minor 1 for forgiveness and that, "We shouldn't talk

8   anymore."  There was certainly an acknowledgment by the time

9   he's 20 years old that what was going on was wrong.  And there

10  has been a constant and consistent acknowledgment from the

11  outset of this case that what he did was wrong and that his

12  remorse is genuine.

13          And I know that some might say:  Well, it's regret.

14  It's not remorse.  It is remorse.  He has been in custody.  He

15  was taken into custody during the pandemic.  And despite all of

16  that, begged -- we had to get orders to get a psychiatrist in

17  there to see him, to start giving him some therapy and

18  treatment because of the isolation and the absolute remorse

19  that he was feeling for his actions, and the help that he

20  wanted to get.

21          And whether we like it or not, Judge, everybody in

22  this courtroom, the government, me, everybody here, we are all

23  stakeholders in the lives of our fellow citizens.  And in

24  particular, we are stakeholders in the success of Jerry Harris.

25  Because regardless of the sentence that you pass today, Your

1   Honor, Jeremiah Harris will return to society.  And there is an

2   obligation under the Sentencing Code and there is a moral

3   obligation of society to make sure that individuals that are

4   punished for their wrongdoing are given an opportunity to be

5   successful after that punishment has been served.

6         And you know that one of the key indicators of

7   Jeremiah Harris' future success in this case is the 40-plus

8   people who have showed up here today, the 70-plus people who

9   provided you letters in this case.  The overflow room has

10  plenty of people down there as well, all of whom really wanted

11  to come in here and speak, and they were persuaded that the

12  materials you were given and the videos were going to be

13  sufficient, and we didn't need two days of testimony.  But

14  they're all here, and each and every one of them would stand up

15  here today.

16        And there was this issue floating around earlier that

17  somehow these people must not have known what Jerry did.  I

18  take issue with that.  Because from the detention hearings in

19  this case in the very beginning, when the criminal complaint

20  was unsealed, from the indictment in this case, every single

21  one of those people were on the call.

22        You remember our statuses, how many people would be

23  on the phone call.  They know exactly what Jerry did.

24        And I'll tell you this about Jerry.  Despite a

25  criminal case pending, Jerry never held back.  When he was

1    given the opportunity, once COVID restrictions lifted and he

2    could start to see his extended family, he was candid, and he

3    told them exactly how he felt about what he did and exactly

4    what he did.

5            So when all of these individuals were doing their

6    videos and writing their letters, they know exactly what Jerry

7    did.

8            And bravo to the courage of Minors 1 and 2 and their

9    mother.  Unlike most cases, what happened to them was global

10   knowledge.  At the same time that Jerry was being arrested, *USA*

11   *Today*, as she referenced, did a huge article.  Everybody in the

12   cheer community knew what happened.  And for that reason, the

13   people that wrote character letters in this case, they were not

14   operating under any illusion who the person was who they said

15   "can come and stay in my house anytime."

16           But I ask you, Your Honor, if we want him to be

17   successful, if we want him to still have that light that

18   everybody, even the victims in this case, say that he has, we

19   have to give him an opportunity to exit the Bureau of Prisons

20   and to have a support network around him.  But the supporters

21   for him are people who are currently in their 50s and the sibs

22   are currently in their 20s.  If we are to push Jerry away for

23   an excessive number of years, I don't know whether that network

24   is going to be there.  People's lives change.  They get older.

25   But they're here now.  And they stood here for two years, and

1  they know that they're going to stand here for at least another

2  five or six or seven or eight or whatever it takes.

3          But sometimes the type of numbers that the government

4  suggests in this case, 180 months for an offender who committed

5  his crimes when he was barely an adult, and fully accepted

6  responsibility, has gotten help and, as Special Agent Goodman

7  said -- you know, he echoed what everybody else said.  This

8  young man has a great sense, a great chance at rehabilitation.

9  And you can probably sit up there a long time before an FBI

10 agent is going to say that about a defendant in a case.  But he

11 said it in this case.  And few people know as much about the

12 nature and circumstances of the offense as, of course, the case

13 agent would.

14         But that's what everybody has to say about Jerry.

15 And we just have to make a decision that do we want to just

16 extinguish the light that is Jerry Harris?  Because there is a

17 significant period of time that he can be placed in the Bureau

18 of Prisons that the light that is him will be extinguished, and

19 he will leave the Bureau of Prisons a bitter and damaged,

20 forever really damaged, human being.  And I don't think anybody

21 wants that.  I know that it would not be consistent with the

22 goals of sentencing.

23         And I listened really carefully to the victims in

24 this case.  I don't think they want that either.  They don't

25 want Jerry broken beyond repair.

1       There's a punishment to be had here.  We've asked for
2   72 months followed by a substantial term of supervised release.
3       I did not come in here and ask for the minimum.  And
4   we gave a lot of thought to that.  Because this isn't a minimum
5   case, but it is by all -- by no means is it the type of case
6   that you would lock somebody up for so long that they'd have
7   nothing when they got out.
8       Thank you, Judge.
9       THE COURT:  Hold on.  I've got a question for you.
10      MR. PUGH:  Oh.
11      THE COURT:  What you just said at the end anticipated
12  my question of you, which is, why haven't you asked for the
13  minimum?
14      You've said this is not a minimum case.  And it's a
15  difficult position to put you or anyone in to explain how you
16  arrive at numbers or recommendations.  Ultimately, I am the one
17  who has to do that.  And I was wondering, given the
18  presentation, how did you arrive at the recommendation you
19  arrived at, which is to impose a sentence that is not the
20  minimum?
21      And within that, in response to some of your comments
22  about what the government is recommending, as you've
23  characterized it as severe or harsh, it is worth putting that
24  in the context of what the government did in this case, which
25  is drop charges that would have required a 15-year sentence,

1    and that the government's position in this case is to not

2    recommend what the guidelines would otherwise recommend in this

3    case.

4            So everyone has staked out positions that are

5    different than what the law requires at a minimum or at a

6    maximum.  And there has been a plea agreement here that has

7    arrived at a statutory range that was different than what the

8    charges originally warranted.

9            So in that context, to -- and if there's really

10   nothing more to say other than what you have said --

11           MR. PUGH:  No.  I'm happy --

12           THE COURT:  -- that's fair, but it's --

13           MR. PUGH:  I'm happy to explain.

14           THE COURT:  I think it's worth exploring a little

15   bit.

16           MR. PUGH:  Absolutely.

17           So, as you are aware from the status reports that you

18   were provided during the pendency of this case, we spent a long

19   time preparing for and providing the government with mitigation

20   materials, and then a mitigation pitch session, a very long,

21   thoughtful one, more so than any one I've ever been involved

22   in.  And I think for all the lawyers that were present, said

23   more so than they've ever been involved in.

24           And, you know, without talking about too much inside

25   baseball, of course, there were discussions that were had in

1    there which caused a level of thoughtfulness.  And as a lawyer,

2    sometimes I believe that just coming in and asking for the

3    minimum demonstrates a certain lack of thoughtfulness.  That

4    is, of course, I'm the defense.  I'm going to ask for the

5    minimum.  But we had an opportunity to spend a lot of time with

6    Jerry and talk to him about what his sentencing options were,

7    what is available.

8              I will admit some surprise that, you know, that we

9    fought very hard to get the statutory floors dropped -- and not

10   just one floor, but two floors -- and then to get a

11   recommend -- to get an argument for basically what was the

12   floor before.  But that's their prerogative.  They are the

13   Executive Branch, and they can do that.

14             But in thinking about the time that Jerry spent in

15   custody, and particularly because of the time that he spent

16   during COVID, and didn't have as great of access to services as

17   he does now, and was able to, it was our impression that, based

18   upon sort of the nature and circumstances of the offense and

19   history and characteristics of Jerry, that we didn't believe

20   that asking for the minimum sentence would -- in doing so, I

21   think we would have sent a message to you, Judge, that we

22   hadn't given this enough thought.

23             And we have given it a lot of thought.  And before we

24   made that request of you, we had full buy-in and ownership from

25   Jerry Harris.

1      So -- and I think that's important for the victims to

2  know, too, is that Jerry didn't say, "Get me as little as you

3  can get me."  I mean, there was still meat on the bone, you

4  know, to use a term.  And he was in agreement that the request

5  to you was a thoughtful request of the 72 months followed by

6  the term of supervised release that we had asked for, but is

7  fairly consistent with what you're thinking about anyway.

8          THE COURT:  Thank you, Mr. Pugh.

9          MR. PUGH:  Did you have additional questions?

10          THE COURT:  I did not.  Thanks.

11          MR. PUGH:  Thank you, Your Honor.

12          THE COURT:  Ms. Guzman?

13      (Counsel approaches.)

14          MS. GUZMAN:  Thank you, Your Honor.

15          The United States is respectfully requesting today

16  that the Court impose a sentence of 15 years.

17          We've had several hours of defense presentation

18  today, mitigation materials.  All of that information that was

19  presented through testimony and videos today was already known

20  to the Court and to the government before we got to this

21  hearing today.  It was taken into account in the government's

22  recommendation of 15 years.  And that is why the government's

23  recommendation is so, so far below what the guidelines range is

24  here, which is life, and brought down to 50 by the statutory

25  maximum.

1    So I want to take some time today and focus my

2    remarks on why the government's position is that an eight-year

3    sentence is not sufficient to achieve the sentencing aim set

4    forth in 3553 and why 15 years is necessary.

5    We have heard a lot about Mr. Harris' status as a

6    victim himself, and the government acknowledges and agrees that

7    that is powerful mitigation in this case, and certainly a

8    significant factor in bringing Mr. Harris to this moment.  He

9    had a difficult childhood and a difficult upbringing, to say

10   the least.  He has experienced trauma.  It has affected him.

11   I also agree that, in mitigation, he was forthcoming

12   with law enforcement and participated in an interview

13   immediately, did not lie about his offense conduct.  That is

14   also significant mitigation.

15   But his status as a victim and the things that

16   happened to him in childhood are not a blank check for him to

17   commit crimes against other people in adulthood.  It does not

18   give him a right to visit that same trauma on others.

19   And the presentation literally started with his birth

20   certificate today.  There is a lot of daylight between the

21   early childhood developments and the early childhood trauma and

22   the year 2020 when Mr. Harris was committing the offense

23   conduct.

24   Since then, he has had a lot of advantages.  And this

25   Court sentences defendants every day who begin, unfortunately,

1    in Mr. Harris' circumstances, the circumstances like that.

2    It's sad how often it happens.  People are abused and neglected

3    and brought up in terrible neighborhoods, in poverty, are not

4    given the love and support and acceptance that they need, are

5    not taught right from wrong, and are living under desperate

6    circumstances for years, for lifetimes when they commit offense

7    crimes in federal court.

8            But Mr. Harris had had some advantages, especially in

9    the years leading up to the offense conduct that this Court

10   needs to acknowledge.

11           When his mother passed, the cheer family raised

12   $28,000 to keep him in college and to keep him in cheerleading.

13   And so he was able to continue in this sport that he loved and

14   able to continue getting a top-flight education.  He lived part

15   time, and eventually full time, with a loving family in an

16   affluent suburb.  And there, he was able to find friendship and

17   belonging, acceptance of his sexuality.  His basic needs were

18   met.

19           I have never seen so many people in court supporting

20   a defendant.  He has almost a hundred videos or letters

21   submitted on his behalf in this case.  And those are all people

22   who were there for him and who loved him at the time that he

23   committed these offenses.

24           He had access to therapy and support services.  And

25   he had achieved massive success in his sport.  He won awards

1    for cheerleading.  He went to college at Navarro, which has a
2    premier cheerleading program in the country.  And he had
3    academic success, too.  He got a scholarship to University of
4    Louisville based on his grades.

5           And finally, he achieved fame.  Even before the
6    Netflix series aired, Minor 1's mother talked about the fact
7    that he was very well known in the cheerleading community.
8    There was a YouTube channel that focused on his team and
9    focused on him.  After the *Cheer* series aired, he earned over
10   $500,000 in endorsements.

11          So at the time that Mr. Harris committed these
12   offenses, he was not in need.  He was not in a state of
13   desperation.  And his difficulties in his early life, as
14   substantial as they were, were in the rear-view mirror for him.
15   He was flourishing at that time.  He had every reason not to
16   commit this crime, and he did it anyway.

17          And I think one of the most important factors for the
18   Court to consider today is deterrence.

19          Now, the Court's received two psychological
20   evaluations here that both find him at low risk of recidivism,
21   but these reports should be given very little weight.

22          Dr. Hutchinson's report gets basic facts wrong.
23   Minors 1 -- I'm sorry, Minors 2 and 3 are victims.  Mr. Harris
24   reached out to Minor 2, bothered him for hours for sexually
25   explicit photos.  When Minor 2 refused to do that, he

1    unfriended him for two weeks, came back two weeks later and

2    asked Minor 2 for photos of his butt for three hours.  It

3    wasn't until Minor 2 persisted in saying "No" that Mr. Harris

4    then offered to pay Minor 2 and to induce him with the money

5    that he now had, because he had been paid these endorsements

6    for the Netflix series.

7         Dr. Hutchinson's report characterized this completely

8    inaccurately.  Characterizes Minors 2 and 3 as reaching out to

9    Mr. Harris, is asking him for money, and as playing a game.

10        And I think the Court has to just dismiss the

11   opinions of an expert who is totally rewriting the facts in the

12   case.  That report also ignores most of the offense conduct.

13   It talks about sexting.  It talks about sending nudes.  But

14   that's not what happened here.  And it's our job today to do

15   what the mitigation experts didn't do and get the facts right

16   and look them in the face.

17        In this case, Mr. Harris pressured these boys for

18   months and months to keep sending him sexually explicit photos

19   of themselves for his own sexual gratification.  It wasn't just

20   photos.  It was videos.  It was Facetime calls where he

21   pressured them to perform live for him, and gave them direction

22   on how to masturbate for him.

23        And when they said they didn't want to send a photo,

24   or when they said they didn't want to do a Facetime call or

25   send a video, he pressured them, he manipulated them, he

1    guilted them.  He made these boys who were three, four, five

2    years younger than him feel terrible about themselves.

3         And he threatened to post those photos.  Minor 1's

4    brother and Minor 5 both independently reported that Mr. Harris

5    threatened to post the photos that they'd been giving if they

6    did not keep sending him sexually explicit photos.

7         He groomed these boys for months for in-person

8    contact.  It wasn't even just the nudes that are discussed by

9    the so-called experts in this case.

10        At 19, Mr. Harris lured a 13-year-old boy into a

11   bathroom and attempted to get him to have sex with him there.

12   Minor 1 ran out of the bathroom and literally escaped from Mr.

13   Harris that day.  But Mr. Harris tried to get him to meet

14   again -- the first time was in January or February, the second

15   time was in May of the same year -- at another bathroom at

16   another cheer competition.

17        He successfully lured, at that same competition, a

18   15-year-old boy into that bathroom, into a bathroom stall.

19   Turned him around and anally penetrated him against his will.

20   He told that boy after that happened, "You should've cleaned

21   out to prepare for this."

22        That is the offense conduct in this case.  Not

23   sending nudes.  Not sexting.  We shouldn't be talking about

24   sexting because it's not what happened here.

25        Dr. Hutchinson found that Mr. Harris was -- had

1    developed an addiction to sex in order to manage the difficult

2    emotions that came up from his trauma and his upbringing, but

3    didn't recommend any sex offender treatment, didn't recommend

4    any term of incarceration.  Essentially concluded that it was

5    enough that cheerleading was taken away from him.

6            If somebody is addicted to sex to the degree that it

7    drives them to commit these offenses, sex offender treatment is

8    obviously necessary.  And this Court can't give much weight to

9    a report that says otherwise.

10           Likewise, Dr. McGarrahan's report is problematic.

11   She concludes that Mr. Harris is not attracted to children and

12   does not bear any indicia of pedophilia.

13           Every single minor in this case, the first question

14   he asked was, "What is your age?"  This is not a case where

15   scienter is an issue, where maybe Mr. Harris liked people who

16   came off as young, but didn't know their age.  He knew their

17   age because he asked it, because it mattered to him, because

18   that's what he was attracted to.

19           And Dr. McGarrahan says -- when she's finding that

20   he's at a low risk of recidivism, she notes four factors that

21   she believes lowers the risk of recidivism; that he does not

22   have an attitude condoning sexual offenses, that he's not a

23   pedophile, that he's not antisocial, and that he is prosocial.

24           Even if all of those things are true, Judge, they

25   were all true at the same time and for the two years that he

1    was committing the offense conduct in this case.  So those
2    factors can't be lowering his risk of recidivism because they
3    didn't stop him from committing the offense in the first place.

4           Defense also raises the issue of Mr. Harris'
5    developmental delays and the possibility that he was
6    emotionally less mature than his chronological or biological
7    age.  And, again, those are factors that the government was
8    aware of and took into account, and that's the reason the
9    government's recommendation is 40 years below the guidelines
10   range.

11          But he still was substantially older than the
12   children that he was abusing.  When he lured Minor 1 into a
13   bathroom, he was 19 and Minor 1 was 13.  When he raped Minor 5,
14   he was 19 and Minor 5 was 15, four years older.

15          Likewise, Minor 4, while he was talking with Minor 4,
16   again, Mr. Harris was 19, Minor 4 was 15.  And you heard the
17   testimony today that these are important developmental stages.
18   So not just four years, but a 15-year-old boy is a lot
19   different than a 19-year-old.

20          And I think what the Court needs to -- all the Court
21   needs to hear about, whether Mr. Harris was an adult in this
22   case, as said by Minor 5, when he said, "I was a child being
23   taken advantage of by an adult, an adult that knew exactly what
24   he was doing, and I knew nothing."  And that is the nature of
25   the offense conduct in this case.  Mr. Harris chose victims who

1   did not know what was happening, and he did, and he knew what

2   he was getting out of them.  And that's why it was advantageous

3   to him to find them, because he could take advantage of them.

4   And he could take advantage of them more easily because he had

5   this persona of being kind and generous and a team player and

6   supportive and lifting people up, the light that is Jerry

7   Harris.

8          And while all those things may be true, they also

9   contributed to his ability to commit these crimes.  Because

10  what they did was make people, like Minor 1, think that he was

11  talking to somebody who was very safe, somebody who was a

12  deeply good person, who was celebrated as a moral hero.  They

13  had no reason to be guarded around him.  They had no reason to

14  be careful about their interactions with him.

15         These are the actions of a sexual predator.  Okay.

16  Harris was adept at appearing kind and generous, at showing

17  people what he knew that they wanted to see when they were

18  looking.  And that makes him dangerous.  It made him dangerous

19  to the people that he interacted with, and it will make him

20  dangerous to the people that he encounters when he's released

21  from prison.

22         This is not a one-time mistake by an innocent or a

23  misguided attempt at a relationship.  Mr. Harris tried again

24  and again, at competition after competition, to get these boys

25  into bathrooms with him.  This was intentional conduct.  It was

1    concealed.  It was extended abuse and exploitation of people

2    who were more vulnerable than him, of people who he knew looked

3    up to him because of the persona that he spent so much time and

4    energy presenting.  And so a sentence of six years does not

5    acknowledge the seriousness of this offense and the

6    intentionality behind his conduct.

7              I want to also address the defense argument today and

8    the mitigation expert's position that Mr. Harris' conduct was

9    normalized within the cheer community.

10             In the papers that were submitted to the Court and in

11   the testimony today, you know, Your Honor has heard *ad nauseam*

12   that sexting is rampant, and sending nudes was normalized, and

13   unfortunately happens a lot more than anybody wants to believe.

14   But this is a straw man.  This is a straw man that they're

15   setting up to knock down.  Because sexting is not what Mr.

16   Harris did.  It's the least of our problems here.  He raped a

17   little boy in a bathroom stall.  What does that have to do with

18   sexting?  Nothing.  Nothing.

19             And you heard today directly from Minor 1 and from

20   his brother about the character of the interactions.

21             So if we want to look only at the part of the offense

22   conduct that happened over phone screens in this case, that's

23   fine, because that wasn't sexting either.  What that was was

24   pressuring.  It was threatening to post publicly.  It was

25   manipulating.  And it was guilting and inducing and exploiting

1    people who were vulnerable.

2            So this narrative that the cheer world is somehow

3    responsible for this, that the cheer world raised Mr. Harris

4    and corrupted him and then failed him, it didn't do any of

5    those things, Judge.  It provided him an opportunity which he

6    alone took.

7            He is the only person who these boys have accused of

8    abusing them.  He's the only person indicted in this case.  He

9    has no co-conspirators.  There was nobody pressuring him to

10   engage in this conduct.  He did not have to do what he did to

11   these boys.  And he knew it was wrong.  He knew because it had

12   happened to him.  He knew because he'd been told that it was

13   wrong.  You know he knew that it was wrong because he knew to

14   hide it.  He told Minor 1's brother not to tell anybody.  He

15   made Minors 2 and 3 swear on their mothers not to tell anybody.

16           And he deleted his accounts.  He deleted their

17   photos.  He threw out his phone when he found out that he was

18   being investigated.  He knew what he was doing was wrong.  And

19   so this attempt to portray his actions as somehow normalized is

20   just a deflection of blame here.

21           The failure of the cheer community or any other

22   community to provide supervision is only dangerous when there's

23   a predator present.  But the absence of supervision, it doesn't

24   negate the predatory nature of what Mr. Harris did.

25           And the Court's sentence today has an expressive

1    function that can protect children from people like Mr. Harris,

2    by refusing to blur the lines between adolescent behavior,

3    which is legal, and abusing, exploiting vulnerable children,

4    which is what Mr. Harris did, which is illegal.  And for good

5    reason.

6          A 15-year sentence sends a message to the community

7    that when an adult pays and pressures and threatens a child,

8    someone five, six years younger than him, to engage in sex

9    acts, it's not normal.  It's a crime.

10         And it's all the more important today that the

11    Court's message send that -- the Court's sentence send that

12    message and make that clear in order to protect children who

13    are naive, who don't know better, children like Minor 1 who can

14    be led into thinking that they are finding a genuine friendship

15    here and who can't protect themselves.

16         The Court has heard a lot about Mr. Harris today and

17    about the troubles he's faced.

18         THE COURT:  Before you move on --

19         MS. GUZMAN:  Go ahead.

20         THE COURT:  In response to something you said a few

21    moments earlier, do you want to clarify anything based on

22    footnote 4 of the defendant's version of the offense?

23       (Counsel retrieves item, then returns.)

24         THE COURT:  The end of that footnote that goes on to

25    page 5 refers to another case.

1    MR. PUGH:  Your Honor, are you referring to our

2    version or our memorandum?

3    THE COURT:  The version of the offense.

4    MR. PUGH:  Ah.  Got it.  Okay.

5    MS. GUZMAN:  Judge, I'd just say that Mr. Harris is

6    the only person named in the indictment today.  He's the only

7    person who's charged with this offense conduct.  He didn't have

8    any accomplice in this.  He didn't have anybody pressuring him

9    or helping him to do this, or putting this idea in his head.

10   And that was the point I was trying to make.

11   THE COURT:  Understood.  Thank you.

12   MS. GUZMAN:  The Court has heard a lot today about

13   Mr. Harris, from day one of his life and the troubles that he's

14   faced, and the government's recommendation has taken all of

15   that information into account.

16       Fifteen years is the mandatory minimum on the

17   offenses that the government elected not to proceed on, but

18   which Mr. Harris has admitted to as stipulated offenses.  And,

19   as defense counsel has noted, that decision was made earlier in

20   the case after a mitigation presentation.  And that decision

21   was not to tie the Court's hands and not to commit at that

22   point to a mandatory minimum sentence.

23       But we've received more information now.  We've

24   talked to the victims now.  And it is now time to make a

25   recommendation to the Court, and the government's

1    recommendation today is 15 years.

2            And I think that it's worth paying attention to the

3    fact that for those offenses, that Congress determined that a

4    15-year sentence was the *minimum per se* for the crimes

5    committed by Mr. Harris, even without aggravating factors.  And

6    there are aggravating factors in this case, like his use of

7    fame and influence, and the extended period of time over which

8    he personally harassed these boys.

9            The fact that he did it after he knew it was wrong in

10   February of 2020, when he contacted Minor 1 and said, "I'm

11   sorry.  I shouldn't have done this to you," and immediately

12   reengaged.  The fact that he -- and, actually, let me return to

13   the factor of recidivism.

14           The truth is that Dr. McGarrahan and Dr. Hutchinson,

15   they don't know, and the Court doesn't know, nobody knows what

16   Mr. Harris is going to do in the future.  What we know is that

17   he had knowledge, that he had been reported and he was being

18   investigated, and he continued to engage in this conduct.

19           In February 2020, he knew -- we know he knew it was

20   wrong, because he texted Minor 1, "This is wrong.  I shouldn't

21   have done this."  Then in April and May, he was advised he was

22   under investigation.  At that point, he knew it wasn't just the

23   wrong thing to do to somebody else.  It was illegal.  It was

24   against his own self-interest.

25           And he knew it was wrong.  He deleted his screen

1   names.  He deleted those photos and the messages from the

2   applications.  He got a new phone.  And he started right up

3   again when nothing happened.  He reengaged almost immediately.

4   That is a person who doesn't have control of his behavior, at

5   least not yet.  That is a person who cannot be trusted to

6   police himself.  Because even given every opportunity to do so,

7   every reason to do so, he was unable to in this case.

8           This defense recommendation of six years does not

9   take into account the impact of this offense on the victims.

10  It is insufficient to recognize what was done to them.

11          You have heard from some of them in court today.  And

12  there are others who are not present.  They're not strong

13  enough or brave enough right now to come here, to stand in this

14  courtroom to face the person who exploited them, to revisit

15  what happened to them in gory detail and to talk about it in a

16  room full of strangers.  But that doesn't mean that they don't

17  have something to say or that they won't be struggling with

18  this the same way Minor 1 and his brothers are for the rest of

19  his life.

20          These are teenage boys all striving for acceptance

21  who they believed they knew who Jerry Harris was, who thought

22  they were talking to somebody who was kind and generous and

23  safe and wouldn't do them harm, but, in fact, they were talking

24  to somebody who saw them as sex objects, who used their naivete

25  for his own gratification, to get them to do things that he

1    knew they didn't want to do.

2           They didn't ask for this.  They didn't get anything

3    out of it.  Minor 5's first sexual experience in life was being

4    anally penetrated by an adult twice his size in a bathroom

5    stall.  Their lives are forever altered by what Mr. Harris did

6    to them for his own gratification.  Their childhoods were

7    marked by this.  Their middle school and high school years

8    overshadowed, colored by this.

9           Cheerleading is just as important to them as it is to

10   Mr. Harris, and it was ruined for them by what Mr. Harris did

11   to them.  They now have trauma.  They now have mental health

12   issues that they didn't have before.  It changed who they were

13   as students.  It changed how they relate to others.  And, as

14   Minor 1's mother put it, Mr. Harris in a very real way handed

15   each of them a life sentence, something that they are going to

16   have to reckon with again and again throughout the course of

17   their lives, as they go to college, as they enter

18   relationships, as they have children, when they get married,

19   when they send their kids to school, when they drop their kids

20   off at cheerleading practice.

21          A sentence of six years would mean that Mr. Harris

22   is released when Minor 1 and his brother are transitioning from

23   high school to college; a transition that Mr. Harris was able

24   to make with the loving support of his cheer family, the 99

25   people who showed up in court today, and without any abuse

1    occurring in his life.

2            A sentence of six years will mean that Mr. Harris is

3    released at the time they're trying to make that transition,

4    which is difficult for normal kids who have not had trauma.

5            A sentence of 15 years will protect them while they

6    do that.  It will allow them to make that transition, to

7    reestablish healthy identities, to take years to build back

8    their trust in other people, their joy, their trust in

9    themselves, the supportive and productive relationships that he

10   destroyed, without the shadow of his influence and without his

11   presence in their lives.

12           Nobody can give these victims back what Mr. Harris

13   took from them, but this Court can give them that, at least,

14   with its sentence.  And that's the reason the government is

15   asking for a sentence of 15 years.

16           THE COURT:  One question for you, Ms. Guzman.

17           There was some discussion earlier today about the

18   number of victims; that in Mr. Harris' statement, he said

19   between five to ten.

20           In the case, as it's been presented here and to me,

21   we have Minors 1 through 5.  Are there others that have been

22   identified?

23           MS. GUZMAN:  Yes, Judge.  And some of the reports

24   that you have alluded to a couple of them.  Minor 2 had another

25   friend who was also involved in some of the conversations.

1           There are.  They were not all charged, but --

2           THE COURT:  Understood.  But to understand the scope

3   of the conduct, is there a number of known identified victims

4   who provided sexually explicit images to Mr. Harris beyond

5   Minors 1 through 5?

6           MS. GUZMAN:  There are Minors 1 through 5 in the

7   indictment.  There are two additional -- there's Minor 1's

8   brother and Minor 2's friend in the materials that the Court

9   has.

10          I don't know -- and I'm happy to ask the agents -- if

11  there's somebody else who was involved.  But I do know that --

12  and I think the defense agrees -- Mr. Harris' statement was

13  five to ten.

14          THE COURT:  That's fine.  Thank you.

15          Mr. Harris, you now have an opportunity to address me

16  before I make my comments.  And --

17          MR. PUGH:  Do you want him before you or right here?

18          THE COURT:  He could stay, he could stay seated, but

19  I would prefer that if he rotate and address his comments to me

20  so he can proceed.

21          THE DEFENDANT:  I wrote it down so I will remember

22  everything.

23          (Defendant stands.)

24          THE COURT:  You know, Mr. Harris, because of the

25  audio system in the courtroom, it's probably easier if you stay

1      seated so that you can be picked up by the microphone.

2           (Defendant sits.)

3           THE COURT:  And counsel can just slide off a little

4      bit so that I can be sure to see Mr. Harris.

5           And, Mr. Harris, if you'd like to make a statement,

6      now's your opportunity to do so.  You're not required to make a

7      statement, and I won't hold it against you if you choose not to

8      make a statement; but if you'd like to make a statement, now's

9      your opportunity.

10          THE DEFENDANT:  Yes, yes.

11          Your Honor, thank you for this opportunity to address

12     the victims of my actions, my family, and you.

13          To those I have harmed, I am deeply sorry for all the

14     trauma my abuse has caused you.  I pray deep down that your

15     suffering comes to an end and that these proceedings provide

16     you with some relief.

17          I am very ashamed as I know that I took advantage of

18     your youth and vulnerability.  I was selfish and wrong.  I hurt

19     you, and only I am to blame.  I regret my decisions, and I am

20     deeply sorry.

21          All I can do going forward is to try to do better and

22     be a better person.  I do not deserve forgiveness, but I do

23     pray that one day you might find it in your hearts.  I promise

24     you that I will not let you down, that I will make my amends.

25          To the people who have loved and supported me through

1    everything, I am so thankful.  You gave me moms after my mother
2    died.  You showed me what a real family looked like.  You gave
3    me a roof over my head.  You loved me for the person that I
4    was.  You taught me that I wasn't broken, and you tried to give
5    me a space to heal.  You all have provided me with kindness and
6    inspiration through a very dark time.  I am so sorry that I let
7    you down.  I owe each of you a debt that I fully intend to
8    repay.

9          Finally, Your Honor, I pray that you can see me for
10   the human being that I am and not just someone who committed
11   terrible crimes.  These past 22 months have been a time of
12   therapy, reflection, and self-discovery for me.  Much of it has
13   been incredibly painful but deserved.  I have had to confront
14   my past to understand what I have done.

15         My journey is not done, though.  I am 22 years old,
16   Your Honor.  I believe with all I am as a person that I still
17   have something very positive to contribute to this world.  I
18   know that as a first step, I must take responsibility, and that
19   the next part of my life will be in prison.

20         I am not an evil person.  I am still learning who I
21   am and what my purpose is.  I am fighting to see a new path
22   forward.  I will work every day to atone for what I have done
23   here and earn back everyone's trust.  I am determined to make a
24   difference as an adult and do good things with my life.  I ask
25   that you not give up on me.  I am prepared to accept my

1    consequences, Your Honor.

2          Thank you.

3          THE COURT:  Mr. Harris, now is the time where I

4    explain to you how I take all of this into account and arrive

5    at a conclusion.

6          You abused and exploited your victims, and you

7    committed and repeated harms that you yourself suffered.  You

8    experienced and were on the brink of remarkable success and

9    stability, overcoming obstacles in your life that would have

10   crushed other people, and yet while achieving all that you

11   achieved, you also went out of your way in a persistent,

12   determined way to hurt people over whom you had real influence,

13   a kind of power that you abused.

14         This case is a tragedy.  And in the ordinary case of

15   this kind, our society has decided, through statutes and

16   guidelines on the books, that someone who commits the crimes

17   you committed should be imprisoned for the rest of their life.

18   And in the ordinary case, with the crimes originally charged

19   against you, the law would require a sentence of at least 15

20   years in prison.

21         Yours is not the ordinary case.  The prosecutor has

22   decided to drop some of the charges against you, which brings

23   the mandatory minimum down to five years.  The prosecutors also

24   decided to recommend a sentence that is well below what the

25   sentencing guidelines recommend, which is 50 years in prison.

1          I still consider, though, these laws and guidelines

2    because they reflect the policy and moral judgments of the

3    people.  These laws and policies treat your crimes as among the

4    worst things a person can do to another human being, to a

5    person under the age of 18.

6          It ought not to be controversial that teens are

7    worthy of protection.  They don't fully understand the risks of

8    interacting with others.  Teenagers especially think they're

9    more mature than they really are.  And when someone hurts a

10   teen, especially in ways that have long-lasting and devastating

11   effects, the condemnation of that crime ought to be severe.

12         In the legal jargon, the question that I have to

13   answer is what sentence, what punishment sufficiently reflects

14   the seriousness of the offense, promotes respect for the law,

15   and imposes just punishment.  And if people are paying

16   attention, what sentence will stop or deter other people from

17   exploiting teens and sexually assaulting and abusing them.

18         And within that question is the question of what

19   punishment also takes into account your history and

20   characteristics.

21         There's a common metaphor about scales and things

22   tipping the balance on one side of aggravation or on another

23   side of mitigation.  That's not really an accurate metaphor for

24   what we do at sentencing.  This is a very complicated,

25   multidimensional exercise that, in some ways, we boil down to

1   some number at the end of the day, which really doesn't do

2   effective communication of all the different aspects of human

3   life that we have to crystalize in these kinds of cases.

4           There has been, in some of the materials, a

5   suggestion that this is a case somehow about the typical social

6   media landscape within either typical adolescents or within the

7   cheer community.  And I worry that there's a risk that people

8   who are less informed about the facts of this case might think

9   that this conduct is just the kind of conduct that teens engage

10  in; and that because you didn't have better guidance in

11  navigating over social media, your responsibility is

12  diminished.  But that's not how I see this case.

13          Minor 5 did not want to have sex with you.  He did

14  not consent.  You sexually assaulted him.  His statement that

15  he thought if he kissed you, that would get you off his back,

16  that statement is a very powerful statement about what some

17  victims go through when they know their abusers.  They think,

18  "Maybe it'll stop if I do this much."  That anyone felt that

19  they had to sacrifice part of themselves to get out of a worse

20  situation and then that failed, that's just a devastating harm

21  to them.  That's why acquaintance rape is a serious crime

22  worthy of serious punishment.

23          You also attempted to sexually assault Minor 1, to

24  get him to perform oral sex in a bathroom at a cheer event,

25  when he was 13 and you were 19.  You asked to have sex with

1    Minor 4 when he was 15.

2            All of this is not teenage flirtation.  And the

3    social media landscape isn't responsible for your decision to

4    assault and attempt to assault your victims.

5            Paying teens to send you images, that's not teenage

6    flirtation either.  That's exploitation.

7            Encouraging Minor 2 to become a sex worker, to

8    perform a sex act in exchange for money, that's exploitation.

9            Threatening Minor 5 to expose images if he didn't

10   send you more, that's exploitation.

11           Within the cheer community, you were prominent,

12   someone young people admired.  One of your friends' videos that

13   was submitted to me explained how important these elite cheer

14   teams are to the broader cheer community.  Anyone on Navarro or

15   on the Cheetahs was revered.

16           You abused that influence.  Asking for explicit

17   images after creating an inspirational video for Minor 1,

18   that's another example of how you used and abused your

19   influence to exploit others.

20           You have a great talent for motivating people.  That

21   charisma, that energy can be a good thing.  But it also gave

22   you the opportunity and ability to exploit your victims, and

23   that made you more dangerous to others.

24           You knew what was appropriate and inappropriate.

25   Your conduct, when advised that there was going to be scrutiny

1    of your behavior, demonstrates that you understood that what

2    you did here was wrong.  And you have not denied that.

3            And social media did play a role here.  These

4    applications, these platforms make it easy to communicate and

5    obtain images.  Because of that, your crimes were easy to

6    commit.

7            And your exposure to an online culture of

8    exploitation at a young age probably did steer you into certain

9    behaviors before you could fully understand the damage and harm

10    that they caused you.

11            Crimes that are easy to commit but have a devastating

12    effect, that's among the reasons why the penalty for them ought

13    to be high.  The point of harsh punishment is to try to deter

14    people from entering these dangerous worlds that traffic in the

15    abuse of children.  And apart from deterrence, punishment

16    signals or communicates society's condemnation of this

17    behavior.

18            The idea that because of technology, some conduct is

19    more widespread than it used to be does not mitigate the damage

20    the criminal behavior causes, especially in your case where the

21    exchange of images was geared toward in-person sexual assault

22    and abuse.

23            You used the social media environment to, for

24    example, persuade Minor 1 to generate illegal images repeatedly

25    and then used technology to persuade him and others to meet in

1   person so that you could abuse them.

2          Victims of abuse sometimes become abusers.  You did.

3   Our current criminal justice system, with its emphasis on

4   incarceration, is not really well equipped to address the

5   psychology involved in that cycle.

6          In your case, your development was compromised by

7   your experience as a victim of both physical sexual abuse and

8   with exposure to pornography and online interactions at a young

9   age.

10          Understanding that background does help me think

11   through how much incarceration is necessary to protect the

12   public from you.  Because if we can understand why you did what

13   you did, there are alternatives to decades of incarceration

14   that can control your behavior.  We have other measures to

15   protect the public from you.  You can be supervised and you can

16   receive help to process and live with your past trauma.

17          I am skeptical of some parts of Dr. Hutchinson's

18   report, but I do credit what Dr. McGarrahan says about your

19   prosocial disposition.  That's borne out by all the favorable

20   things that your friends and family say about you.

21          I also credit, at least in part, the conclusion that

22   your risk of re-offending can be managed outside of an

23   institutional setting.

24          I also credit what has been said about your personal

25   history causing developmental delays, addictive behaviors, and

1  how your youth at the time of the offense conduct should be
2  viewed as mitigating.

3        I mentioned earlier that teenagers deserve
4  protection.  Well, in part because they don't fully understand
5  the risks of interacting with others.

6        Well, you were a teenager, too, for a time here, and
7  barely past your teenage years when you committed these crimes.
8  As a 19- or 20-year-old, you hadn't fully matured.  And we do
9  generally, as a society, think younger people are less culpable
10 than adults who have had the benefit of healthy developmental
11 opportunities.

12       And beyond your chronological age, there is reason to
13 think that your life history left you delayed in development
14 and more like an adolescent at the time of your offense conduct
15 than as an adult.  Many people who certainly know you better
16 than I will ever know you saw you more like a child than
17 someone ready for adulthood.

18       That history, the one that led to your slowed
19 development, a lot of that history is not your fault, not your
20 responsibility, and that factors into my evaluation of how long
21 a sentence you should serve.

22       I do think you are capable of forming age-appropriate
23 relationships, and that's important when I think about how to
24 protect the public from you.

25       We have heard from some today, and it's a theme in

1    some of the submitted materials, that the cheer community bears

2    some responsibility for your crimes.  And there has been a

3    comment or an argument about how the way that industry mixed

4    ages and encouraged relationships skewed your own perception of

5    appropriate behavior.

6              If an institution, any institution, creates or

7    fosters a culture of abuse, that institution deserves to be

8    condemned and maybe even dissolved.

9              What's regrettable in your case is that you had some

10   resources and interventions available to you, especially around

11   the time of this offense conduct.  By that point, you had a

12   group of available mentors and parental figures.

13             It really is regrettable that there was no

14   intervention that helped you better navigate your identity and

15   relationships and your addictive behaviors.  The lack of

16   follow-through on certain interventions, where more could have

17   been done, more that perhaps your family could have addressed,

18   that is regrettable here.

19             The fact that outside forces and influences, and the

20   lack of acceptance from your family, and the lack of positive

21   interventions, including some deeply-rooted societal forces,

22   that those affected your behavior is not unusual.  Very few

23   crimes are committed in a vacuum.  Maybe there are other people

24   in institutions who should also bear some consequences for

25   contributing to your environment and your development, but that

1   doesn't change or lessen the harm that you caused.

2          And that is the weightiest factor for me when I think

3   about a prison sentence for you.  The harm on the victims, as

4   we've heard today, and as is in the materials, is very deep and

5   likely long-lasting.  Retribution or, to put it maybe more

6   crassly, revenge might suggest that the isolation that the

7   victims felt should correspond to the isolation of prison.

8   Perhaps knowing that you are not free gives some comfort to

9   your victims.

10          And, of course, it takes a lot of bravery and courage

11  to revisit trauma by expressing its effects, which, of course,

12  is true for the victims and is, in part, true for yourself, Mr.

13  Harris, as you have gone through this process.

14          I do consider your unusually deep and broad network

15  of support.  I agree with Ms. Short that the volume of support

16  that you have is really quite remarkable.  For someone with

17  your background of poverty, homelessness, food insecurity,

18  bullying, lack of parental support from your father, certainly,

19  childhood educational, psychological, and physical challenges,

20  and what I would call a mixed, certainly, complicated positive

21  and negative relationship with your mother, and what I don't

22  doubt is the effect of racism in trauma that you experienced in

23  your life, for someone with all of that background, to emerge

24  as a successful student, an elite competitor, and to have

25  earned the community of supporters that you have -- because you

1    have earned the support of the people that are here with you --

2    that is a testament to your abilities and your character.

3          You succeeded when you were set up to fail.  That

4    work ethic translates, I hope, to the ability to do the work

5    you will need to do to be a safe member of the community.  You

6    have started some of that process while in custody.

7          In some cases of child exploitation, we worry that a

8    defendant is irredeemable.  I don't think that's your case.

9    You are not hopeless.

10          Trauma, the kind of trauma you experienced, is not so

11    easily put in the rear-view mirror.  So even though, at the

12    time of this offense, you were in circumstances that were much

13    improved from your background, that doesn't mean that the

14    trauma that you experienced in your past wasn't having

15    continued effects on you.  And it's going to take work to try

16    to recover from that.

17          Neither the prosecutor nor the Probation Office is

18    suggesting that you be in prison for the rest of your life, or

19    even for the 50 years that the sentencing guidelines recommend.

20    So you will be out some day.

21          And at your current age, I think about whether there

22    is a window of time available to you to be a productive member

23    of society.  Too much time away from your support network could

24    lower the chance of success.  Things change.  People change.

25          Time is not just a number.  Time is human existence.

1    Days, months, years.  That's how we live.  And I have to think

2    about what that time means both for you and for the rest of

3    society.

4         And as I think about that time, I also think about

5    the fact that you pled guilty.  You have been cooperative and

6    forthcoming about your conduct.  You have demonstrated a

7    willingness to change and accept help.  Those are good signs

8    for your future and for the safety of the community when you

9    return.

10        Whether this is remorse or regret, it's -- that might

11   be too difficult to answer for anyone.  What I can say is that

12   the expression of remorse, the expression and acknowledgment of

13   harm that you caused is a sign that you have an understanding

14   of your behavior and your conduct, and that's important.

15        You will bear consequences beyond imprisonment, as

16   Mr. Pugh listed them all out, sex offender registration,

17   ongoing supervision.  And then there will also be financial

18   penalties.

19        Cheer was a huge part of your identity.  And to be

20   officially ostracized from that industry is, no doubt, a blow.

21   Frankly, those consequences are to be expected.  You abused

22   your position in cheer to commit your crimes.

23        But the fact that we may have other tools at our

24   disposal to protect the community does affect the need to

25   incarcerate you.  Because if we can protect other children from

1    future behavior on your part through something less costly than

2    incarceration -- and by cost, I mean not just dollars and

3    cents, but the human toll that incarceration extracts -- we

4    ought to think about that.

5         You have no record of other misconduct.  There's no

6    evidence that you distributed images of child pornography or

7    otherwise participated in the wider black market of child

8    exploitation.  You don't have a criminal history.  You've never

9    been to prison.  Those are signs that you can be a

10   rule-follower in most every other aspect of life.

11        And prison, for a first-time offender, should be, we

12   hope, an effective deterrent without stretching into decades,

13   especially having served time during the pandemic.  I hope you

14   don't need any convincing that you never want to be in a prison

15   cell again.

16        At the end of this whole process, I have to decide on

17   a number, a length of incarceration.  The United States

18   sentencing guidelines recommend the maximum of 50 years.  The

19   Probation Office in this case has recommended 22 years.  The

20   prosecutor recommends 15 years.  Your lawyers recommend 6

21   years.  The mandatory minimum that's set by Congress for the

22   charges you have pled guilty to requires at least 5 years.  So

23   those are a lot of numbers and I have to take them all into

24   account.

25        And ultimately, in your case, I think the length of

1    incarceration is best viewed as an expression of the

2    seriousness of your crimes tempered with some hope that all is

3    not lost for you or for your victims.  And that in the future,

4    some healing can occur that everyone would benefit from.

5            Before I announce the sentence, Mr. Pugh, have I

6    addressed the principal arguments in mitigation?

7            MR. PUGH:  I believe you have, Your Honor.

8            THE COURT:  Mr. Harris, it's my judgment that you be

9    committed to the custody of the Bureau of Prisons to be

10   imprisoned for a total term of 144 months on Counts Three and

11   Seven, to be served concurrently.

12           The costs of incarceration are waived.

13           A special assessment of $100 per count is due

14   immediately.

15           I am imposing a $5,000 special assessment on Count

16   Three and a $5,000 special assessment on Count Seven under the

17   JVTA.

18           And I am now imposing a special assessment under the

19   AVAA of $35,000.

20           You do have resources now, and that special

21   assessment is an appropriate imposition considering the nature

22   of your crimes, the goals of that assessment, and your ability

23   to pay.

24           Restitution will be deferred pending further

25   briefing.

1        I am not imposing a fine because, in light of the

2   other financial penalties I am imposing, I do conclude you're

3   not -- you won't be able to pay a fine.

4        Upon release from imprisonment, you will be placed on

5   supervised release for a term of eight years for the reasons I

6   explained earlier.

7        And I have now fully considered the 3553(a) factors,

8   and they all justify the conditions that I explained I intended

9   to impose earlier, and I now impose them.

10       The costs of supervision are waived.

11       Mr. Harris will be remanded to the custody of the

12  Marshal.

13       Are there any recommendations the defense would like

14  to make with respect to the Bureau of Prisons?

15       MR. PUGH:  Your Honor, we've given that some thought,

16  and we're not going to ask for a judicial recommendation due to

17  the fact that Bureau of Prisons has a limited number of

18  facilities that can accommodate him.  And I think he has some

19  special security needs as well.  So I didn't -- I'm not going

20  to ask the Court to interfere in that.

21       THE COURT:  Mr. Harris, in your plea agreement, you

22  have largely waived your rights to appeal, but I am required to

23  advise you that any notice of appeal must be filed within 14

24  days of entry of judgment.

25       If requested, the Clerk will prepare and file a

1    notice of appeal on your behalf.

2            If you can't afford to pay the costs of an appeal or

3    for a lawyer on appeal, you can apply to have the Court waive

4    those costs and appoint you a lawyer.

5            Mr. Pugh, or anyone else on behalf of the defense, is

6    there anything further you'd like me to address?

7            MR. PUGH:  Nothing further, Your Honor.

8            THE COURT:  Ms. Guzman, is there a motion to dismiss

9    the remaining counts?

10           MS. GUZMAN:  Yes, Your Honor.

11           THE COURT:  That motion is granted.

12           I didn't circle back on whether the government makes

13   a motion for the third point for acceptance of responsibility.

14           Do you make that motion?

15           MS. GUZMAN:  We do.

16           THE COURT:  That motion is also granted.

17           Mr. Alper, have I forgotten anything from Probation's

18   perspective?

19           MR. ALPER:  Just to clarify, Your Honor, for the

20   record, all other conditions of supervised release that were

21   recommended in the PSR are imposed with the added comments

22   earlier?

23           THE COURT:  Correct.

24           MR. ALPER:  Thank you.

25           THE COURT:  Thank you.

1          Then that will conclude the sentencing.  I appreciate

2     the presentation from the parties.  And we will be in recess.

3               MS. GUZMAN:  Thank you, Your Honor.

4               MR. PUGH:  Thank you, Your Honor.

5          (Proceedings concluded.)

```
1                        C E R T I F I C A T E

2

3

4

5                I, Colleen M. Conway, do hereby certify that the

6       foregoing is a complete, true, and accurate transcript of the

7       Sentencing proceedings had in the above-entitled case before

8       the HONORABLE MANISH S. SHAH, one of the Judges of said Court,

9       at Chicago, Illinois, on July 6, 2022.

10

11

12          /s/ Colleen M. Conway, CSR, RMR, CRR        07/25/22

13               Official Court Reporter                  Date
                 United States District Court
14              Northern District of Illinois
                      Eastern Division
15

16

17

18

19

20

21

22

23

24

25
```