IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No: 3:20-CR-00165 |
| v. ) | JUDGE CAMPBELL |
| ) | |
| CALEB D. JORDAN ) | |

UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through United States Attorney Henry C. Leventis, and Assistant United States Attorney S. Carran Daughtrey, hereby submits this sentencing memorandum on behalf of the United States.

**I.   Introduction**

The United States requests a sentence at or close to the statutory maximum of 360 months for this defendant, who is a repeat offender and who terrorized three boys for at least four months using increasingly sinister threats to harm and kill them and their parents if they did not create hundreds of videos involving violent sexual abuse.

**II.   Procedural Background**

On April 18, 2020, the defendant, Caleb D. Jordan, was arrested on a federal complaint for production of child pornography and transportation of child pornography. (D.E. 1: Complaint.) He was subsequently charged by indictment with seven counts of production of child pornography, extortion, distribution of child pornography, and possession of child pornography. (D.E. 20: Indictment.) The statutory maximum for these counts was 270 years.

The defense presented mitigating factors early on in the case, which included various diagnoses listed below. Based on the defendant's deficit and age, and in an effort to resolve the case and eliminate the need for three traumatized children to testify, the United States agreed to

1

allow the defendant to plead guilty to a single count of production with stipulations to the facts underlying the remaining counts. (D.E. 88: Plea Agreement.) The government will dismiss the remaining counts after sentencing. (*Id.*)

The defendant now faces sentencing on July 6, 2023. (D.E. 91: Order.)

### III.  Factual Background

Caleb Jordan coerced and groomed and then terrorized three minor boys online for months, demanding that they create sexually explicit videos, some of which involved violence and pain. Before the defendant was caught, he had forced these boys to create and send him over 391 videos from approximately 60 to 80 separate days from December 2019 through April 2020. The videos depict the boys (ages 11 to 13) engaging in various sex acts, including oral sex, masturbation, and/or the attempted insertion of items into their anuses. The minor victims cry in some of these videos, begging the defendant to stop. Some of the videos depict one boy thrusting his penis into his younger brother's mouth so hard that the younger boy gaged and choked. The defendant demanded that the boys engage in conduct and record it, and he stated that he did not care if the boys choked or vomited during the sex acts. He also threatened that if the videos were not perfect, he would make them create the videos again. (PSR ¶ 17.) Jordan sold some of these videos through an encrypted internet-based chatting application "Kid Crazy." At one point, the defendant instructed one of the minors to create a video in which he states, "I am Kid Crazy." (PSR ¶ 18.)

The defendant was able to manipulate the boys into making these videos by representing himself to be a powerful person who was a billionaire and hacker for the government. After connecting with the boys by giving them video gaming currency in exchange for videos of "face-sitting" on each other, he then began to threaten the boys into making the videos by telling them that someone was coming to get them, that their parents had committed murder and were trying to

sell the boys on the black market for sex or body parts, and that he would kill or sexually assault their parents. (PSR ¶ 13.) The boys were too afraid to disclose the abuse to a parent or trusted adult because of the defendant's violent, terrifying threats. In fact, Jordan's brutality only ended when law enforcement discovered the criminal activity. (PSR ¶ 19.)

In April 2020, an undercover Homeland Security Investigations agent was conducting an undercover operation in the chatting application and learned that "Kid Crazy" was making child sexual abuse material ("CSAM") available for purchase. The undercover agent engaged "Kid Crazy" online and arranged for the purchase of a video in exchange for $100. "Kid Crazy" sent the agent a video that depicted a pubescent boy thrusting his erect penis into a prepubescent boy's mouth until he gagged. The undercover agent contacted Homeland Security Investigations (HSI) in Nashville, and they were able to identify Jordan as the perpetrator. (PSR ¶ 19.) During the execution of a search warrant at Jordan's house, HSI agents discovered multiple devices from the defendant that contained more than 10,000 CSAM images and videos that included depictions of severe bondage and the penetration of infants. The victims depicted in the defendant's CSAM collection ranged from infancy to adolescence. The majority of the collected material depicted boys being penetrated by adult men's penises. (PSR ¶ 20.)

### IV. Consideration of the Sentencing Factors in 18 U.S.C. § 3553(a)

This Court now is tasked with imposing a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §3553(a) as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and

3

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

. . . .

(5) any pertinent policy statement—

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The United States submits that a sentence of imprisonment at or close to the statutory maximum on the single count of conviction, which is 360 months, followed by lifetime supervision would accomplish the goals set out in 18 U.S.C. § 3553(a).

A. <u>Nature and Circumstances of the Offenses</u>, 18 U.S.C. § 3553(a)(1)

Pursuant to 18 U.S.C. § 3553(a)(1), this Court should consider the nature and circumstances of these offenses. The defendant's criminal conduct was extremely serious and demands an appropriately stringent sentence. This defendant preyed upon vulnerable children by grooming them and then torturing them psychologically to make them comply with his demands of cruel and painful sexual abuse.

The defendant found two brothers, who were 11 and 13 years old, and their 12 year old friend, though an online gaming system and befriended them. He convinced them to communicate with him on a social media website. He represented himself as a billionaire who lived in a mansion and worked as a hacker for the government, which was a message to the boys that he was a powerful man, both technically and financially. The defendant initially asked them

to create a video sitting on each other's faces in exchange for video gaming currency. The initial request was for the boys to do this clothed, after which he convinced them to create similar videos when they were nude. On the heels of representing himself as a hacker for the government and to coerce the boys to create more sexually explicit videos of themselves, the defendant began to terrorize the boys by telling them that someone was coming to "get them," stating that he could prevent it if the boys created sexually explicit videos for him. The intimidation worked, and the boys complied. (PSR ¶ 13.)

To further his scheme of collecting sexually explicit videos to sell online, Jordan fabricated an electronic website that purportedly showed the brothers' parents advertising their children's body parts for sale over the dark web. (*Id.*) See Attachment 1 (filed under seal). The defendant continued to bully the boys by claiming that their parents had committed murder in the past and were trying to sell the boys for sex or body parts on the black market. (*Id.*) He also threatened to kill or sexually assault the victims' parents if they failed to comply. (*Id.*) The defendant used these frightening claims to coerce the boys, who believed these lies, into producing more sexually explicit videos. (*Id.*) The defendant also demanded that the victims follow specific instructions in creating the videos. For example, he instructed the younger brother to lie naked on a bed with his head hanging backward over the side, and he told the older brother to insert his erect penis into his younger brother's mouth. (PSR ¶ 14.) The defendant further order the boys to send the produced videos to him. (*Id.*)

It is clear that the boys were not making the videos willingly but out of fear for their families and themselves. For example, one of the boys was crying in several videos he was forced to make, including when he was forced to masturbate and later to insert a food item into his anus. (PSR ¶ 15.) Jordan also demanded that the older brother thrust his penis forcefully and deeply into

5

his younger brother's mouth, causing him to choke and turn red. (PSR ¶ 17.) Jordan told the boys that he did not care if the boys choked or vomited during the sex acts and that he would make them redo the videos if they were not perfect. (*Id.*). Jordan then sold videos online. (PSR ¶ 19.)

These young boys may have been old enough to navigate and use online gaming platforms, but unfortunately they did not feel comfortable disclosing this abuse to one of their parents or another trusted adult. These children were at an age where they were particularly vulnerable to an adult experienced at manipulating others for his own sexual gratification and profit at the expense of the well-being of the boys. In particular, the older brother has suffered significantly, likely out of guilty and shame stemming from what he was coerced into doing to his younger brother. Indeed, the defendant's heinous crimes against these children may have severe negative consequences that last for years or even a lifetime.

B.        History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)

The defendant's criminal activity was not limited to the crimes listed in this indictment. Rather, he had been abusing multiple children for years and was preying on other local minor boys during the same time period.

A clinical summary provided by the defense indicates that at age 15, Jordan was continuing to access the dark web to view sexually explicit and abusive behavior involving children. (D.E. 98.5: Defense Exhibit 6, pg. 1.) The report noted that Jordan was "manipulative and very shrewd in continuing to access the internet both at school and at home," that he was not compliant with treatment, and that he was engaging in deceptive behavior. (*Id.*)

When Jordan was 16 years old, he was caught uploading child sexual abuse images and videos of prepubescent boys to the internet. In an interview with law enforcement officer, he admitted he had been watching CSAM at home and school. (PSR ¶ 66).

6

After he turned 17, law enforcement received a report that Jordan had convinced two brother (ages 8 and 12) from another state to send him videos of sitting on each other's faces. He also had met them through an online video game and directed them to a social medial website, where he promised them money, an Xbox, new phones, and girlfriends in exchange for the videos. He was convicted as a juvenile of sexual exploitation of a minor and ordered into state custody. (*Id.*)

Once in state custody, Jordan was sent to a residential treatment program, but and due to inappropriate sexual behavior while there, he was referred to Hermitage Hall, a residential care facility for juvenile sex offenders. (D.E. 98.5: Defense Exhibit 5, pg. 1.) While at the new facility, the defendant admitted to having additional unknown victims yet he continued to act out sexually, focusing primarily on manipulating the younger residents into engaging in sexual acts with him. (*Id.*) In preparation for his release from the facility, a psychologist at Hermitage Hall performed a psychosexual evaluation that was dated just days before his 18th birthday. (*Id.*) The psychologist found that the defendant was at high risk for re-offense, which is consistent with his continuing his criminal sexual behavior. (*Id.*; PSR ¶ 82(b).) The psychologist further noted that the defendant continued to have obsessive thought related to the abuse of young children, that he refused to take responsibility for actions, and that he characterized himself as the victim. (PSR ¶ 82(b).) Before the end of the year, the defendant continued to perpetrate on young minors, including the conduct that lead to the instant case, thus supporting the evaluation that he is at high risk for re-offending.[1]

While the defendant was terrorizing the three victims in the instant case, multiple referrals related to Jordan's sexual abuse of local minor boys were made to local law enforcement in the fall of 2019 (listed in chronological order): the Tennessee Bureau of Investigation (TBI) received

---

[1] While the defense has questioned the validity of this evaluation, the government is unaware of any updated psychosexual evaluation that finds otherwise.

information that the defendant solicited sex from a 14-year-old boy in exchange for $800; the Wilson County Sheriff's Office received information from a 16-year old boy who had received screenshots from another minor boy related to the defendant's payment to other minors for child sexual abuse material (CSAM); the TBI received information that a 17-year old boy received screenshots indicating that the defendant was willing to pay for CSAM videos. (PSR ¶¶ 9-11.) During this time, the TBI learned that the defendant also had reached out to one of two brothers in Pennsylvania whom he had victimized a year earlier. (PSR ¶¶ 12, 61.) In November and December of 2019, local law enforcement officers identified at least 8 minor victims or potential victims.

The defendant clearly knew that what he was doing was wrong. For example, he continued to hide his activities from his parents and acquire additional electronics that they were unaware of. (D.E. 98: Exhibit 6, 11.) Additionally, when law enforcement officers arrived at his home with a search warrant and complaint, Jordan saw them and fled. An officer had to chase him for four blocks to catch him. The defendant also has been convicted of a sex crime on the eve of adulthood, fired from a job after complaints from workers, placed into therapy, and sent to treatment for inappropriate sexual behavior. This history makes clear that the defendant knew he was not supposed to sexually exploit children. Yet he continued to engage in this extremely harmful activity.

With regard to the defendant's speculation that he witnessed or experienced prior abuse, there is no concrete evidence that the defendant had such experiences. The PSR reflects that the defendant told someone on Instagram that he had been sexually abused. (PSR ¶ 75, fn. 3.) More specifically, he claimed in an Instagram chat (provided by the defense but not attached to the sentencing memorandum) that he had been raped as a baby before he was adopted (at age 11 months) and that he had found a video of that. This statement stretches credibility since it is

8

unlikely he would have found a video of something that happened to him prior to his adoption when he was in foster care. In addition to this incredulous claim, the defense point his statement to his therapist that "I do think something did happen to me when I was a baby," as indication he was sexually abused. (PSR ¶ 75, fn. 3.) And finally, the defense insinuates that alleged sexual abuse of a family member by a much older family member could have influenced Jordan's behavior. The bottom line is that there is no definitive evidence that Jordan was sexually abused or witnessed it other than through pornography that he found on the internet. As such, these claims should be viewed with skepticism.

Moreover, while it is unfortunate and unfair that this defendant was bullied about his sexuality, race, and adoptive status, what he did to these three boys is significantly worse than his own experiences. Indeed, he bullied, frightened, and terrorized these minor boys to engage in humiliating and painful sexual activity so often that they produced over 391 videos for him before he was detected by law enforcement.

In contrast to many defendants before this Court and others, Jordan grew up in with loving adoptive parents who sought to help him through all difficulties he had experienced. It is possible that in the first eleven months of his life, before his parents adopted him and while he was in foster care, that he did not have the same kind of loving home as he did after his adoption. (*See* PSR ¶ 73.) Indeed, the defendant "declared that he had a stable childhood, and there was no abuse inflicted on him or present in the home," as verified by his mother. (PSR ¶ 75.) Indeed, the defendant's parents continue to support him today.

The government acknowledges that the defendant has mitigating factors, including (high functioning) autism, a low average IQ, and mental health issues. (PSR ¶¶ 79, 80, 82). The defense provided much of this information and more to the government early on in the case. Based on this

9

information and after much negotiation, the government considered these factors, as well as the defendant's age, and agreed to limit the defendant's exposure to the statutory maximum of a single count by agreeing to dismiss the remaining counts at sentencing.

But while the defendant's deficits act as mitigation to an extent, these conditions have not prevented the defendant from completing high school and some college classes before his arrest. (PSR ¶¶ 87, 88.) He also is capable of working. (PSR ¶ 89.) And he is able to manipulate children easily, deceive family members, and navigate the internet, and he remains at high risk of reoffending sexually against children. (D.E. 98: Exhibit 6, 11.) If, as suggested by the defense, these deficits contributed to the defendant's having committed these heinous crimes against vulnerable young boys or that he does not have control over his behavior, then mitigating circumstances also represent the reason that Jordan is and will continue to be such a high risk to the community. These kinds of deficits should not be seen as a blank check allowing someone to commit hideous crimes against vulnerable children.

C. <u>Need to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment</u>, 18 U.S.C. § 3553(a)(2)(A)

A sentence of 180 months imprisonment, as suggested by the defendant, simply will not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense. While a mandatory minimum sentence might be appropriate in some cases, it is not appropriate for an individual who terrorized young boys repeatedly, forced the boys to produce nearly 400 videos of sexually explicit activity even when the boys begged him to stop, sold some of those videos online, and negatively affected the boys' family relationships. Furthermore, this defendant has not shown remorse for earlier criminal activity, as shown by his refusal to take responsibility and characterization of himself as the victim. A sentence of at or close to the statutory maximum (360 months) on the single count would therefore be both reasonable and

appropriate—"just punishment" in the terms of § 3553(a)—given the lifelong consequences that these victims will likely experience due to the defendant's reprehensible acts. Such a sentence would protect the public for at least the time the defendant is incarcerated.

D.    Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B)

Given that collection of child exploitation material has become so prevalent, it is imperative that a sentence be imposed for the *production* of sexually explicit material that will afford adequate deterrence to such criminal conduct and will promote future lawful conduct, pursuant to 18 U.S.C. § 3553(a)(2)(B), generally and for the defendant. Indeed, Congress, the Supreme Court, and the Sentencing Commission believe that general deterrence is a very important factor when considering an appropriate sentence for offenders who possess and/or trade child pornography. *United States v. Irey*, 612 F.3d 1160, 1210-11 (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982); *Osbourne v. Ohio*, 495 U.S. 103, 109-10 (1990) (holding that "[i]t is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (stating that "[t]ransporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it."); *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) (noting that "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced").

In *United States v. Bistline*, the Sixth Circuit reversed the district court for failing to see any importance in general deterrence for a defendant who had collected child pornography. 665 F.3d 758, 767 (6th Cir. 2012). The district court in that case had stated that "general deterrence . . . will have little [if] anything to do with this particular case." *Id.* The Sixth Circuit found that the district court's statement was "inexplicable and in any even conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'" *Id.* (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)). See also *United States v. Demma*, 948 F.3d 722, 732 (6th Cir. 2020) (holding that the statutory factor of general deterrence is crucial in determining a sentence for a child pornography offender).

The need for deterrence in production cases is even greater, given the enormous, potentially life-long harm to children who have been victimized in this way and whose images and videos of their sexual abuse are permanently on the internet. The Sixth Circuit also has recognized the need for individual and general deterrence in production cases. *See, for example, United States v. Goodin*, No. 19-3554, 2020 WL 2768860, at *4 (6th Cir. May 28, 2020); *United States v. Easterling*, No. 19-1109, 2020 WL 2037226, at *4 (6th Cir. Apr. 28, 2020).

Both specific and general deterrence call for a significant sentence above the mandatory minimum to send a message that engaging in repeated sexual abuse of children that causes extensive harm, and producing visual depictions of that abuse, will result in a lengthy federal prison term. This defendant terrorized three boys for his own sexual gratification and financial gain. Under these circumstances, it is important that the sentence in this case provide a deterrent for *this* defendant. Additionally, a sentence of at or close to the statutory maximum would provide a generic deterrence by sending a strong message to the community that terrorizing young children into recording sexual abuse of themselves will be punished harshly.

E.  Protect the Public from Further Crimes of Defendant, 18 U.S.C. § 3553(a)(2)(C)

The public has a right to be protected from this defendant who has demonstrated an unequivocal desire to manipulate and terrorize minor boys into producing or engaging in sexual activity. The reports provided by the defense all indicate that the defendant has difficulty controlling his urges and has been unable to refrain from engaging with minors. At least one of the reports indicates that the defendant is at high risk for re-offending. And his repeat record of abusing children is likely representative of the dangers the public will face when this defendant is released.

F.  Kinds of Sentences and the Sentencing Guideline Range, 18 U.S.C. § 3553(a)(4)(A)

In determining the appropriate sentence, pursuant to 18 U.S.C. § 3553(a)(4), this Court must also consider the advisory sentencing guideline range. The defendant's total offense level is 53, which is treated as level 43 pursuant to U.S.S.G. §5A. With a criminal history category of I, the resulting advisory guideline range is life, although it is limited by the statutory maximum for the single count of conviction is 360 months. Given that the sentencing guideline is life and the government has elected to dismiss all but one charge due to the defendant's health issues, a sentence of 360 months is already a significant departure from both the guideline sentence and the statutory maximum sentence for the multiple crimes to which the defendant has admitted.

G.  Disparity in Sentencing, 18 U.S.C. § 3553(a)(6)

Congress has determined that 180 months is the minimum sentence for someone who has sexually exploited a child. The guideline calculations often advise that a sentence above the mandatory minimum should be considered. This mandatory minimum sentence is the lowest sentence for production of CSAM and should be reserved for the least egregious production cases. For example, in this district, one defendant pleaded guilty of attempted production when he solicited sexually explicit images from a 16 year old minor in a different state; he received the

mandatory minimum of 180 months. (See *United States v. Kenneth Smith*, Case # 3:10-cr-00195.) Another defendant surreptitiously recorded mature teenagers engaged in consensual sexual activity with each other; he also received the mandatory minimum sentence of 180 months. (See *United States v. Louis Levine*, Case # 3:09-00125). This is not that kind of case. This defendant may not have touched these minor boys who lived in a different state, but he directed one boy to rape his younger brother repeatedly. And he was able to terrorize the boys for months and did so even knowing that they were suffering, both from the forced sexual activity and the content of the threats. And then he sold the videos for profit. Nor is this isolated criminal conduct: this defendant had abused many other minors for years and terrorized the minors in this case hundreds of times to get these videos. The boys are likely to have life long consequences from the trauma they have experienced. Even with his mitigating circumstances, this defendant does not deserve to get the minimum sentence. Indeed, a sentence of 180 months would create disparity.

The defendant cites a case out of the Northern District of Illinois in urging this Court to impose the minimum sentence, arguing that the circumstances are similar. Having reviewed the sentencing transcript, the government submits there are many more aggravating factors in the case at hand. (See D.E. 95.1: Sentencing Transcript in *United States v. Jeremiah Harris*.) While the young men were similar in age and both had families unaccepting of their sexuality, many facts set the cases apart. Unlike Harris, Jordan has aggravating factors that make his criminal activity more egregious. For example, Jordan has been caught sexually abusing boys numerous times over many years; he has been convicted of a sex crime; he misrepresented himself to these boys; he frequently threatened his victims with severe violence in order to control them; he forced a barely pubescent boy to rape his younger prepubescent brother repeatedly and violently; and he sold videos that he forced these victims to record. Harris had several additional mitigating factors in his

14

favor: he had never been charged with a sex crime previously; he had been sexually and physically abused throughout his childhood, sometimes severely; he had lost his mother at age 16; he had had a close but abnormal relationship with his mother; and he had lived in poverty and was essentially homeless until after his mother died. Although Harris' actions were egregious, he didn't brutalize his victims. Jordan's argument that the cases are similar fails.

H. <u>Need to Provide Restitution to Victims of Offense</u>, 18 U.S.C. § 3553(a)(7)

The government is asking for restitution in this case to ensure the victims receive future counseling services for the trauma resulting from the defendant's repeatedly terrorizing them into making hundreds of videos, many of which show the older brother raping his younger brother, as well as visible suffering. The Sexual Assault Center estimates that the cost of counseling for one year in Nashville is $10,800.[2] The two brothers whose parents have requested restitution have already struggled as a result of this trauma and likely will struggle at different periods in their life for many years to come. Thus, the government is requesting three years' worth of counseling for each boy, which results in a total of $64,800.

In *United States v. Kearney,* the First Circuit Court found that Congress made clear that restitution is "mandatory" "for any offense under" Chapter 110, which includes the provisions of 18 U.S.C. § 2251, criminalizing production of CSAM. 672 F.3d 81, 99 (1st Cir. 2012). Costs include but are not limited to medical and psychiatric services, therapy, rehabilitation, transportation, housing, child-care expenses, lost income, and attorney fees. 18 U.S.C. § 2259(b)(3) (2012). As the Supreme Court pointed out in *Paroline v. United States,* mandatory restitution under § 2259 — when properly interpreted — does not violate the Eighth Amendment's excessive-fines clause. 572 U.S. 434, 455-56, 134 S.Ct. 1710. Additionally, there is a retributive

---

[2] The victims live in a much larger metropolitan area, so the cost for therapy likely exceed this yearly amount.

aspect to restitution when it is mandated regardless of the defendant's ability to pay, as mandated by the mandatory restitution statutes. *United States v. Hardy*, 707 F. Supp. 2d 597, 603 (W.D. Pa. 2010).

## **CONCLUSION**

The United States submits that consideration of the factors under 18 U.S.C. § 3553(a) supports a sentence significantly higher than the mandatory minimum of 180 months suggested by the defendant. The sentence must be based on the serious nature of these crimes, the defendant's history and characteristics, the need to reflect the seriousness of the crime and promote respect for the law, the need to protect the public from future crimes of the defendant, and the need to avoid disparity among offenders in this district. The defendant has already received a significant break by having a limited statutory exposure of 360 months. Even the maximum sentence is a huge departure from the advisory guideline range of life. While the mitigating factors in this case do not support a life sentence, the aggravating factors support a sentence well above the mandatory minimum. To depart or vary the sentence even further would not achieve the goals of sentencing. The defendant was not corralled into this crime by a series of unfortunate life circumstances. Rather, he chose his path. His sentence should reflect those facts.

Respectfully submitted,

HENRY C. LEVENTIS
United States Attorney for the
Middle District of Tennessee

s/ S. Carran Daughtrey
S. CARRAN DAUGHTREY
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, Tennessee 37203
Telephone: (615) 736-5151

16

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing will be served electronically via CM/ECF to Kathleen Morris and Jodi Bell, counsel for the defendant, on June 30, 2023.

s/ S. Carran Daughtrey<br>S. CARRAN DAUGHTREY